1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,      )
                               )
                               )
          Plaintiff,           )
                               )
     vs.                       )   Case No. 09-CR-43-SPF-2
                               )
                               )
OSCAR AMOS STILLEY,            )
                               )
          Defendant.           )

* * * * *

**TRANSCRIPT OF PROCEEDINGS
NOVEMBER 13, 2024
BEFORE THE HONORABLE STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE
FINAL REVOCATION OF SUPERVISED RELEASE & SENTENCING
VOLUME I**

* * * * *

**APPEARANCES:**

**FOR THE PLAINTIFF:**
    MR. CHARLES A. O'REILLY, Attorney at Law
    U.S. Department of Justice, Tax Division
    150 M Street, Room 2.404
    Washington, DC  20002

**FOR THE DEFENDANT:**
    MR. OSCAR AMOS STILLEY, Pro Se
    MR. TREVOR L. REYNOLDS, Attorney at Law
    1700 Southwest Boulevard
    Tulsa, Oklahoma  74107


REPORTED BY:    Jennifer Golemboski, CSR, RPR, RMR
                Official Shorthand Reporter
                Northern District of Oklahoma
                Tulsa, Oklahoma  74103

U.S. District Court
Northern District of Oklahoma

2

**INDEX**
**VOLUME I**

PAGE

APPEARANCES                                                    1


WITNESSES CALLED BY THE GOVERNMENT:

PATTI RUSH
     DIRECT BY MR. O'REILLY . . . . . . . . . . . . . . . . . 20
     CROSS BY MR. STILLEY  . . . . . . . . . . . . . . . . . 36

RYAN FORSYTH
     DIRECT BY MR. O'REILLY . . . . . . . . . . . . . . . . . 55

U.S. District Court
Northern District of Oklahoma

**P R O C E E D I N G S**

NOVEMBER 13, 2024, VOLUME I:

THE DEPUTY COURT CLERK:  Call Case No. 09-CR-43-SPF-Defendant 2, *United States of America vs. Oscar Amos Stilley*.

Counsel, make your appearance for the record.

MR. O'REILLY:  Charles O'Reilly for the United States, Your Honor.

MR. STILLEY:  Oscar Stilley appearing pro se, Your Honor.

THE COURT:  Very well.  Let me address one preliminary matter.  And I suppose there are more -- there's more than one matter that we should probably treat as being preliminary, and I'm not positive as to what would be the preferred order in which to address preliminary matters.

But let me address one matter at this point, and that is, Mr. Stilley, one of your recently-filed motions relayed -- asked the Court to re-appoint Robert Burton as standby counsel. That, for reasons indicated in my order that was entered on November 7th, is not feasible.  But, nevertheless, in that same order, I stated that if -- in substance, that if you could prevail on Mr. Burton to sit with you at the table, although not making an appearance and although not being compensated from public funds, that that would be permissible.

And I note that you're at the table alone so I take it whatever the situation is with that, that that did not pan out.

MR. O'REILLY:  Mr. Burton has passed away, Your Honor.

THE COURT:  Oh, okay.  Well --

MR. O'REILLY:  We learned that just yesterday.

THE COURT:  -- that settles that.  I'm surely sorry to hear that.

Point number two with respect to representation, I'm advised that we do have a panel attorney versed in federal criminal practice who is available as standby counsel.  A prerequisite to that is your signing a financial affidavit to justify the appointment of a panel -- a CJA panel attorney as standby counsel.  And if you are -- if you're willing to -- to proceed on that basis, Mr. Stilley, I would certainly be happy to appoint standby counsel.

I certainly recognize, and have recognized now going back a decade and a half, your desire to represent yourself pro se, and that is your right.  But nevertheless, I would be willing to appoint standby counsel to consult with you if you so desire and are willing to sign a financial affidavit to support the appointment of standby counsel at public expense.

So, Mr. Stilley, what would be your desire on that score?

MR. STILLEY:  Thank you very much, Your Honor.  And I appreciate this mightily.  I would like to do that.  I will need to plead the Fifth on a question or two that you'll see that it's a valid plea of the Fifth Amendment, but I would be glad to fill that out for you.  I would ask for --

THE COURT: If you would, please, work from the lectern. I can hear you better from the lectern.

MR. STILLEY: Sure. Thank you, Your Honor.

Your Honor, if it pleases the Court, I would like to get everything together for you and do a proper job of this and submit it. If anything is wrong, I mean, I would like a ruling from you because I want to do it right and first class according to the law. Excuse me. And what I would request is 30 days so that we could get everything put together, make sure you're satisfied, and appear here ready to -- to do the hearing, the trial as it might be.

THE COURT: Well, the delay -- if I hear you're asking for a delay, a delay is not available. So that request is denied.

Now, do I understand you to be saying that you would invoke your Fifth Amendment right and refrain from putting any substantive information in a -- an affidavit to support the appointment of standby counsel at public expense? Am I to understand that you would decline to provide substantive information in that affidavit?

MR. STILLEY: No, that's not correct, Your Honor. Let me explain, if it pleases the Court.

One of the rules is that I'm not allowed to possess cash, so if I put down cash I just confessed to a -- to an infamous crime that carries up to two years in prison, so I don't want

to answer that question.  I am perfectly willing to tell you, and I can tell you right here, that I've got roughly $1,000 in my bank account.  I have no other liquid assets that would arguably support hiring an attorney.  If that much information is satisfactory to you, I could -- I could fill that out and -- and submit that.  That really shouldn't take long for the submission.

THE COURT:  So as to what aspect of a financial affidavit would you invoke your Fifth Amendment right against self-incrimination?

MR. STILLEY:  Well, they asked about other assets and -- and, like I said, possession of cash is forbidden.  This Court has said deposit all the cash.  So --

THE COURT:  Excuse me just a minute.

Pam, do we have -- do we have one of those affidavits handy?  This is actually not the affidavit form.  This is the appointment form.  Do we have an affidavit -- one of those form affidavits handy?

THE DEPUTY COURT CLERK:  Not handy.  Let me find one.

THE COURT:  Standby for just a moment, please.

Mr. Stilley, the affidavit that would be required, it's CJA-23.  It requires you to disclose your property consisting of home, vehicles, boats, stocks, bonds, and other property in addition to disclosing your liquid assets.  It also requires you to disclose the items that add up to your monthly expenses.

And I don't believe that I'm authorized, and in any event would not be inclined, to appoint counsel without an adequate factual basis for the determination of your eligibility.

And so returning now to -- for instance, to the property part of that affidavit, would you be willing to fill out an affidavit that provides your estimation of the value of those -- your property in those categories, or is that a matter as to which you would invoke your Fifth Amendment right against self-incrimination?

MR. STILLEY:  I have absolutely no problem with telling you how much is in that account because I've just got one account.  Actually, there might be one that might have $20 in it that I just didn't bother with.

THE COURT:  I'm not talking about your liquid assets.  I'm talking about the property section of the affidavit.  Would you be -- would you fill out truthfully the property section of the affidavit?

MR. STILLEY:  As long as I can exclude any answer about cash, I'm happy to because that's just --

THE COURT:  Any answer about what?

MR. STILLEY:  Cash.

THE COURT:  About cash?

MR. STILLEY:  Right, because there's a special condition that says all cash has to be deposited, so I don't want to confess to a crime.  So if I can tell you about -- I'll

just go ahead and say it.  I don't have a home.  I do have a car.  I can tell you about that, about what it's worth.  No boat, no stocks, no bonds.  Other property basically is things like computer, printer, just a basic personalty that doesn't amount to very much at all and has very little liquidation value.  So if I can plead the Fifth to the one thing that could -- could be assigned as a crime, I'm happy to do the rest of it.

THE COURT:  And would you be willing also to provide your estimation of those monthly expenses as set forth in the affidavit recognizing obviously that you don't have all of your records here so this would simply have to be estimates.  Would you be willing to provide that?

MR. STILLEY:  I would be more than happy to provide that.  Now, I'll admit that I've been unemployed for six months so when I put some of these things down here like the rent and stuff like that, I'm not claiming that I'm current on rent, but that's -- that's the expense.  I'd be glad to put that down.

THE COURT:  Very well.  If -- I'm going to inquire of Mr. O'Reilly momentarily, but my inclination is I want to get to our mid-morning recess to have you fill out this affidavit, as you have told me that you will do; and on the assumption that you will, in fact, do that, I'm prepared to appoint standby counsel immediately unless the government would suggest otherwise.

9

MR. O'REILLY:  No, Your Honor.  I would mention Mr. Stilley's reading of having to deposit all cash as a term of supervision is not one that I read from his conditions.  He must deposit all income, not all cash.  But that being said, the government has no objection.

THE COURT:  Very well.

And, Pam, I understand we do have standby counsel available?

THE DEPUTY COURT CLERK:  Yes.  Mr. Reynolds is in the gallery.

THE COURT:  Say that name again.

THE DEPUTY COURT CLERK:  Mr. Reynolds, Trevor Reynolds, is in the gallery.

THE COURT:  Mr. Reynolds.

Mr. Reynolds, if you'll please come forward.

MR. STILLEY:  Your Honor, I have just one more question, if it pleases the Court.

THE COURT:  Bear with me just a moment.

MR. STILLEY:  Sure.

THE COURT:  Mr. Reynolds, number one, I sincerely appreciate your availability this morning.  It is not only a service to Mr. Stilley, it is a service to all concerned.  And without belaboring the point, I certainly do appreciate your availability this morning.

And you are now appointed as the standby counsel to consult

10

as-needed with Mr. Stilley.  You are not -- neither expected nor required to speak, if you will, as you would in a normal attorney-client situation, in open court, but you are certainly welcome and expected to sit at the table with Mr. Stilley and provide whatever consultation he may require here that is appropriate in your estimation.

So do you have any questions about the scope and purpose of your appointment?

MR. REYNOLDS:  I do not, Your Honor.  I will let the Court know, however, that I don't know how long this is intending to go today.  I do have an initial appearance on a superseding indictment at 2:00 at the other courthouse.  So if it would be possible to maybe take the afternoon break, if we need to, at that time, that would be good for me.

THE COURT:  Please remind me of that at the appropriate time, and I suspect we can certainly accommodate that.

MR. REYNOLDS:  Okay.  Thank you, Your Honor.

THE COURT:  Very well.  And so you may be seated at counsel table.

And, Mr. Stilley, you said there was one other matter you wanted to address at this point.

MR. STILLEY:  Yes.  Excuse me.

Yes, Your Honor.  If you don't mind, just kind of an administrative, technical detail.  By filling this out, can I

also get a declaration of indigency so when the -- the transcript is ordered and the filing fee is -- comes due, that that that is taken care of as indigent?

THE COURT: I'm not prepared to make that factual finding at this point. But on an appropriate motion at the appropriate time, if necessary, I will certainly be happy to address that.

MR. STILLEY: Oh, okay, Your Honor. Would, like, at the end of the hearing -- and, of course, I'm hoping that I don't get convicted. But at the end of the hearing, would that be appropriate at that time?

THE COURT: I doubt that I will be inclined to address that at the end of the hearing. And -- but if you file a motion -- again, in the event that that is a relevant matter. I'm not going to presuppose any outcome today. But in the event that that's a relevant matter, you can certainly file an appropriate motion to get that form of relief so that you can get a transcript. You may be seated.

MR. STILLEY: Thank you, Your Honor.

THE COURT: We have some other preliminary matters that I'll address now. I think that the one preliminary matter that is antecedent to anything else would be the motion filed, I'm told, late yesterday, docket entry number 815, a motion to disqualify me as the presiding judge in this matter. And that motion is filed under 28 U.S.C. Section 455.

12

It appears to some degree to be -- and this is not intended as a criticism necessarily, but it appears certainly to some degree to be a stream of consciousness sort of document. It states that, "Judge Friot is knowingly protecting and facilitating an embezzlement scheme." And that scheme is, "Being used to steal from the U.S. Treasury and also from the payors of criminal restitution."

Interestingly, it refers on the second -- on the third page to an order in which I thought I was going the extra mile to cut Mr. Stilley some slack and make life more livable with respect to his payment of restitution installments. It then proceeds to comment at some length on other matters that, to me at least, seem to be essentially unrelated to this matter. And then at the bottom of page 9, it poses the question: What does Stephen P. Friot stand to gain by sending Stilley to prison? And it refers to six numbered allegations on page 10.

I have certainly reviewed every one of those with the criteria of Section 455 in mind. My conclusion, quite readily, is, first of all, that I have no extra judicial bias of any kind in this case. All my thoughts about this case are derived, if you will, from the four corners of this case, including my experience in this case going back about 15 years. But I certainly have no source of extra judicial bias in this case, nor within the four corners of this case have I developed any bias of any kind contemplated by Section 455.

I have no personal interest in any aspect of the case, including restitution, contrary to one possible interpretation of the assertions in the motion. And I have no personal knowledge of disputed evidentiary facts. On that score, we do have the petition that was filed, which I'm going to get to here momentarily, as well as exhibits to the petition that -- that were filed on October 30th. I have reviewed those matters. But, again, I have no personal knowledge of disputed evidentiary facts. If there are matters in those exhibits that are undermined by the evidence today, then they will be undermined by the evidence today.

So having carefully considered this late-filed motion, I conclude quite readily that 28 U.S.C. Section 455 does not by any stretch require that I disqualify from further proceedings in this matter.

We also had filed on November 4th at docket entry 803 a motion for an initial appearance. That motion was denied by the order at docket entry number 807 entered on November 5th.

We have the motion to re-appoint Robert Burton, which I will certainly deny. Mr. Burton, I am now told, is deceased, and we have otherwise addressed those concerns by the appointment of Mr. Reynolds and so that -- that motion will be denied as moot.

We have a motion to vacate, docket number 752. That motion was filed on November 4th at docket entry number 805. I had

carefully reviewed that motion and find no basis in the motion for granting the relief sought in the motion. So the motion at docket entry number 805 is denied.

We have a motion for a true and correct record. Also -- well, that one was filed on November 5th at docket entry number 808. I have thoroughly reviewed that motion. I find it to be wholly without merit. It is denied.

We have a motion to vacate docket number 338 filed on November 5th at docket entry number 809. That is a motion to vacate, as I have said, docket 338, which is the April 28th, 2010, judgment and commitment. I have thoroughly reviewed that motion. For the most part, it covers matters that have previous -- previously been addressed by this and the Court of Appeals at some length, and I find that motion likewise to be without merit. For that reason, those preliminary motions are denied.

We do have -- and everyone should understand that we're here on the basis of the petition filed on October 1st and supplemented on October 30th. The petition as filed on October 1st asserts nine numbered violations of the conditions of supervised release. I do have, and have thoroughly reviewed, Mr. Stilley's response to the petition, that response having been filed on November 5th. And I have likewise received and thoroughly reviewed the government's memorandum as filed on November 10th at docket entry number 814.

So having covered all of those preliminary matters, I hope having framed the matters before the Court this morning -- excuse me, for the benefit of all concerned, I am first going to invite Mr. O'Reilly to the lectern to give me a very concise overview of your intended presentation.  And when I say concise, I'm thinking in terms of -- I'll start getting kind of antsy if you take more than about five minutes.

MR. O'REILLY:  I assure you, it will be less than five minutes, Your Honor.

Very quickly, I may have missed it.  Did the Court address Mr. Stilley's motion for -- to dismiss for lack of venue?

THE COURT:  Well, I don't remember mentioning that, but I do remember the motion.  Let me --

MR. O'REILLY:  Docket number 810, Your Honor.

THE COURT:  I thank you for mentioning that.  That is a motion to dismiss for lack of venue at docket entry number 810.  I have likewise thoroughly reviewed that motion.  That raises matters, for the most part, if not entirely, that have also been thoroughly addressed in previous proceedings, and that motion is denied.  And so I believe that does cover all of the preliminary matters.  Mr. O'Reilly, you may proceed.

MR. O'REILLY:  Thank you, Your Honor.

Yes, the government will be presenting two witnesses.  The first witness will be Mr. Stilley's former employer, Ms. Patti Rush, at REVAMP.  The second will be probation officer Mr. Ryan

Forsyth.  And we will go through and establish each of the allegations contained in the petition.

We've -- the exhibits will consist of the exhibits already provided to the Court by probation, Exhibit 92 and 802, as well as some materials received from the State of Arkansas consisting of Special Master's transcript with findings -- the findings thereof and a copy of the voter registration form completed by Mr. Stilley.

THE COURT:  Very well.

Mr. Stilley, my inquiry of Mr. O'Reilly has been satisfied. That is obviously not in the nature of an opening statement. For that reason, I'm not going to invite you to make an opening statement because all I wanted was an overview of who he might be calling and what he might intend to cover.

So with that, Mr. O'Reilly, you may -- you may call your first witness.

MR. O'REILLY:  Thank you, Your Honor.

MR. STILLEY:  Your Honor, may I just be -- have a couple of motions at the lectern?

THE COURT:  Please come to the lectern.

MR. STILLEY:  Thank you.

Judge, number one, Mr. O'Reilly was kind enough to bring up the issue of the venue motion, and clearly every single thing that I'm accused of, Oscar Stilley's accused of, happened somewhere else; mostly, if not solely, in the Western District

of Arkansas.  I would move for a change of venue to put it over there to be closer to witnesses, closer to -- and it complies with the Constitution.

The Constitution's Sixth Amendment says that's where venue is, is where the offense occurred.  And this Court has already, in the past, sua sponte transferred this case to another district.  It was the Western District of Oklahoma.  But it's very easy for this Court to just transfer it over there, much easier for all parties.  And I would like to know what the Court would say about that.

THE COURT:  Well, I -- again, on that transfer to the Western District, as soon as I was made aware that you saw problems with that, I immediately re-transferred the case back to this district.  But venue is appropriately laid in this matter in this district; and for that reason, that motion is denied.

As an additional ground, I would have to say that it also comes far too late.  Everybody's here.  People have traveled here from Arkansas, and you're not the only one who has traveled here from Arkansas.  And the motion, by any standard, comes too late.  But on its merits, it is likewise denied as being wholly without merit.

Do you have any -- you said you had a couple of motions.

MR. STILLEY:  Yes.  Yes, Your Honor.

Thank you, Judge.  I will do one -- I do need to inquire if

this Court has instructed Mr. O'Reilly that he didn't have to respond to the motions, because all those motions are defaulted. They're defaulted. There's nothing in the record that said he had permission not to respond. Due process says I'm entitled to see that. If he's going to -- if he's going to oppose it, he needs to say his reasons. So I need to find out if there was communications that I haven't been informed of.

THE COURT: Mr. Stilley, as a procedural matter, you are incorrect. A trial court, specifically a Federal District Court, does have the authority to deny a motion which is, on its face, without merit, and that is what I have done. You may be seated.

MR. STILLEY: Your Honor, that does not answer the question of whether there were communications with Mr. O'Reilly. Can I ask that and get an answer to that, whether there were communications?

THE COURT: Mr. Stilley, you will be seated.

MR. STILLEY: So I'm not going to get that answer?

THE COURT: I have not had communications with Mr. O'Reilly.

MR. STILLEY: Okay. I do have -- okay, you have not had. Has somebody else in your office had a communication?

THE COURT: Mr. Stilley, you are directed to be seated at the table.

MR. STILLEY: I do have -- I told you I had multiple

motions.  I do have one -- I have just now today found out where this proceeding is going to be.  I didn't know.  I had a very meritorious motion for -- to dismiss, and I also asked for such other and further relief as may be appropriate whether or not specifically prayed, which would be -- include a transfer.  So I didn't know until today.  I have not had any chance to get my witnesses together and to be able to present my side of the case.

Could I get 30 days so that I can have a chance to work with my standby counsel and get everybody subpoenaed here so that we can -- we can have a proper, contested criminal trial?

THE COURT:  Mr. Stilley, you have known about this matter for several weeks.  You have known about this setting for quite some time.  And you have also known about your alternatives in terms of getting witnesses here at public expense, getting counsel at public expense, and so forth.  That request is denied.  You --

MR. STILLEY:  Your Honor, may I -- may I point out that I have had no assistance of counsel -- up to this point in time to today, I've had zero assistance of counsel, which is a constitutional requirement.  And I'm most grateful that the Court has provided it, but I need just a little time.

THE COURT:  Mr. Stilley, forgive the interruption.  You are directed to be seated at the counsel table.

MR. STILLEY:  Thank you, Judge.  Thank you, Your

Honor.

THE COURT:  The government will proceed.

MR. O'REILLY:  Thank you, Your Honor.

The United States calls Ms. Patti Rush.

THE DEPUTY COURT CLERK:  Please come forward and be sworn.  Please raise your right hand.

(Oath given.)

THE WITNESS:  Absolutely.

(Witness sworn.)

**PATTI RUSH,**

Having been called as a witness, after being first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. O'REILLY:**

Q.  Good morning.  Could you please state your full name and spell it for the court reporter?

A.  Yes.  My name is Patti, P-a-t-t-i, Rush, R-u-s-h.

Q.  Thank you very much.

MR. O'REILLY:  Before we begin, I would ask the Court to take judicial notice of the entire case, all the prior proceedings, exhibits, also the docket entries that have been filed.

THE COURT:  I think that would include the exhibits at docket entry number 802 that were filed on October 30th as -- as well as the original petition?

MR. O'REILLY:  Yes, Your Honor.

MR. STILLEY:  Your Honor, may I have a clarification of that?  My understanding is that the rules allow the consideration of the entire case from the first filing all the way on, and I have no objection to that.  Is that satisfactory?

THE COURT:  That is consistent with Mr. O'Reilly's request, and you are -- you are correct.  I certainly have the authority to judicially notice the entire record in this case including the recent filings, so that will be granted.

MR. O'REILLY:  Thank you, Your Honor.

MR. STILLEY:  Thank you, Judge.

Q.  (By Mr. O'Reilly) Again, good morning.

A.  Good morning.

Q.  Ms. Rush, could you tell us what do you do for a living?  What do you do for a living, for employment?

A.  I'm the president of a group called REVAMP.  It stands for Remember Every Victim and Missing Person in the U.S.

Q.  Where is that located?

A.  It's based of Fort Smith, Arkansas.

Q.  What does REVAMP do?

A.  We work Arkansas and Oklahoma.  We work cold case homicides and missing persons.  And when I say we work them, we -- we oversee searches; we work with OSBI, Oklahoma State Bureau of Investigation; we work with lots of agencies, city and county. We were recently involved in several searches and one

presented -- produced a body that had been missing for over 20 years. We -- we do a lot of things, but we advocate for the missing and murdered unsolved cases.

Q. Do -- does REVAMP handle or have people perform community service as part of their judgments in state --

A. No, sir.

Q. -- (cross-talk)?

(Stenographer clarification.)

Q. (By Mr. O'Reilly) As part of their state or federal convictions?

A. No, sir.

Q. Okay. Ms. Rush, this is a weird situation, but what you need to do is just wait until I'm done.

A. Okay.

Q. Because as good as she is, she can't get both of us.

A. And I talk fast. I'm sorry.

THE STENOGRAPHER: Slow down a little for me. Thank you.

Q. (By Mr. O'Reilly) If you talk too fast, she will tell you, just like she tells me.

What are your duties as the president of REVAMP?

A. As the president, I oversee the general operations, but mostly I advocate for the victim's families. Mostly I'm an advocate.

Q. How long have you been REVAMP's president?

A.   About six years.

Q.   Do you know an individual by the name of Mr. Oscar Stilley?

A.   Absolutely.

Q.   Do you see him in the courtroom today?

A.   I do.

Q.   Could you please point him out for the Court?

A.   Sure.  He's sitting right over there.

MR. O'REILLY:  Would the record reflect that Ms. Rush has pointed out the smiling gentleman?

THE COURT:  The record will so reflect.

Q.   (By Mr. O'Reilly) How is it you came to know Mr. Stilley?

A.   The first time that I met Mr. Stilley in person was at Jim Baier's house.  He owned a convenience store.  In 1979, there was a young woman that was kidnapped and murdered, and I had gone to interview him, and that's when I met Oscar Stilley.

Q.   Let me ask you this:  Can you -- do you know how to spell Mr. Baier's last name?

A.   B-a-i-r [sic], I believe.

Q.   Did you come to know Mr. Stilley in a different capacity?

A.   Eventually, he came to work for us.  I saw that he was a brilliant person, and I thought, you know, if he could put that good brilliance to use, that he would be a great asset to REVAMP.  And so we agreed to hire him with some stipulations. We hired him -- I can't remember the exact date that we hired him, but it was right after I met him at Mr. Baier's house.

24

He's worked for us a couple of years.  On January the 1st, I hired an executive director and our board hired --

Q.  One second.  First of all, January 1st of what year?

A.  Of this year.

Q.  All right.  Let's step back.  Approximately, not -- I don't need the exact date.  Approximately when did you -- you and REVAMP hire Mr. Stilley?

A.  I'm going to say it was about two years ago, two and a half years ago, from today's date.  So probably -- maybe the summer of 2022.

Q.  Okay.  What did you hire Mr. Stilley to do?

A.  To be the administrative assistant.

Q.  What duties did --

A.  Well, we didn't -- we didn't have an administrative assistant, but the main thing was to form our letters, because I'm not really good with emails, I'm not really good with the spoken word.  I can tell stories.  I can tell the truth.  I can tell interviews as they go, but emails and the written language is not my forte, and I thought Oscar would be great at it.  So that was the main thing, was for him to do the office stuff; emails, correspondence, that type of thing.

Q.  With respect to the emails and correspondence, with whom were these emails and correspondence?

A.  Sheriffs, chief of police, different agencies, different nonprofits.  Mostly we correspond a lot with the Bureau of

25

Investigation, the State of Arkansas, the cities, the counties, the states.  You know, most of communications with law enforcement or with the families.

Q.   The families of the missing, the victims?

A.   Correct.

Q.   Does REVAMP have much need for communication with people who are incarcerated?

A.   We don't have a huge need, but we did see that there were a lot of people incarcerated that did have some information, and we thought that -- we have -- one of our volunteers is a police officer here in central Oklahoma.  She had mentioned, and so had Oscar, that there were a lot of posters in the common area, and we thought that would be a great way to get leads on some of these cold cases because we -- we work really hard for our families.

And so we had decided that it would be good if we could reach some of these people that were witnesses or were associated with the crimes, if we could reach out to them, and that was the beginning.  And so what we did is when I talked to Ryan Forsyth, who was the probation officer, we made an agreement that we would have Oscar communicate with these people, but we would have a list and associate them with one of the cases that we justified as open, and we always have a current list of the cases that are open.

Q.   So could you briefly describe what were Mr. Stilley's

duties at REVAMP?

A.   His duties at REVAMP were to do mailings; to check our emails, dress up our emails, if needed; work on fundraising. Really, that was pretty much it.

Q.   Did Mr. Stilley have a responsibility to inform you or somebody at REVAMP if and when he was communicating with people who were incarcerated?

A.   Correct.  Yes.  That was one of the agreements that -- that I had with the probation officer and with -- with Oscar Stilley at the same time is that anybody that he communicated with, we would have a list of that person, where they were, and what case it was associated with.

Q.   How did you make that known to Mr. Stilley?

A.   I told him several times verbally.  It may have been in a couple of emails, but I know verbally.  And I'm not the only one.  My team coordinator also relayed that.  And Jeremy Bennett, our executive director that took over January 1st of 2024, he relayed that to him as well.

Q.   Did Mr. Stilley comply with the requirement to provide a list of names?

A.   The very first -- when he began working for us, he did eventually give us a list of people, but I don't know that he ever gave us a list after that.  We asked for it, but we -- we didn't receive it, and that was one of the reasons he was terminated.

27

Q.   Let me just step back a moment.

You're aware that Mr. Stilley had a prior revocation hearing, correct?

A.   Yes, sir.  I've attended -- this is the third one I've been to.

Q.   With respect to his employment, was he hired before or after the revocation hearing?

A.   Before.

Q.   Okay.  And when he came out after serving the three months, he resumed employment with REVAMP, correct?

A.   We gave him a leave of absence, yes, sir.

Q.   You mentioned that REVAMP terminated Mr. Stilley's employment, correct?

A.   Correct.  Say -- say that again.

Q.   You indicated -- did Mr. -- did REVAMP terminate Mr. Stilley's employment?

A.   Yes.

Q.   Why did REVAMP -- well, were you the person that made that decision?

A.   We all, as a board, made that decision.  We had a board meeting on April the 30th, and it was a unanimous decision to terminate him.

Jeremy Bennett called him immediately after that board meeting in the presence of the board and spoke with him and then sent him a letter on May 1st going back over everything

that was said.  So we terminated him the night of the 30th, but the actual letter went out May 1st.

Q.  Why did REVAMP terminate Mr. Stilley's employment?

A.  Well, we had about $3600 that we couldn't justify that was for REVAMP.  We had taken him off of the bank account April the 10th, I believe, and he had called me and asked me about doing a trust called -- it was a book that he was writing.  He wanted the proceeds from that book to go into the trust.  The trust would be attached to the REVAMP bank account.  I did not feel comfortable about it, so I told him that he needed to talk to Greg Murray, our treasurer.

So at the March -- or April board meeting.  At the April board meeting, Mr. Stilley was there.  He followed Greg outside.  I followed them out, and Greg and I both decided that that was a terrible, terrible idea.  We did not want anybody's trust attached to our bank accounts.  Nobody's.  And he argued with Greg.  He argued with me.  But it didn't happen.

And so that was just a multitude of things.  It was -- it was the -- Greg was having -- was -- was having a difficult time justifying some of the -- the purchases that were used with this debit card.  I had --

THE COURT:  Say that -- say that last part again.

A.  Our treasurer had some problems understanding the justification for some of the charges that were coming out of our accounts.

THE COURT: Okay. Go ahead.

A. And I don't think that -- and I'm -- I'm sure that Greg never got satisfied -- he was never satisfied with the -- any response that he ever did get, if he did get a response.

Q. (By Mr. O'Reilly) Let me ask you this: Are you aware of Mr. Stilley providing any detail about the expenses incurred on the debit card, the $3600?

A. No, he did give me a few -- he said that he needed postage, but he never told me really what for. He said that he needed a fax machine, which we have a fax at the office. Now, beginning -- early on, one of the agreements that we made is that all correspondence would go through the REVAMP office. So that kind of told me that there was a lot of correspondence that was not going through the REVAMP office if he needed postage -- you know, a lot of postage and fax machine.

There was a number of reasons. One -- the main reason that we terminated him was because we had asked for several items, and he did not respond to them. He --

Q. Let me ask this: What were the several items you asked for that he did not provide?

A. One was the list of the inmates that he was communicating with. I don't believe that we ever received that since the very -- very first of his employment.

Q. Were there any other items that you requested?

A. Another time is we had a case that was out of Mena,

Arkansas, and I asked him to gather all the information and his exact words to me is, "I don't do the grunt work."  I remember that, so -- I remember that clearly.  He'd always say, "I don't do the grunt work."  That was something that was required by all of us to gather the initial original case file.

Q.  Were there other requested tasks that Mr. Stilley either refused to or did not perform?

A.  The time card.  I think Jeremy had asked for a detail of the time card to justify his wages, because the original agreement was that as long as he had -- we had enough donations coming in to pay his wages, but there was many times that me and Greg would put in several hundred dollars to pay his wages.  And there was times that it just wasn't there in the operating funds for the wages, so we had asked for a justification of his -- of his employment, and we were not given that.

We were asked for a list of the inmates that he was contacting and communicating with to associate them with a case that we had currently open, and we were not given that.

The $3600.

There was a dispute at one time back in February.  I believe it was February of this year.  There was a new employee that was taken on as executive director, and there seemed to be a lot of an animosity between the two, and it just wasn't working.

Q.  Let me just ask you this just to be clear:  The animosity

was between --

A.   Oscar Stilley --

Q.   -- the individual --

THE STENOGRAPHER:  Okay, wait, wait.  You have to let him finish his question.  Thank you.

Please repeat.

Q.   (By Mr. O'Reilly) Okay.  Who was the animosity between?

A.   With Jeremy Bennett, our executive director.

Q.   And?

A.   And Oscar Stilley.

Q.   Did there come a point that Mr. Stilley -- I believe on April 23rd, did you and Mr. Bennett tell Mr. Stilley that you planned to terminate his employment if he didn't provide materials?

A.   Yes, sir.

Q.   Did Mr. Stilley -- did you give him a deadline?

A.   We gave him a deadline.

Q.   What was the deadline, if you recall?

A.   Five days.

Q.   Did Mr. Stilley provide that material?

A.   No, sir.

Q.   And when did REVAMP terminate Mr. Stilley's employment?

A.   On April the 30th is when we had board meeting, and that's when the executive director called him was on the night of April 30th; and then the letter went out to recount what was

said on the phone call and what was said at the board meaning on May 1st.

Q. Did anyone, any federal employee, including U.S. Probation, have any role in Mr. Stilley's -- the termination of Mr. Stilley's employment?

A. No. No. That was strictly a board of directors of REVAMP. It was their decision.

Q. I have one thing I want to ask you to take a look at, and this is in what is marked Government's Exhibit 2, which is the petition exhibits in document 802. I'll give you the page numbers. I apologize. Actually, just the very last page of -- it says page 270.

THE COURT: That's page 270?

MR. O'REILLY: 270 of document 802.

MR. STILLEY: I didn't know you that filed that.

(Discussion between Mr. Stilley and Mr. O'Reilly at counsel table outside the hearing of the stenographer.)

MR. STILLEY: I ain't got it.

MR. O'REILLY: Mr. Stilley is advising the government that he does not have a copy of what was filed as exhibit -- as document 802, Your Honor.

THE COURT: You're saying you don't have a copy of document 802?

MR. STILLEY: I profusely apologize. I do not have it. I have everything but that.

THE COURT: You have everything but 802 itself or page 270?

MR. STILLEY: 802 itself. And I'm so sorry, but I don't have it.

THE COURT: Did you receive one from the Court?

MR. STILLEY: I did.

THE COURT: But I take it -- well, where is it?

MR. STILLEY: I didn't -- I didn't print it off and bind it. I don't -- it was a monster. I got distracted. I didn't print it off. I don't have it here today.

THE COURT: Very well.

Mr. O'Reilly, you may show page 270 to Mr. Stilley and then I'll inquire as to whether he has any objection to its admissibility.

MR. STILLEY: No objection.

THE COURT: Very well.

MR. O'REILLY: May I approach the witness, Your Honor?

THE COURT: You may.

Q. (By Mr. O'Reilly) Ms. Rush, do you recognize that letterhead?

A. No, I do not.

Q. Okay. What does that letter, 270, purport to be?

A. It -- it looks like it's a letter to a lady that works at Sebastian County Prosecuting Attorney's Office to report that a Saber Woodard had provided 20 hours of community service in

compliance with a judgment entered in the case 4-17-2024. "Furthermore, I'm pleased to say that he has done all his requested work cheerfully, diligently, in a workman-like manner.  The judgment requires 150 hours of public service" --

THE STENOGRAPHER:  Ma'am, ma'am, hold -- slow down when you're reading.  In a workman-like manner?

A.  I'm so sorry.

THE STENOGRAPHER:  That's okay.  Slow down for me.

A.  "The judgment requires 150 hours of public service, which means as of this report, the balance due is 130 hours."

THE COURT:  And then we can all read the rest of it for ourselves.

THE WITNESS:  Do I need to read the rest of it then?

THE COURT:  No need to.

MR. O'REILLY:  No.

THE WITNESS:  Okay.

MR. O'REILLY:  It is in evidence.

Q.  (By Ms. O'Reilly) The question I have for you on this is who signed this -- who appears to have signed this electronically?

A.  Oscar Stilley.

Q.  Did Mr. Stilley have the authorization to sign or send this letter?

A.  I didn't know.  I did not know anything about this community service until after the fact.  And the only reason

that I know is Mr. Woodard called me, and I called the Prosecuting Attorney's Office, and it was probably a month later.  I don't know the exact date, but it was probably sometime in April of 2025 [*sic*] and at that time --

Q.  Let me just ask you, what is the date of this letter?

A.  May 1st of 2024.

Q.  And so you believe you had the conversation approximately when?

A.  The conversation with the prosecuting attorney?

Q.  Yes, ma'am.

A.  Probably towards the end of the month of May.  That was the first time that I knew anything about community service because we had never even discussed community service.

Q.  When you're saying "we have never discussed community service," who is "we"?

A.  The board of directors or with Oscar.  None of us had ever approached the subject.

Q.  Was Mr. Stilley authorized to have this type of correspondence?

A.  Absolutely not, no.

Q.  Were you aware of it until --

A.  No, I was not aware of this until much after the fact.

        MR. O'REILLY:  May I approach the witness, Your Honor?

        THE COURT:  You may.

        MR. O'REILLY:  I have no further questions for

Ms. Rush, Your Honor.

THE COURT:  Cross-examination?

**CROSS-EXAMINATION**

**BY MR. STILLEY:**

Q.  Ms. Rush, do you recall the starting pay of Oscar Stilley?

A.  I do not recall.

Q.  Would $13 an hour times 40 hours a week sound --

A.  That sounds --

Q.  -- right?

A.  -- correct.  I'm not sure it was 40 hours but, yeah, that sounds correct.

Q.  Okay.  Thank you.  And please be careful to try to wait until you hear the complete question.  So make --

THE STENOGRAPHER:  If you just take a breath after his question, it will help you remember.

MR. STILLEY:  Thank you.

Q.  (By Mr. Stilley) So isn't it also true that within a few weeks, that Oscar Stilley requested that his pay be cut to 30 hours a week and minimum wage?

A.  Yes.

Q.  Okay.  And the reason for that was so that Oscar Stilley could do his best to stay out of prison, right?

MR. O'REILLY:  Objection, Your Honor.  That's Mr. Stilley's testimony.

THE COURT:  Well, that will be overruled.  You may

answer.

A.   That was part of the conditions, yes.

Q.   (By Mr. Stilley) Okay.   But you understood that Oscar Stilley cut his own pay to the minimum so that he could make sure that he doesn't get sent back to prison for not having a legal job?

A.   Yes.

Q.   Okay.   And Oscar Stilley continued at that pay level for the remainder of his time at REVAMP.   Is that not correct?

A.   Correct.

Q.   Okay.   You talked about a gentleman by the name of James Baier.   Would that last name possibly be B-a-i-e-r?

A.   Possibly, yes.

Q.   Thank you.

     Okay.   Now, we talked -- you talked a little bit on direct examination about Oscar Stilley's duties.   And --

A.   Yes.

Q.   -- is it not true that his duties were drafting letters about various things, including litigation or threatened litigation?

A.   Repeat that.

Q.   Isn't it true that part of Oscar Stilley's duties was drafting letters about litigation or threatened litigation?

A.   I remember Oscar -- I remember one time you did reply to a letter to an attorney on our behalf.   Is that what you're

talking about?

Q.   Yes.

A.   Okay.  Yes, I do remember that.

Q.   And that was part of Oscar's legitimate duties, correct?

A.   I think so, yes.

Q.   Oscar also drafted legal pleadings for you.  Is that not correct?

A.   Can you remind me of some?

Q.   Sure.  Freedom of Information Act requests for various individuals.

A.   Oh, yes.  FOIA requests, yes.

Q.   And you also knew that Oscar Stilley would draft anything else within his knowledge and experience for REVAMP, correct?

A.   Yes, I think so.  I mean, we asked him to do a few things, but he didn't seem quite interested in them.

Q.   Well, you never asked Oscar Stilley to draft any, for example, Freedom of Information Act petition that he refused to draft, did you?

A.   No, sir.

Q.   And you can't really think of any specific item that Oscar Stilley refused to draft for you, can you?

A.   Yes, sir.

Q.   Can you tell us what they are?

A.   Yes, sir.  One of them was a case down in Mena, Arkansas.  I think we talked about it a little bit earlier.  In Mena,

Arkansas, we had a mother had come forward, and I think you even came to a meeting at my house with the mother and a couple of the advocates.  And she had everything on disk, but it was not acceptable; and, therefore, you did not want to do it.

Q.  Okay.  But isn't it true that Oscar Stilley told you that the problem was that things were in a terrible format and it needed a little bit of work?

A.  As -- as all of our cases do.

Q.  Okay.  And were you also aware -- you testified a little about Saber Woodard, correct?

A.  Yes.

Q.  Were you aware that at the time of the Oscar Stilley's firing, Saber Woodard was in Oscar Stilley's office?

A.  No, sir.

Q.  Were you aware that Saber -- Saber Woodard had done some of the scut work that Oscar was talking about to make that case proceed further?

A.  He did furnish me with some stuff.  After he called me, he emailed me some things that he had worked on, but I had no knowledge of it before the phone call.

Q.  Sure.  But that's work you wanted done, correct?

A.  Well, he did work on the case, obviously; but I had no knowledge of it, and that is not something we do.  When I called the Prosecuting Attorney's Office and talked to them, they said, "You know, we didn't think that sounded right," but

40

the judge was really excited that you were going to take on volunteers, but I had no knowledge of it.

Q.  As a matter of fact, Saber Woodard came to -- either called you or came to your office and offered to continue to provide the same support work for REVAMP --

A.  I've never --

Q.  -- correct?

A.  -- met Wood -- I've never met Saber Woodard face-to-face. I only remember the phone call.  He called and asked me -- he said they was trying to get ahold of Oscar Stilley; that Oscar had been signing his probation -- or community service work, and he wanted to know if I could do it.  And when I told him, no, I had no idea what he was talking about, he asked me if I could call the prosecutor's office and ask them to do -- to send him to the church in Barling and --

THE STENOGRAPHER:  In Barling?

THE WITNESS:  Barling, Arkansas.  B-a-r-l-i-n-g.

A.  And I said, "I have no power to do that, but I definitely will call them."  And so I called, and Russell Harper was my liaison that the prosecutor had appointed to me.  I called the week that he -- that Saber called me, and he -- Russell Harper was on vacation.  He called me the following week.  Said that it didn't sound right and if he would have been involved in it, he would have known that was something we didn't do.  So I had no more communication with Saber after that.

Q.   (By Mr. Stilley) So you turned down volunteer labor from Saber Woodard, correct?

A.   Yes, I did.

MR. O'REILLY:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q.   (By Mr. Stilley) If you had continued on with Saber Woodard, there's no doubt he would have gotten all the work done.  The scut work, he would have --

A.   I don't know.

Q.   -- done all that.

A.   I don't know.

MR. O'REILLY:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q.   (By Mr. Stilley) The case that Saber Woodard was working on, you said it came out of Mena or south Arkansas, correct?

A.   Yeah, it came out of another region of Arkansas.

Q.   And isn't it true that in that very case, there was a witness who had been an inmate in a jail in Texarkana who heard another inmate confess to the murder that you were investigating on that issue?

A.   I don't remember specific tips because, like I said, we're involved in about 80 cases right now.  But I don't remember that.  No, I do not remember that.  But I had no communication with Saber.  I didn't even know Saber existed really until he called me after the termination.

Q.   This is not about Saber anymore.  This is about a case that you had.  And what I'm trying to get -- to see if I can refresh your recollection is that you got a tip from an inmate out of a jail, correct?

A.   Did you fill out a report on that?  We're really big on REVAMP reports.  Did you have fill out a report on that?

Q.   We have OneDrive.  Is that not correct?

A.   I'm sorry?

Q.   The -- the inmates, their identities were kept on OneDrive.  In other words, when I -- Oscar Stilley talked to somebody, he put it on OneDrive --

A.   I never saw that.

Q.   You never saw the OneDrive?

A.   I saw the One -- I saw the drive that we have, the Google Drive but I --

Q.   Okay --

THE STENOGRAPHER:  Wait, wait --

THE COURT:  This is all getting pretty far afield.  Let's -- let's have your next question, either obviously relevant in terms of this subject or some other subject.

MR. STILLEY:  Sure, Judge.  And I'll -- just so that I can make myself clear, what I'm trying do is to prove that Ms. Rush had access to the information about the inmates that Oscar Stilley was talking to because it was online.

THE COURT:  Objection to that will be sustained.

That's irrelevant.

MR. STILLEY:  So it's irrelevant that she had knowledge when she's trying to say that I didn't tell her?

THE COURT:  I'm not here to entertain argument.  We'll have the next question.

Q.  (By Mr. Stilley) Okay.  Oscar -- anytime you asked Oscar Stilley personally, Oscar Stilley always told you about the inmates that he was communicating with, correct?

A.  I don't remember anything specific, no.

Q.  Okay.

A.  I asked you for a list, but I never got that list.

Q.  You're not the one that asked for the list.  That was Jeremy Bennett, correct?

A.  No, I asked for the list too.

Q.  Do you have any --

A.  And Jeremy asked for it since January.

Q.  Do you have any paperwork record of that?

A.  Probably.

Q.  When was Jeremy Bennett hired?

A.  January 1st, 2024.

Q.  Okay.  And you realize that he initially -- for literally weeks, he would not give me his phone number, right?  You don't recall that?

MR. O'REILLY:  Objection as to relevance, Your Honor.

A.  You had his email address.

44

THE COURT:  Well, I'll hear -- I'll hear the answer to that and then we'll wait for the next question.

A.  Okay.  What was the question?

Q.  (By Mr. Stilley) Jeremy Bennett would not even give Oscar Stilley his phone number to talk for weeks after he was hired and after Oscar Stilley requested it, correct?

A.  I have no idea about that.  That was between you and Jeremy.  But I do know that you knew Jeremy's email address because Jeremy had sent out emails.

Q.  He sent -- he did send an email.

A.  Uh-huh.

Q.  And he later gave me his cell phone, correct?

A.  I would assume because I know you called him.

Q.  Okay.  Now, you suggested on direct examination that Oscar Stilley -- did you not? -- that Oscar Stilley was supposed to use REVAMP's email address for his communications with inmates?

A.  I never said that.

Q.  You didn't say that?

A.  I said that you were supposed to use the REVAMP email when you communicated with them?  I said that you were supposed to keep us abreast of every inmate and which case it would pertain to that we had open.  I didn't say anything about which email.

Q.  Okay.  After Oscar Stilley had to put monitoring software on his computer and phone, isn't it true that you shut off Oscar Stilley's access to his office email,

U.S. District Court
Northern District of Oklahoma

Oscar@remembereveryvictim.com?

A.   I think that you suggested that.

Q.   And that took place, right?

A.   Correct --

Q.   You agreed?

A.   -- at your suggestion.  At your suggestion, yes.

Q.   You agreed?

A.   Yes.

Q.   You said that Oscar Stilley was fired on May 1, correct?

A.   April the 30th.  Actually, it was -- the actual termination date was the day of the board meeting, and Jeremy called you that evening from the office.  We were all -- the board was all present.  That would have been April 30th.

The letter went out.  You wanted it in writing, so on May 1st he sent an email, and I supplied Ryan with that copy of that email.

Q.   Okay.  So if there's a memo in the file that says that Jeremy Bennett fired Oscar Stilley at 1:23 p.m. on May 1, would you disagree with that?

A.   Yes.

Q.   You would disagree with that?

A.   I would.  I would say it was April the 30th.

Q.   Okay.  As for the request for materials from Oscar Stilley, isn't it true that Oscar Stilley asked for clarification of the request?

A.  I heard the conversation.  He was very clear.  He -- he laid out exactly what he wanted returned to the office and it was not returned.

Q.  Isn't it also true that at the time that Oscar Stilley was fired, REVAMP was three paychecks behind on Oscar Stilley's payments?

A.  No.

Q.  That's not true?

A.  You didn't get paid, but Jeremy had asked for justification on those wages, and he said he never received that.  Neither did Tom, who is our team coordinator.  Neither did Greg, who is our treasurer, and neither did I.

Q.  The agreement was for the minimum wage that is tolerated by U.S. Probation, correct?

        MR. O'REILLY:  Objection.  Relevance, Your Honor.

        THE COURT:  Sustained.

Q.  (By Mr. Stilley) Isn't it true that Oscar Stilley did work sufficient to provide the funds for his pay?

        MR. O'REILLY:  Objection.  Unclear on what the question is actually asking.  And relevance.

        THE COURT:  Could you rephrase the question, please?

Q.  (By Mr. Stilley) Isn't it true that Oscar Stilley generated the funds to REVAMP's bank account to pay his wages and his expenses?

A.  Not always, no.

Q.   Not always?

A.   No.

Q.   Do you have any analysis or any documents showing that that wasn't done?

        MR. O'REILLY:  Objection.  Relevance, Your Honor.

        THE COURT:  Sustained.

    Let me explain one thing, Mr. Stilley.  Mr. O'Reilly has brought out some matters that appear to be relevant to one or more of the asserted violations, but going into a general inquest into this employment relationship is, to my perception, not relevant to any of the matters asserted in the petition for revocation.

    We've got nine numbered violations and, as I said, Mr. O'Reilly elicited some testimony relevant to one or more of those, but a general inquest into this employment relationship is really not within the scope of this hearing.

    We'll have the next question.

Q.   (By Mr. Stilley) Okay.  Isn't it true that you agreed, in a telephone call with Oscar Stilley, that you would have -- you had already set up a bank account that would be separate so that Oscar Stilley's pay would come out of it and all of his expenses would come out of it?

A.   That would be something that you and the treasurer had to discuss.

Q.   You didn't -- you didn't make that agreement?

A.   That would be something the treasurer would have had to discuss.

Q.   I'm asking -- here's what I'm doing.  I'm asking you to admit that you did say that to Oscar Stilley.

MR. O'REILLY:  Objection.  Relevance, Your Honor.

THE COURT:  Well, I'll hear the answer to that.  We did have some direct testimony about -- about this trust and this bank account.  I'll hear the answer to that.

A.   Okay.  Ask the question again.

Q.   (By Mr. Stilley) Isn't it true that in the early part of this year, you created a special account that all of the money that Oscar Stilley raised would go into and all of his pay and all of his expenses would be paid out of it?

A.   Well, not earlier this year.

Q.   When did that happen?

A.   When you were  -- right after you were employed, we created an account.  It was an expense account for the administrative assistant in which you had a debit card.

In March of this year, we disabled that credit card or that debit card at the urging of the treasurer because he had so many questions about the $3600 that he could not account for. So I'm not really sure clearly on what you're asking, but you did ask about the -- attaching a trust to it that we had no control over, and that's when your debit card was disabled because Greg did not feel good -- he did not feel comfortable

after you had asked that.

Q.   All right.   Let's make this a little bit easier.

A.   Okay.

Q.   Isn't it true that in the early part of this year, 2024, there was a REVAMP account that was exclusively for the purpose of holding money for wages for Oscar Stilley and for his expenses?

A.   It seems like that we did open a separate account, but that was not the reason.   The actual reason was because the treasurer was trying to separate the accounts because he believed that you could see the main accounts.   There were two other accounts, and he believed that you had access to them, so he had gone to the bank.   And Greg Murray would have to testify to that.   He would be the person that you would want to talk to.   But he never got justification for that $3600, so that's why the new bank account was --

MR. O'REILLY:   Your Honor, I object.   This is not relevant to the alleged violations.   Relevance objection.

(Stenographer clarification.)

MR. O'REILLY:   I apologize.   Objection as to relevance.   This is not relevant to the alleged violations.

THE COURT:   That's understood.   I've heard the answer. Now it's time for a question on some other subject.

MR. STILLEY:   Sure.

Q.   (By Mr. Stilley) And isn't it true that Jeremy Bennett

50

actually borrowed money, without asking, from the account that is to be used for only for Oscar Stilley's payments?

A.  No, because --

MR. O'REILLY:  Objection --

THE COURT:  Wait just a minute.  Let Mr. O'Reilly speak.

MR. O'REILLY:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  (By Mr. Stilley) And isn't it true that Oscar Stilley requested a written agreement that the account would be used solely for those purposes, Oscar Stilley's wages and for his expenses?

A.  I can't be sure of that; but, if so, then what about all the money that we donated ourselves to help pay your wages when the money wasn't there?

Q.  Isn't it true that you refused to agree in writing to what I just asked you about?  That is, an agreement that the money in that account would be used only for Oscar Stilley's pay and expenses?

A.  REVAMP expenses.  Not Oscar's expenses.  REVAMP expenses.

Q.  Okay.  But wasn't it agreed -- you refused to agree that the money that went in there would be for Oscar's wages even, correct?

MR. O'REILLY:  Objection.  Asked and answered and relevance.

U.S. District Court
Northern District of Oklahoma

THE COURT:  That has been asked and answered.  We'll have the next question.

Q.  (By Mr. Stilley) So is the answer --

MR. STILLEY:  I don't understand the answer.  Is she saying that she admits that they didn't refuse --

A.  I know your wages came out that account.  Is that what you're asking, if your wages came out of that account?

Q.  No.  What I am asking is if you refused to agree not to borrow money and use it for something else and leave --

A.  I don't really think that you had any control over that.  I think that was REVAMP funds; was it not?

Q.  You made the agreement -- you made the agreement --

THE COURT:  That's enough of this back and forth. Let's have another question on some other subject.  You have exhausted this subject.  Next question on a different subject.

MR. STILLEY:  Sure.  Sure.

Q.  (By Mr. Stilley) Oscar Stilley had a major account that provided most of the money, correct?

A.  Well, we had donations, and you said that --

Q.  Donations?

A.  -- you were responsible for getting those donations in.

Q.  After you refused to agree to sequester the money, use it as the -- as a witness -- as the donors intended, that those payments stopped, correct?

MR. O'REILLY:  Objection.  Relevance.  Asked and

52

answered.

THE COURT:  Sustained.

MR. STILLEY:  Can I get a -- I would like to do a proffer for the record and see what she would say.

THE COURT:  Do you plan to take the stand?

MR. STILLEY:  No.  I want to -- I want to have the -- the information ready for appeal, what the -- what the witness's answer would be.

THE COURT:  I'll -- I will permit you to make a very concise proffer at this point with emphasis on "concise."

MR. STILLEY:  Sure.  What -- okay.  What the witness would say, if allowed to answer and testify, is that the --

THE COURT:  An offer of proof within the meaning of the Federal Rules of Evidence.  You can make a very concise offer of proof.

MR. STILLEY:  Sure.

The major donor quit making payments after REVAMP refused to agree to use them in accordance with the donor's intent. That's what it would say.  That's all I -- that's all I want on the record.

THE COURT:  We'll have the next question.

MR. STILLEY:  Thank you, Judge.

Q.  (By Mr. Stilley) You brought no financial information with you, correct?

A.  I did not.  I had nothing to do with the finances really.

Q.   As much as we've had a history, you still don't hate Oscar Stilley, do you?

A.   No.

Q.   And you do not want Oscar Stilley to go over to the jail today, do you?

A.   To go where?

Q.   To go to jail today.

A.   I think that's up to the Court.

Q.   So you don't care one way or another?

A.   If you deserve to go.  If you don't, I'm sure the Court will see -- see fit what -- what needs to be done.

Q.   Okay.  Oscar has --

A.   No, I don't wish anything bad against you.  I don't have any hard feelings.  I think you could -- you're a brilliant person.  I think you could have done a lot of good, and that's what I had hoped for.  I was your staunch defender.  I was your supporter.  I came to all your parole revocation hearings.  I stood by you.  I believed in you.  And, Oscar, you could have done a lot of good.

THE COURT:  Okay.

THE WITNESS:  Okay.

THE COURT:  It's his turn to ask a question.

THE WITNESS:  All right.

MR. STILLEY:  Pass the witness.

THE COURT:  Any redirect?

MR. O'REILLY:  No, Your Honor.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  And this would be an appropriate time for a mid-morning break.  I would like to --

Let me inquire of Ms. Lynn.  I'm thinking we can probably manage to have a mid-morning break of ten to fifteen minutes. Does that work?

THE DEPUTY COURT CLERK:  Yes.

THE COURT:  Okay.  And Ms. Lynn is in charge of the length of the break.  Let's try to keep it to ten minutes.  If it's not ten minutes, then let's be back here, in any event, within 15 minutes.

Court will be in recess.

(Recess had.  Thereafter, the following transpired on the record in open court:)

THE COURT:  We're resuming in Criminal 09-043, *United States of America vs. Oscar Stilley*, with the parties and counsel present as before.

We will have the government's next witness.

MR. O'REILLY:  Your Honor, the government would call U.S. Probation Officer Ryan Forsyth.

THE COURT:  Very well.

THE DEPUTY COURT CLERK:  (Oath given.)

THE WITNESS:  I do.

(Witness sworn.)

**RYAN FORSYTH**

Having been called as a witness, after being first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. O'REILLY:**

Q.   Good morning.  Would you please state your full name and spell it for the court reporter?

A.   Ryan Forsyth.  R-y-a-n.  F-o-r-s-y-t-h.

Q.   Thank you.  And, Mr. Forsyth, how are you employed?

A.   I'm a United States Probation Officer in the Western District of Arkansas, Fort Smith Division.

Q.   Before we begin your testimony, do you have some notes that you will be using to refresh your recollection during this hearing?

A.   Yes, I do.

Q.   Okay.

        MR. O'REILLY:  If I may approach the witness, Your Honor?

        THE COURT:  You may.

Q.   (By Mr. O'Reilly) Is that a copy of the -- the same notes that you will be relying on?

A.   Yes, it is.

        MR. O'REILLY:  May I approach the witness again, Your Honor?

U.S. District Court
Northern District of Oklahoma

THE COURT:  You may.

MR. O'REILLY:  May the record reflect I am providing Mr. Stilley with a copy of these notes?

THE COURT:  The record will so reflect.

Q.  (By Mr. O'Reilly) Mr. Forsyth, how long have you been with U.S. Probation?

A.  Since March of 2019.

Q.  What are your general duties as a U.S. probation officer?

A.  I supervise individuals on probation or supervised release.

Q.  Approximately how many individuals do you supervise at any one time?

A.  It's ranged anywhere from 35 to 60 at one time.

Q.  How many do you have right now?

A.  I have 43.

Q.  In what federal district are you employed?

A.  The Western District of Arkansas.

Q.  Do you know Oscar Amos Stilley?

A.  I do.

Q.  How is it that you know Mr. Stilley?

A.  I'm supervising him on behalf of the Northern District of Oklahoma.

Excuse me.

Q.  Do you see Mr. Stilley in the courtroom today?

A.  I do.

Q.  And is he seated at defense counsel table?

A.   He is.

MR. O'REILLY:  May the record reflect he has identified Mr. Stilley?

THE COURT:  The record will so reflect.

Q.   (By Mr. O'Reilly) When did you start supervising Mr. Stilley?

A.   Initially, it was in August of 2022 when his first term of supervised release had commenced.

Q.   And you are in the Western District of Arkansas, correct?

A.   Correct.

Q.   Why are you supervising him instead of a U.S. probation officer from the Northern District of Oklahoma?

A.   Mr. Stilley had submitted a residence plan while he was incarcerated asking to reside in Fort Smith.  Through that investigation, which is typical for our office to do, he had identified a family member's residence or property that he -- he could live at, and we approved it.

Q.   So where does Mr. Stilley live?

A.   He lives in Cedarville, Arkansas.

Q.   And what district is that located in?

A.   Western District of Arkansas.

Q.   Do you recall if Mr. Stilley's initial term of supervision after he was initially released from prison began in August of 2022?

A.   That's correct.

Q. Did there come a time that there was a revocation hearing prior to this one?

A. Yes.

Q. Do you recall approximately when that was?

A. I believe that was in November of 2022.

Q. Do you recall the results of that hearing?

A. Yes. Mr. Stilley was revoked and sentenced to three months' imprisonment with 33 months' supervised release.

Q. Do you recall if Mr. Stilley's current -- I'll step back.

Following his three-month term of imprisonment, did another -- a 33-month term of supervised release commence in approximately February of 2023?

A. Yes, it did.

Q. Does Mr. Stilley's conditions of release contain certain conditions?

A. Yes.

Q. Was Mr. Stilley made aware of these conditions?

A. He was.

Q. How do you know this?

A. I performed an intake. I believe it was on March 6th of 2023 or the end of February. I'm not sure of the date. That intake involved going over his judgment with him specifically and reading each condition, and he signed an Acknowledgment of Conditions form.

Q. Was that meeting in person?

A.   Yes.

Q.   Where did that take place?

A.   In my -- in the probation office in Fort Smith.

Q.   Did there come a time that you -- that U.S. Probation made a determination that it would file a petition for a -- to show cause why he should not be revoked a second time?

A.   Yes.

Q.   And is that what has been marked as Government's Exhibit 1?

          MR. O'REILLY:  May I approach the witness, Your Honor?

          THE COURT:  You may.

A.   Yes.

Q.   (By Mr. O'Reilly) Are you familiar with Government's Exhibit 1?

A.   I am.

Q.   Is that also what was filed as document 792 in this case?

A.   It is.

Q.   How is it that you are familiar with this document?

A.   So I had notified the Northern District of Oklahoma's probation office of the allegations in this petition.

Q.   Did you or somebody else actually prepare this petition?

A.   Somebody else prepared this petition.

Q.   Is that a person from U.S. Probation in the Northern District of Oklahoma?

A.   Yes.

Q.   What was the information upon which it relied?  Who

60

provided that information?

A.  It -- I provided the information that was relied on for this petition.

Q.  Are you familiar with all the contents of that petition including the exhibits?

A.  I am.

Q.  And are these -- the contents true, complete, and accurate?

A.  Yes.

    MR. O'REILLY:  I believe the Court has already taken judicial notice of all documents, but I would, at least for purposes of this hearing, offer Exhibit 1 into evidence.

    THE COURT:  Any objection?

    MR. STILLEY:  No objection as long as it's not duplicative.  In other words, extra set of paper.

    THE COURT:  It is received.

Q.  (By Mr. O'Reilly) Was there a supplemental set of exhibits prepared with respect to the petition?

A.  There was.

Q.  Was that material filed with the Court as document 802 in this case?

A.  Yes.

    MR. O'REILLY:  If I may I approach the witness, Your Honor?

    THE COURT:  You may.

Q.  (By Mr. O'Reilly) I'm Showing you what's been marked as

Government's Exhibit 2.  Are you familiar with this exhibit?

A.  I am.

Q.  How is it that you're familiar with this exhibit?

A.  After the initial petition was filed with the exhibits that it contained, I had reviewed it and noticed that several of the exhibits that I had provided were missing that I felt were important to the case, so I discussed that with the probation office in Tulsa, and they moved forward with filing this supplemental exhibit which contained the rest of the documents I -- I noticed were missing.

Q.  Are the contents of Exhibit 2 complete, true, and accurate?

A.  Yes.

        MR. O'REILLY:  Your Honor, the government would offer, for purposes of this hearing, Exhibit 2 into evidence.

        THE COURT:  Any objection?

        MR. STILLEY:  The same objection.  But as long as it's not duplicative, no problem.

        THE COURT:  Well, it is received.  It is -- it partially duplicative of Government's Exhibit Number 1, but I understand the reason for that more comprehensive compilation; and for that reason, Government's Exhibit 2 is received.

        MR. O'REILLY:  Thank you, Your Honor.

    And, Your Honor, may I approach the witness?

        THE COURT:  You may.

Q.  (By Mr. O'Reilly) Mr. Forsyth, did you reach out to the

authorities in Arkansas requesting some additional materials with respect to allegations about Mr. Stilley and his attempt to vote -- to register to vote in that state?

A. I did.

Q. Did you receive some information just over the weekend?

A. I did.

MR. O'REILLY: Your Honor, if may I approach the witness?

THE COURT: You may.

MR. O'REILLY: Your Honor, just so the record reflects, Mr. Stilley was provided a copy of these earlier. Exhibit 3?

MR. STILLEY: Yeah. Yes. Yes.

Q. (By Mr. O'Reilly) Mr. Forsyth, can you identify -- are you familiar with Exhibit 3?

A. I am.

Q. What is Exhibit 3?

A. So primarily it's comprised of a transcript from a hearing that occurred before a Special Master in Arkansas, in the Arkansas Supreme Court. Case Number CV-24-453.

It also includes some exhibits. I call them exhibits because that's what they were called for the -- the Special Master's hearing, but includes some voter -- a voter registration application that was filed by Mr. Stilley; a registration -- a registrant information card by Mr. Stilley;

and some other, I guess, Crawford County court -- Crawford County documents just reflecting his voter status.

MR. O'REILLY:  Your Honor, the government would offer Government's Exhibit 3 into evidence.

THE COURT:  Any objection?

MR. STILLEY:  Same objection.  I just don't want duplication.  This is part of a -- an official record.  No problem with the Court considering it.

THE COURT:  It is received.

MR. O'REILLY:  Thank you, Your Honor.

Q.  (By Mr. O'Reilly) With respect to the conditions of supervision that Mr. Stilley was under, was one of them that he maintain employment?

A.  Yes.

Q.  Generally, what are the requirements that a person under supervision has to maintain on -- how is that met?

A.  It's met by working in a lawful type of employment 30 hours a week or more, which is what we consider to be full-time.  And when we discuss lawful or the type of employment, that would be dependent on, you know, somebody's background or their -- their offense.  So if -- if somebody's convicted of a -- a sex crime, we're not wanting them to work at a day care, if that makes sense.

Q.  So the requirement is not just lawful employment, but approved employment?

64

A. Correct.

Q. Is there a requirement regarding what a person under supervision is to do if they are fired?

A. Yes. And that's to notify -- well, generally, it's -- they should notify their probation officer within ten days of any change in employment. That includes any sort of change in their job responsibilities. But also they have 72 hours to report any unanticipated changes to their employment situation.

Q. So with respect to the ten days you mentioned, that's if they are advised ahead of time that they're going to be terminated or somehow their job is going to change?

A. Correct. Or even if they were going to be promoted.

Q. Are these requirements to remain employed and to notify if things change important for your ability to supervise a person under supervision?

A. Yes.

Q. Why?

A. Well, in this case, there's restitution ordered so it's important that I am aware that, you know, he is working. And if there's any changes to his work circumstances, it allows me to -- you know, if I need to conduct a recalculation of -- of the payment amount, I can do that.

Working in general is just important. It's productive. It helps structure somebody's time in a -- in a positive, pro-social activity. There's statistics out there that show

that it helps people with their self-esteem and -- and self-worth.

Also, it's -- it's important to just communicate with our office and with your supervising officer.  Failing to do so is -- kind of shows -- or, in my opinion, reflects that somebody maybe isn't agreeable with being supervised or wants to be supervised, and it probably will lead to other violations down the road as well.

Q.  Moving on then, that was the first alleged violation of -- with respect to this petition, correct?

A.  Yes.

Q.  What was the second violation alleged in the petition?

A.  The second violation that is alleged is regarding Mr. Stilley's special financial conditions where, upon the request from me, he would complete a personal financial affidavit and authorize a release of any and all financial records or documents.

Q.  And is it important for you, in your ability to supervise Mr. Stilley, that he provide such information?

A.  Yes.  He has a large amount of restitution that is owed in this case.  The instant offense or underlying conviction is tax fraud.  Because of that restitution, I'm -- I'm required to conduct financial investigations.  And if he isn't providing me with those documents or complying with that condition, the special financial conditions of -- of his judgment, I'm unable

to actually complete a financial investigation.

Q.   What was the third alleged violation?

A.   The third was also involving the special financial conditions and that was regarding some -- some money that I have seen him possibly receive and that I had questioned him about but he wouldn't give me any -- any answers to.

MR. STILLEY:  Objection.  Speculation.  "Possibly."

THE COURT:  Overruled.

Q.   (By Mr. O'Reilly) What was the requirement that Mr. Stilley do that he is alleged to have violated?

A.   He was required to maintain a checking account in his name and deposit all income into -- into that account.

Q.   Is this type of a restriction important in a case like this?

A.   Yes, because it allows me to -- you know, when he's -- if he's complying with a -- with a financial investigation and he's providing me with bank records or -- or other documentation, I'm able to see and reasonably be assured that all money that he is receiving is going into this one account.

Q.   Do you believe you can effectively supervise Mr. Stilley if he is not complying with this restriction?

A.   No.

Q.   Did Mr. Stilley's conditions of supervised release also include a separate requirement, as alleged in violation four, that he cooperate with the installation and maintenance of

computer and cell phone monitoring equipment?

A.   Yes.

Q.   What does this monitoring consist of?

A.   So we nationally -- so the U.S. Probation Office nationally has a contract with a company called IPPC Technologies where they have a software and providing a service to the probation office for monitoring of various individuals' devices in conjunction with a monitoring condition.

Q.   What is monitored by this system?

A.   So anything you use your -- the device for.  So if your phone is monitored, it's -- it's capturing key strokes.  It's also taking screenshots when the monitoring software's program identifies a risk word that maybe has been entered into their case profile and then it -- it logs all that data for review at later date by -- by me.

Q.   How is the monitoring paid for?

A.   It is paid for by the individual being monitored.

Q.   Is this type of monitoring important for U.S. Probation in supervising a defendant like Mr. Stilley?

A.   Yes.

Q.   Why?

A.   Based on -- on his background, his underlying conviction, what he was convicted of, concerns obviously that he might repeat that behavior, and that's why having that condition is important to ensure that he's not, you know, participating in

any sort of fraudulent activities while on supervision.

Q. Does this type of monitoring system also allow you to see with whom someone is communicating?

A. Yes.

Q. And was a -- Mr. Stilley restricted on with whom he could communicate as part of the conditions of release?

A. Yes.

Q. Staying with the monitoring for a second, do you think that if the monitoring system is disabled, you could effectively supervise Mr. Stilley?

A. Absolutely not.

Q. Why not?

A. Based on what I'm alleging today, it's -- it's a lot of communication with individuals that he shouldn't be -- be speaking with without permission. And especially -- yeah, I -- I just don't believe that we would be effect -- or be able to effectively supervise him without that monitoring condition.

Q. Let's now move to I think it's the fifth alleged violation. What was the fifth alleged violation in the petition?

A. Yes. So the fifth violation alleges that the data obtained -- that I obtained through the IPPC monitoring software that was installed on Mr. Stilley's phone and laptop devices shows that he's had multiple communications with individuals known to have prior felony convictions without permission or approval from our office.

Q.  Is this restriction important in supervising Mr. Stilley?

A.  Yes.

Q.  Why?

A.  Well, generally, in any case, it's important to -- that the probation office be aware of -- of those that are supervised and their communications or possible communications with individuals that have prior records.

Because we're in the business of change, we -- we try to help people rehabilitate.  We obviously believe that people with -- with felony backgrounds can do that and be successful, but we want an opportunity to be able to vet that, that contact, to make sure it's appropriate and then make a determination on that.

Q.  Do you believe you can effectively supervise Mr. Stilley without this condition?

A.  No.

Q.  Why not?

A.  I think what I'm alleging shows exactly why.  I think he's been involved in some things that constitute the unauthorized practice of law.  He's been receiving money.

MR. STILLEY:  Objection.  This witness has no knowledge of unauthorized practice of law or what it takes.

THE COURT:  Overruled.

THE WITNESS:  I can continue?

THE COURT:  (Nods head.)

THE WITNESS: Thank you.

A. He was receiving money as well. To me, it looked like it is connected to that unauthorized practice. Without these conditions, or this specific condition, he's essentially not on supervision and we're not able to try to work with him to help him stay on the right track and re-enter the community.

Q. (By Mr. O'Reilly) Violation number six I think related to what you just mentioned. What was the allegation in the petition on number six?

A. Yeah, so number six is related to the -- the condition that says he shall not engage in any activity that would constitute the unauthorized or unlicensed practice of law, and it's alleged based on the content of the communications that I had seen through the -- the IPPC monitoring and through his CorrLinks account that he had been engaging in that activity.

Q. Is this a condition of supervised release that is important for your ability to supervise Mr. Stilley?

A. Yes.

Q. Why?

A. Mr. Stilley is a former attorney. His profession was directly involved in -- in the underlying conviction that placed him on supervised release. And, you know, based on those activities, which got him into -- or got him on supervision, it's important that that condition be in place because had it not been, he may just be going -- going out

there and trying to give out additional advice, like he has in the past and like I'm alleging in the petition, to others in the community and, therefore, harming them in some way fraudulently.

THE COURT:  Let me interrupt with a question just for my education.  What is CorrLinks?

THE WITNESS:  So CorrLinks is a -- is a program that is utilized by various correctional institutions.  It's big in the Bureau of Prisons, and it allows inmates to be able to communicate with people by email on the outside.  So --

THE COURT:  And I think that is a -- an inmate communication system that, by design, is capable of being monitored?

THE WITNESS:  Yes.

THE COURT:  Next question.

Q.  (By Mr. O'Reilly) Is Mr. Stilley authorized by any state or locality to legally practice law?

A.  No.

MR. STILLEY:  Objection.  No foundation of witness knowledge.

THE COURT:  That will be overruled.

And for Mr. Stilley's benefit and for the record, the government's brief that was filed November 10th addresses the unauthorized practice of law.  Since it's a legal matter, the Court is also certainly entitled to do some of its own

research.  I have done so.  And if it's necessary to get into argument on that score, we can do that later.

But in terms of factual testimony from this witness as to activities of Mr. Stilley that were at least arguably in the realm of the practice of law -- or the unauthorized practice of law, I'm going to hear the testimony and then we'll sort that out later.

You may continue.

MR. O'REILLY:  Thank you, Your Honor.

Q.  (By Mr. O'Reilly) One of the standard conditions of anybody on supervision is that they not commit another crime, correct?

A.  Correct.

Q.  Was Mr. Stilley under that condition?

A.  Yes.

Q.  Can you briefly describe how that -- how you monitor that type -- that condition of, you know, somebody under supervision?

A.  Well, obviously, we try to encourage somebody not to commit -- commit new crime.  But as far as monitoring goes, we have certain systems that we're able to track whether somebody's been booked into a facility somewhere, you know, a correctional facility, and when they've been booked out of said facility.

Also get notifications when agencies might run the background of somebody that's on -- on supervision, so we get

notified of that, and that allows us do future -- or do -- do an investigation.

Q.   Is this restriction important in monitoring persons under supervision?

A.   Absolutely.

Q.   Why?

A.   The purpose of supervision is to reduce recidivism, which is to reduce crime.  So in my mind, it's common -- common sense that that condition would be important to every case that's on supervised release.  It also goes to keep the community safer.

Q.   Did Mr. Stilley's conditions of release require him to make any notification to U.S. Probation if he were either contacted or arrest -- by law enforcement or arrested?

A.   Yes.

Q.   What was that requirement?

A.   He is required to contact me within 72 hours -- or not just me, just the probation office within 72 hours if he's arrested or questioned by a law enforcement officer.

Q.   Is this restriction important to the ability of U.S. Probation to monitor people under supervision?

A.   Yes.

Q.   Why?

A.   Specifically in cases where maybe somebody wasn't arrested, it allows me to understand if maybe, you know, there's some activities going on that I need to be aware of or maybe

74

opportunities that I can work with somebody that I'm supervising on decision-making, whether it be, like, a traffic stop that they're given a warning or something like that.

So it's important. And, plus, it goes to a larger issue of just communication. It's important to communicate with your supervising officer so that way you stay on the same page and work together to get through your term of supervised release.

Q.  I believe that was the eighth alleged violation, correct?

A.  Yes.

Q.  What was the alleged -- the ninth alleged violation?

A.  That was regarding restitution payments.

Q.  Did Mr. Stilley's conditions of release require him to make restitution payments?

A.  Yes.

Q.  Can you please describe how that requirement works?

A.  Yeah. With the Northern District of Oklahoma, I mean, he had a -- or the Court issued a modification earlier on -- I could be mistaken on the date. I think it was in 2023 -- allowing Mr. Stilley to pay his restitution to the clerk's office here by personal check, which was against their -- their standard norm. But that was permitted, so he was just mailing in his payments.

Q.  Why is this condition important?

A.  Well, he has a -- he owes a lot of restitution. So there's identified victims in the case. I think they were federal and

state agencies but, still, it's a tax fraud case so that --
that means tax dollars were at play.  It's important that he
tries to make an effort to pay that -- those funds back.

Q.  I'm going to actually go through the factual allegations
with respect to these violation allegations.

Did Mr. Stilley violate the condition that required him to
maintain full-time employment?

A.  He did.

Q.  And we heard earlier from Ms. Rush.

A.  Yes.

Q.  So I don't want to belabor that too much.

Do you recall when you were notified that Mr. Stilley had
been fired by REVAMP?

A.  So I was notified that he was terminated from REVAMP on,
let's see, on April 30th.

Q.  Okay.  Did you have an opportunity to see a letter dated
May 1st notifying Mr. Stilley in writing that he was terminated
from employment?

A.  I did.  And I received that letter from their executive
director on May 2nd.

Q.  Did Mr. Stilley have a requirement to notify you within a
certain time period if he was -- if his employment changed?

A.  Yes.  72 hours.

Q.  Did Mr. Stilley notify you within 72 hours?

A.  He did not.

Q.   When did Mr. Stilley notify you?

A.   He notified me on Sunday, May 5th of 2024.

Q.   Did Mr. Stilley give an explanation as to why he waited until May 5th?

A.   He explained he was observing the Sabbath, which I believe -- or which I believe took place -- so it would have been May 3rd, that Friday evening, at sundown through May 4th, Saturday.

Q.   If that was the only factor in this alleged violation, would this -- would you have made a referral on that basis alone?

A.   No.  And I actually told him when we discussed it that I would consider not filing a violation about failing to report that in a timely manner.

Q.   What did you ask Mr. Stilley to do after he was terminated from employment at REVAMP?

A.   I asked him to seek meaningful employment in a different realm of work.  I acknowledged, you know, him for his desire to help others.  And he enjoyed working at REVAMP, but encouraged him to do something where maybe he helped others in a different way, like a customer service role, as to avoid any sort of issues with his supervised release conditions or even appearance of any issues and to hopefully earn more than he was.

Q.   What concerns did you have with respect to his employment

and then termination from REVAMP?

A.   Can --

Q.   Let me ask it a different way.

Did you have any concerns about who he was communicating with as part of his work at REVAMP?

A.   Yes, I did.

Q.   What was that concern?

A.   So the concern was that he had produced a -- a lot of requests early on when he got out for his second term of supervised release.  So this was in May of -- or, excuse me, March of '23, February of '23.

He produced several requests to communicate with individuals that were incarcerated in the Bureau of Prisons. Claimed it was for REVAMP purposes.  As I, you know, followed or reviewed his -- his activities via IPPC monitoring all the way up until his termination, I was concerned that those communications weren't actually for REVAMP purposes and were for other purposes and he was going to continue on with that contact going forward.

Q.   Did you make inquiry of REVAMP of whether he should have been communicating with the individuals that he identified to you?

A.   I discussed it with them.  They had told me that they had requested information from Mr. Stilley kind of detailing who he's talking to and how it was related to a REVAMP case but

told me that they -- they never received anything from Mr. Stilley on that. So they were unable to give me any information about anybody that I was seeing him communicate with.

Q. With respect to his employment at REVAMP, had you worked out an accommodation where he could communicate with persons that were incarcerated or -- you know, persons that were incarcerated that absent your permission would have been in violation of the terms of supervision?

A. Can you restate that? I apologize.

Q. With respect to REVAMP, had you worked out an agreement with Mr. Stilley and REVAMP about him being able to communicate with incarcerated persons that otherwise would have been prohibited under the terms of supervision?

A. Yes, I did.

Q. What was that agreement?

A. Well, I had -- shortly after his release, I -- I just mentioned about in March of '23 I had -- Mr. Stilley had presented several individuals that were trying to message him through the CorrLinks platform and so I had talked to Ms. Rush about that. She wasn't aware of any of these individuals, but we discussed maybe a delegation process, as she called it, where we agreed that she and REVAMP would have to delegate a -- a individual for Stilley to contact and that way they could keep a record of it in their files in -- in the event that I

wanted to verify later on down the road, "Hey, this contact was so and so.  REVAMP, or is it other maybe outside of employment?" and they could verify that for me.

Q.   Did Mr. Stilley ever provide that information to REVAMP?

A.   To my knowledge, no.

Q.   Did REVAMP ever provide any such information to you?

A.   No.

Q.   Did that create concerns for you with respect to any future employment of Mr. Stilley?

A.   Absolutely.

Q.   Did Mr. Stilley, after his termination of his employment from REVAMP, come to you with a proposed alternative employment?

A.   He did.

Q.   Can you please describe that?

A.   Yes.  So I had received an email from -- from an individual.  His last name was McGuire.  He said he owned a civil engineering firm and also was a rabbi for the River -- River Valley Torah Assembly, RVTA for an acronym.  Stated that he would like to hire Mr. Stilley as an administrative assistant on the same terms and conditions in which he was employed at REVAMP.  Same pay, same hours 30 hours a week.  Also spoke about Mr. Stilley's background and -- and experience in criminal institutions or as I had kind of understood it, jails, prisons, and how that would benefit RVTA with their --

their mission work and outreach work.

Q.  Did you approve that employment?

A.  I did not.

Q.  Why not?

A.  Based on what I had seen on the monitoring software and what I was told from REVAMP that they were also concerned that he was communicating with people that were incarcerated, not on REVAMP business or for employment, I felt that it was not proper for him to work in a capacity where he could continue to claim that he was speaking to certain individuals in prison that -- you know, but say it was for work when really it might be for his own purposes.

Q.  Did you advise Mr. Stilley of this?

A.  I did.

Q.  How did Mr. Stilley respond?

A.  I don't recall him being upset.  I think he was pleasant about it but naturally didn't agree with it.

Q.  Did you offer Mr. Stilley alternative ideas for employment?

A.  I had during a home visit shortly after his termination. Considering, you know, what he had told me about his health issues -- he mentioned an issue with his knee, and I think something else, and I'm forgetting.  But how, you know, obviously a factory job wasn't going to be appropriate for him, and I also understand he probably doesn't want to work in a factory, and that's okay too.  I think we should all enjoy our

81

work.

So I encouraged him to consider a place called Foundever. They are a customer-service based employer that I think works for Bank of America. It's an inbound center where you just are answering customer service calls for Bank of America customers. And I tried to spin that as, you know, you like to help people, and this is a customer service job. That might be something that you would be interested in, and he told me he appreciated the -- the advice.

THE COURT: Let me interrupt and backtrack just a moment.

You mentioned that in connection with this possibility of employment by River Valley Torah Assembly, that you were concerned that the -- Mr. Stilley's employment with that organization might, I gather, in your estimation, be some sort of a subterfuge, and I think your words were "for his own purposes." Did that include concerns on your part as to whether this might provide Mr. Stilley an avenue for the unauthorized practice of law?

THE WITNESS: Yes, Your Honor. That's precisely it.

THE COURT: Next question.

Q. (By Mr. O'Reilly) What steps, to your knowledge -- oh, first let me ask this.

Did Mr. Stilley apply for that position that you suggested as a possibility?

82

A.  I -- I don't believe so, no, but I'm not entirely sure.

Q.  You're not aware of him applying there?

A.  No.

Q.  Did he tell you whether he had or not?

A.  I don't remember.

Q.  Have you had discussions about Mr. Stilley's lack of employment with Mr. Stilley since then?

A.  Yes, on several occasions.

Q.  Please give just the general tenor of those discussions.

A.  Just asking for an update about his employment search or if he's made any progress on finding, you know -- or identifying some opportunities out there for employment.  Really, I have fit it in to just about any conversation I've had with him since he's been unemployed.

Q.  How has Mr. Stilley responded?

A.  In a variety of ways.  It's usually broad brush answers such as -- not specific, but he kind of says things like, you know, "I'm trying my" -- or "Rest assured that I'm trying my hardest to make myself more employable.  I hope you can understand."  Also saying things like he's working to improve his circumstances, and there's been no changes, things like that.

Q.  Has Mr. Stilley provided any specifics such as employers or jobs that he has sought?

A.  Just that one with -- I guess the dual position there for

McGuire Engineering and RVTA.  Other than that, there's been nothing else that he's provided.

Q.  When was that?

A.  That was May 10th when I received the email from Mr. McGuire.  May 10th, 2024.

THE COURT:  In terms of -- I have just a general question.  And I'll admit to you, I've wondered about this for 24 years, but it's also relevant this morning.

In terms of your evaluation of the level of effort that an offender is making to find employment, as you've described it here this morning, how menial an employment situation do you either expect or request an offender to take?

In other words, presumably Mr. Stilley could be flipping hamburgers at a McDonald's for minimum wage.  That's a theoretical possibility.  But -- so how menial do you get in your articulation to your offenders of what your expectation is as to their effort to find employment?

THE WITNESS:  I -- I basically set out -- like, my expectations are very low.  I'm big on using the term "The best time to find a job is when you already have one," so just try to get whatever job you can.

Obviously, I -- I don't work in a capacity that I don't enjoy.  That would be miserable.  I want the person I supervise to work in a profession that they -- I guess goes to their "why" or they feel passionate about.  But work is more than

just feeling good on the inside about what you're doing. It's, you know, obviously a basis of income. It's -- there's also a self-esteem factor. Structuring your time. And if it's -- doing that productively.

So I just -- when somebody's terminated last second, I'm trying to get them a job as soon as possible and then, "Okay. Let's -- let's improve maybe your employment circumstances by doing vocational training if you have an interest there" or something of that nature.

THE COURT: Well, did you articulate to Mr. Stilley that even if it was -- he started pretty low in the -- on a pretty low rung on the employment ladder, that you expected him to do what it took to get a job?

THE WITNESS: In a sense. We never had a specific confront -- well, it wasn't a confrontation or an argument.

During our discussion about his termination when I was at his house, you know, I had talked about finding another job as quickly as he could. He had talked to me then about issues with his -- with his physical health. And I think his teeth, if I remember correctly.

I looked at, "Okay. What can I think of that's available right now that you could sit down and work at?" Because he's obviously done very well with that, drafting things and just communicating if he had an office type job. So I just -- that's where I encouraged him to do Foundever.

Foundever, for the record, I think the last time I had somebody working there a year ago, $18.50 an hour full-time. I mean, that was well more than what he was getting at -- at REVAMP. But I -- I just tried to push him to that or identifying something that he felt that he was qualified for and that he would enjoy and looked for him to give me -- or just show me what his progress was.

THE COURT: Very well. You may continue.

Q. (By Mr. O'Reilly) Let's move to the second, which is the -- Mr. Stilley -- did Mr. Stilley violate the term of supervision required for him to provide you with complete and accurate financial information?

A. Yes.

Q. Please describe how he violated that condition.

A. Yes. Mr. Stilley was provided a variety of financial investigation documents, so a net worth statement form and a monthly cash flow statement form, and asked to complete those along with providing supporting documents like Cash App/PayPal statements, bank records, tax returns, et cetera.

When he -- when he passed those in on June 5th, 2024, he left a lot of the questions blank. Wrote "see attached." In the attachment, he -- because each document had an attached document to it. He spoke extensively about how he pled the Fifth to every question on the form. Yeah.

Q. And is examples of these contained in materials that

Mr. Stilley submitted to you that are copies thereof in Exhibit 1, pages 15 continuing on through approximately page 48?

A. Yes.

Q. Did you discuss with Mr. Stilley a lack of information he was providing?

A. Yes. And, you know, I confronted him about that during an office visit with him to review it on June 7th of '24. He had talked about how he felt that he was under criminal investigation for his -- for supervised release violations and felt he needed to plead his Fifth Amendment right and not provide me with information.

Q. As part of that, did Mr. Stilley provide --

THE COURT: Excuse me just a moment.

You referred just a moment ago to Government's Exhibit 1, right?

MR. O'REILLY: Yes, document 792, Your Honor.

THE COURT: And say again what pages you --

MR. O'REILLY: Pages 15 through 48.

THE COURT: 15 through --

MR. O'REILLY: One-five through four-eight.

THE COURT: Okay. Thank you. You may continue.

Q. (By Mr. O'Reilly) As part of what he provided, did Mr. Stilley give you copies of bank statements from Arvest Bank?

A. Yes.

Q.  Did Mr. Stilley give you any of the documentation of deposits made into that account?

A.  No.  I mean, what's on the bank records, so yes; but nothing additional to show me where the deposits came from.

Q.  Just -- just to be clear then, you got a copy of the bank statement?

A.  Yes.

Q.  The bank statement itself would show a deposit was made?

A.  Correct.

Q.  Did Mr. Stilley give you copies of any underlying documents showing the nature of that deposit?

A.  No.

Q.  Did you have occasion to ask Mr. Stilley about any deposits?

A.  I did on June 7th of 2024.

Q.  Please discuss that.

A.  Yeah.  So in reviewing the -- the bank statements with Mr. Stilley, I -- I noticed a $2,540 deposit made to his checking account on January 4th of 2024.

Q.  Did you ask Mr. Stilley about that deposit?

A.  I did, and he assured -- or he assured me that it was procured legally but refused to discuss any more details about the deposit.

Q.  What efforts did you make to get him to more fully or completely discuss the deposit?

A.   Well, I ended up going into another discussion about $4,000 of payments that I -- I had seen through IPPC monitoring that he may have received from Misty Webb.  And in a broader discussion of both of those instances, you know, just explaining, "Is this the same thing possibly or is it a different reason for that deposit, like did you get a gift from a family member?"  It was around Christmas.  I -- you know, I -- I don't know.  But he wouldn't give me any details, and he pled the Fifth Amendment to anything to do with the payments that Misty Webb sent him.

Q.   Just to be clear, with respect to the deposit into the Arvest Bank account -- and I apologize -- in the amount of -- was that two-thousand, five-hundred and --

A.   Two-thousand --

Q.   -- (cross-talk) dollars?

A.   Yes.

        THE STENOGRAPHER:  I'm sorry.  How much?

        MR. O'REILLY:  $2,540.

        THE STENOGRAPHER:  Thank you.

Q.   (By Mr. O'Reilly) Other than telling you it was lawfully procured, did Mr. Stilley assert the Fifth with respect to discussing that?

A.   I believe so.  I -- I can't recall if he specifically said, "I plead my Fifth Amendment rights," or if he just said, "I -- I assure you that it was procured legally, and I don't want to

talk about it."

Q.  Why is it important that U.S. Probation know the source of deposits?

A.  He's a tax fraud case.  He -- and just the -- the details of the underlying conviction involving fraud and then what I had already seen with the payments coming from Ms. Webb and how that could be connected to unauthorized practice of law, I was extremely concerned that this -- this payment of $2,540 was received under similar circumstances.

Q.  But Mr. Stilley did not provide sufficient information for you to determine that?

A.  Correct.

Q.  Was there also a -- I think the third violation was that he deposit all monies into -- I mean all personal expenses from a checking account?

A.  Yes.

Q.  And did he violate that provision?

A.  Yes.

Q.  I think you spoke a little bit ago about -- is it Missy Webb?

A.  Misty.

Q.  Misty, M-i-s-t-y?

A.  Yes.

Q.  Who is Misty Webb?

A.  Well, I believe Misty Webb is connected somehow either -- I

think a spouse of a inmate at the Bureau of Prisons that Mr. Stilley had been seen to be communicating with.

Q. Who was that individual?

A. I think it's Patrick Miller Webb is his name.

Q. What did you see that caused you to believe Misty Webb was sending Mr. Stilley money?

A. Well, she had actually sent him a photo of a check. That was on -- I think that was the end of February of 2024. The photo of the check was for $3,000, and it was made out to a Stephen Stilley. There was also other photos of a certified mail receipt that showed that she was mailing that check to Oscar Stilley at Oscar Stilley's residence.

Q. Just to be clear, the -- the check -- the copy of the check that you saw the photograph of, was that -- is that exhibited at document 792, Exhibit 1, page 60, six-zero?

A. Yes.

Q. And that -- is that a U.S. bank cashier's check in the amount of $3,000?

A. Yes, I believe so. That's my recollection.

MR. O'REILLY: May I approach the witness, Your Honor?

THE COURT: You may.

A. The amount's accurate but -- yes.

Q. (By Mr. O'Reilly) And who is Stephen Stilley?

A. I know Stephen Stilley to be Oscar Stilley's brother.

Q. How do you know that?

A.   I've met Stephen Stilley before at Oscar's residence.   He introduced himself to me as Stephen -- or as Oscar Stilley's brother.   Mr. Stilley also told me that Stephen Stilley would be driving him here today, said his brother would be driving him, and he's in the audience.

Q.   You see Mr. Stephen Stilley here today?

A.   I do.

Q.   Is he wearing a blue shirt?

A.   Yes.

Q.   Did you ask Mr. Stilley about that check?

       THE COURT:   Now, which -- which --

       MR. O'REILLY:   I apologize, Your Honor.

Q.   (By Mr. O'Reilly) Did you ask Oscar Stilley about that check?

A.   I did, but he would not give me any information.

Q.   How did he respond?

A.   He referenced his Fifth Amendment rights and just declined to give me any information about -- about that -- that payment or an additional payment he received.   He also did not refute that he received them.

Q.   The additional payment, is that referenced in further texts in this exhibit?

A.   Yes.

Q.   And was that the amount of $1,000?

A.   Yes.

Q.   Did you see any evidence that Mr. Stilley deposited either of these payments into his checking account as required by the terms of his supervision?

A.   No.

Q.   Can you give the Court a brief explanation --

THE COURT:   Excuse me just a minute.  What's the amount of that cashier's check?  I can't -- I can't make it out.

MR. O'REILLY:   $3,000, Your Honor.

THE COURT:   Okay.  Very well.  You may continue.

Q.   (By Mr. O'Reilly) Please give the Court some idea of why you believe this -- these monies were going to Mr. Stilley, Mr. Oscar Stilley.

A.   Through the -- the scope of just seeing Mr. -- Oscar Stilley's communication with Misty Webb and with her spouse, Patrick Miller Webb, it seemed to me that the money was being sent because Oscar Stilley was helping out Mr. Webb -- or -- yeah, Mr. Webb in the BOP with his case or --

Q.   And the communications between Oscar Stilley and Misty Webb, are those exhibited on pages 49 through 70 of Government's Exhibit 1?

A.   Yes.

Q.   When you discussed these monies with Mr. Stilley, did he indicate in any way of, "Well, that's not for me.  It's for my brother"?

93

A. No.

Q. And I apologize if I asked this already. Did you review Mr. Stilley's Arvest Bank account? Just did you review it?

A. Yes.

Q. Did you see any indication of these monies being deposited there?

A. No, I did not.

Q. Did Mr. Stilley violate the special condition that required him to cooperate with the installation and maintenance of monitoring equipment on his computer and cell phone?

A. He did.

Q. Please describe to the Court how he violated that condition.

A. Initially, it began in the end of July. So July 23rd, 2024, I was notified by IPPC Technologies that Mr. Stilley had contacted them by telephone and revoked his authorization to have his bank account automatically charged for his monitoring fees.

Q. Was that a violation?

A. It was.

Q. Why?

A. Because part of that special condition number 7(B) talks about that he needs to pay for the software or for the installation services.

Q. Let me ask this: If Mr. Stilley had made payments after

that, would that have been a violation by itself?

A. No.

Q. So what happened after he -- you were notified by IPPC that -- actually, step back a second.

Did Mr. Stilley tell you at that time that he was ceasing to authorize the debiting of his account?

A. He did not, no.

Q. After Mr. Stilley notified IPPC that they were not authorized to withdraw money from his account to pay for the services, what happened?

A. Well, he failed to -- to pay. Basically IPPC put him on invoice billing, but he failed to pay any of those invoiced bills. I had spoke with him in the middle of August, August 14th of 2024, over the phone about those payment issues, directed him to pay off his full balance by August 31st or he would risk having his monitor software uninstalled from the two devices, which would present a scenario where he's not only in violation because he failed to comply with the -- with the monitoring software and failed to pay for it, but also he would then be believed to be in possession of two devices with Internet access with no approval. He -- he stated he understood, and that was that.

THE COURT: I'm not sure what you mean by "that was that."

THE WITNESS: That was -- excuse me, Your Honor. That

was the end of the conversation.

Q.  (By Mr. O'Reilly) Did --

THE COURT:  So at the end of that conversation, your understanding with Mr. Stilley was that he would be doing what?

THE WITNESS:  I didn't have an understanding, Your Honor.  The way -- the way the conversation went is I explained the stipulations to Mr. Stilley, and he just said, "Okay. Thank you.  I appreciate it," and then it was up to me to wait until August 31st to see if he paid or not.

He wouldn't give me a clear answer by that time if he was going to -- going to actually go forward and pay for the software or the invoices.  He did later, but --

Q.  (By Mr. O'Reilly) When you say he did later, what did he do later?

A.  Towards the -- really August 29th, August 30th, that time frame, I reached back out to Mr. Stilley by email; asked him if he had any intention on paying the -- the invoice; reminded him that he had to pay it in full before the next day, or before the 31st; and he had responded on the 30th saying that he had no intention of paying any bills sent to him by IPPC.

Q.  Did Mr. Stilley express any concern about what you had told him before about the monitoring systems might be shut off?

A.  No.  And he had asked when he might expect that the software would be uninstalled from his devices.

Q.  Was the software uninstalled from his devices?

A.   Why is it uninstalled now?

Q.   Was it uninstalled?

A.   Eventually, yes.  But not at that time.

Q.   Who uninstalled it, if you know?

A.   So, what had happened was, I think it was early September, I got a notification from IPPC that just stated that there had been no communication between the software and Mr. Stilley's phone -- smart phone for three days.

I contacted Mr. Stilley to ask him if he had done something to interrupt the software or if it was simply a technology issue that we could address through, you know, an appointment with IPPC and reinstallation.  He wouldn't answer my questions.

Later down the road, I think sometime in October, my district, we uninstalled the software officially, but it hadn't been, you know, recording or receiving communications from the -- from his two devices since that early September time period.

Q.   So when the software, the monitoring system, stopped communicating with IPPC, had your office uninstalled it?

A.   No.

Q.   Had IPPC uninstalled it?

A.   No.

Q.   Did Mr. Stilley tell you in any way or indicate why it was no longer working?

A.   He did not.

Q.   Did you ask him?

A.   Yes.

Q.   Is one of the functions of that monitoring system that it allows U.S. Probation to see who a person under supervision is communicating with?

A.   Yes.

Q.   And, in fact, that -- you already spoke about Ms. Misty Webb and her husband, Patrick Webb.  Well, we don't know that -- and Patrick Webb who shares the same surname?

A.   Yes.

Q.   Were there other individuals that you were seeing him in communication with that had raised concerns for you?

A.   Yes.

Q.   And that, I think, takes us to the petition itself.  The allegation of violation, the fifth one, prohibiting him from communicating with individuals either engaged in criminal activity or who have been convicted of a felony without U.S. Probation's permission, correct?

A.   Correct.

Q.   Did he violate that term?

A.   Yes.

Q.   How did you first become aware that he was in violation of that term?

A.   It's hard to nail -- to -- to specifically point out a specific date.  It was during the time period of establishing

the delegation process with REVAMP and Ms. Rush up until when I was contacted by Ms. Rush in April of -- of 2024 and informed that they believed he was communicating with people with -- with -- like, in prison not on REVAMP business.

I had been documenting weekly his activities in case more information came to light. It was just very much in the beginning in a gray area, and I needed more before I could move forward with any sort of violations.

Q. What forms of communication did you become aware of between Mr. Stilley and persons or people who had felony records?

A. Several via CorrLinks. Looking for specific people?

Q. Not yet.

Was there also email communications outside of CorrLinks that you had access to?

A. Yes.

Q. Was there text messaging?

A. There was.

Q. I'm going to ask you now, drawing your attention to page 82 of Exhibit 1 --

MR. O'REILLY: If I may approach, Your Honor?

THE COURT: You may.

Q. (By Mr. O'Reilly) So drawing your attention to page 82 of Exhibit 1, do you have that in front of you yet?

A. Yes.

Q. Okay. What is page 82 of Exhibit 1?

A.   Page 82 is an email that Mr. Stilley received from -- it looks like a person with the last name Daniel on June 3rd of 2024.

Q.   Was Mr. Stilley employed at REVAMP on that date?

A.   No.

Q.   And does that email indicate whether Mr. Daniel had been convicted of a felony?

A.   Mr. Daniel discusses being convicted of a felony involving discharging a firearm during a drug trafficking crime.

THE COURT:  Let me ask a question.

On this page, 82, after Mr. Daniel's name, it gives a -- an eight digit number.  Is that his inmate register number?

THE WITNESS:  It is, Your Honor.

THE COURT:  Okay.  You may continue.

Q.   (By Mr. O'Reilly) I'm going to ask you now to go to --

MR. O'REILLY:  Again, I'm going to have to ask the Court's indulgence to approach the witness.

THE COURT:  You may.

Q.   (By Mr. O'Reilly) Showing you Exhibit 2, pages 66 -- 68, I apologize, to 76.

A.   Yes.

Q.   Please tell the Court what is contained in pages 68 to 76.

A.   Well, between those pages, it's various communication between Mr. Stilley and Michael Allen Dicks, Jr., register number 34954-045.  It also includes a copy of a judgment issued

against Michael Allen Dicks, Jr., in the Western District of Missouri where he was convicted of possession with intent to distribute 50 grams or more of methamphetamine and possession of a firearm in furtherance of a drug trafficking crime on November 17th, 2021.

Q. I'll ask you now to turn to the next set of pages in that same Exhibit 2, pages 77 to 90.

A. Okay.

Q. Can you please describe to the Court what is contained in those pages?

A. You said until -- from 77 to 90?

Q. Yes, nine-zero.

A. Those pages show emails between Mr. Stilley and Thomas Hamet, register number 16997-027, as well as a judgment issued against Mr. Hamet in the Northern District of Indiana where he was convicted of possession with intent to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking crime with forfeiture allegation on February 13th of 2018.

Q. I'm going to ask you to go back now, I apologize, to Exhibit 1, pages 86 to 89.

        MR. O'REILLY:  And, Your Honor, if I may approach?

        THE COURT:  You may.

Q. (By Mr. O'Reilly) Document 802.

A. Huh?

Q.  802.

A.  I'm at page 86.

Q.  Hold on.  86 to 89, I believe.

A.  Yes.

Q.  Can you tell the Court what that is?

THE COURT:  Now, you're in which exhibit now?

MR. O'REILLY:  This is Exhibit 1, Your Honor.

THE COURT:  Okay.

MR. O'REILLY:  Document 792.

A.  Those pages reflect email communication between Mr. Stilley and a Rafael De La Cruz-Jimenez, register number 56269-004.

Q.  (By Mr. O'Reilly) Now I'm going to ask you to draw your attention to -- actually --

MR. O'REILLY:  The Court's indulgence for just a moment, please.  May I approach, Your Honor?

THE COURT:  You may.

Q.  (By Mr. O'Reilly) I would ask you now to return to Exhibit 2, document 802, pages 91 to 103.

A.  Okay.

Q.  Will you please describe for the Court what is contained in those pages?

A.  So page 91 through -- well, page 91 is from IPPC monitoring.  It shows communication between Oscar Stilley and a Julie Stilley.  It appears that an individual named Ken was looking to get in touch with Mr. Stilley.

THE COURT:  Now, you say that -- you're seeing -- I see on page 91 a reference to Julie.  And what's your understanding -- and then there's a letter -- a reference to Julie Stilley?

THE WITNESS:  Yes.

THE COURT:  Do you know -- do you know who that is or was in relation to Mr. Oscar Stilley?

THE WITNESS:  Yes.  I believe it's Oscar Stilley's ex-wife.  And I've noticed that they communicate here and there.

A.  On page 92 through 94, it's communication through the IPPC monitoring program that shows Mr. Stilley and a Ken Nickel speaking.  Some of the -- some of the discussions appear to be related to some legal issues that Ken is going through.

THE COURT:  Now, are you suggesting that -- obviously, we have a couple of the conditions in play here.  One is not communicating with convicted felons, or I think it's worded a little differently than that.  And then the other one relates to the unauthorized practice of law.  Are you saying that your understanding is that Mr. Ken Nickel is a convicted felon or --

THE WITNESS:  Yes, Your Honor.  The remaining pages -- was it 95 to 103?  Yes.  So from -- so the remaining pages, from 95 to 103, reflect that Mr. Nickel was -- was recently arrested, or had been, for a petition to revoke, which is a felony charge.  And then he had also been previously convicted,

if I can find it, of Terroristic Threatening in the First Degree, which was considered a Class D felony in the State of Arkansas, and he was sentenced to 24 months imprisonment with 48 months' suspended imposition of sentence.

THE COURT:  Okay.  I see that now.

Q.  (By Mr. O'Reilly) Mr. Forsyth, with respect to all the communications we've discussed so far, did all of the communications occur after Mr. Stilley was no longer working at REVAMP?

A.  Yes.

Q.  With respect --

THE COURT:  Let me know when you get to a convenient stopping point, and we'll take our midday break.

MR. O'REILLY:  Your Honor, what I intend to do is just a couple more questions on this violation.

THE COURT:  Very well.

MR. O'REILLY:  Then that would be a good stopping point.

THE COURT:  Very well.

Q.  (By Mr. O'Reilly) With respect to all of these communications and these individuals, at any point did Mr. Stilley identify them to you as people he was communicating with?

A.  No.

Q.  Did he ever ask permission to communicate with these

individuals?

A.   No.  And just to -- I want to clarify.  That isn't about Patrick Miller Webb, correct?  We're just talking about the -- the few that we've looked at just now in the -- in each of the exhibits?

Q.   Correct.  We have not yet discussed Mr. -- this question is not related to Mr. Webb.

A.   No, I -- to my knowledge he did not reach out to me and ask me permission to speak with those individuals.

          MR. O'REILLY:  Your Honor, given the nature of the next two contacts, this would be a fine place to stop and then we can continue after the lunch hour.

          THE COURT:  Very well.  We'll take our midday break at this point.  Everybody just stand by for just a minute.

     Okay.  I've got just a little before noon.  Let me speak just a moment with Ms. Lynn.

     (Off-the-record discussion.)

          THE COURT:  We'll take our midday break at this time. I'm going to keep this short, and I'll -- we will resume promptly at 12:45.  Court will be in recess.

      (Lunch recess had.  For further transcription, see Volume II.)

**REPORTER'S CERTIFICATION**

I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

                    CERTIFIED:  s/Jennifer Golemboski
                                Jennifer Golemboski, RPR, RMR
                                United States Court Reporter
                                333 West 4th Street, RM 411
                                Tulsa, Oklahoma  74103
                                (918) 699-4786
                                jennifer_golemboski@oknd.uscourts.gov