UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,           )
                                    )
            PLAINTIFF,              )
                                    )
vs.                                 )   Case No. 09-CR-43-SPF-2
                                    )
                                    )
OSCAR AMOS STILLEY,                 )
                                    )
            DEFENDANT.              )


TRANSCRIPT OF PROCEEDINGS
REVOCATION AND SENTENCING
NOVEMBER 13, 2024
BEFORE THE HONORABLE STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE
VOLUME II


A P P E A R A N C E S


**FOR THE PLAINTIFF:**
     MR. CHARLES A. O'REILLY
     U.S. Department of Justice, Tax Division
     150 M. Street, Room 2.404
     Washington, DC 20002

**FOR THE DEFENDANT:**
     MR. OSCAR AMOS STILLEY, pro se
     MR. TREVOR L. REYNOLDS, Attorney at Law
     1700 SW Boulevard
     Tulsa, OK  74107


Transcribed by:  Laura Griffin, RMR-CRR, Laura_Griffin@oknd.uscourts.gov

**INDEX
VOLUME II**

WITNESSES ON BEHALF OF THE GOVERNMENT:

RYAN FORSYTH

Continued Direct By Mr. O'Reilly ........................... 110

Cross By Mr. Stilley ...................................... 121

Closing Argument by Mr. O'Reilly ...................... 174

Closing Argument by Mr. Stilley  ..................... 182

Ruling by the Court .................................. 188

PROCEEDINGS:

THE COURT:  Good afternoon.  We are resuming in criminal 09-043, United States of America versus Oscar Stilley with the parties and counsel, including Mr. -- is it Reynolds?

MR. REYNOLDS:  Reynolds, Your Honor.

THE COURT:  Present as before.

Mr. O'Reilly, you may continue.

MR. O'REILLY:  Thank you, Your Honor.

We actually may be able to speed this up a bit.  Mr. Stilley and I had a discussion, and correct me if I misstate this, all of the facts that are in the petition, including the exhibits, the communications with the people who were felons, the communications with Mr. Potter, the communications with Mr. Webb.

The voter registration form was completed by Mr. Stilley and he stopped making restitution payments after July of this year.  So basically all of the factual representations in the petition filed I believe, Mr. Stilley, that's --

MR. STILLEY:  Actually, Your Honor, that's not quite it.  I was talking about the additional material about further persons with criminal record that in the interest of time I didn't challenge any of that.

MR. O'REILLY:  Oh, okay.

MR. STILLEY:  I do want to do a cross-examination because there are a few material facts that are not correct

that I would like to point out to the court.  But I'm trying to save time.

THE COURT:  Okay.  I'm not quite clear.  And we're going -- we're going to have to recess at about 1:30 because Mr. Reynolds has a docket and that's only 45 minutes from now.

Perhaps during that recess, which will probably be a little over a half hour, during that recess maybe you can iron out this stipulation.  But I'm -- from what I'm hearing, there may be a stipulation that may be helpful to the court but I'm not hearing it yet based on Mr. Stilley's qualification.

MR. O'REILLY:  Your Honor, if I may make inquiry of Mr. Stilley as to what specifically the facts that he is taking issue with and then we can carve that out.

THE COURT:  Well, why don't you do that.

MR. O'REILLY:  At the break.

THE COURT:  Yeah.  Do that during our break and see if you can arrive at a stipulation.

And let me assure Mr. Stilley, Mr. O'Reilly has referred to stipulating to facts, and I recognize certainly the difference between facts and conclusions to be drawn therefrom or conclusions to be expressed in the petition.  The conclusions are for me to make and I will assure you that by stipulating to factual matters set forth in the petition, if you choose to do so, you are not thereby stipulating to any conclusions.

Those conclusions are for me to make and with all due respect to Mr. Forsyth and for no one else.  So I'll give you that degree of assurance and perhaps you can revisit the matter of a stipulation during the recess that will begin in about 45 minutes.

MR. STILLEY:  Your Honor, if I may speak to that, I would gladly waive, formally waive, his appearance for the time that is necessary to go and do that if it's acceptable to the court.

He's been very, very helpful.  I'm so grateful and I don't want to take this court's time unnecessarily.

THE COURT:  Well, Mr. Reynolds, you are authorized to excuse yourself at the appropriate time.  And when I see you stand up, and you're not hard to miss, when I see you stand up, I will inquire of Mr. Stilley as to whether he still prefers or is still willing to proceed without you for that period of time.

MR. REYNOLDS:  Thank you, Your Honor.

THE COURT:  Very well.

MR. O'REILLY:  Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MR. O'REILLY:

Q.  Mr. Forsyth.

A.  Yes.

Q.  Are you familiar with an individual, the name of James --

Jason Potter?

A.  Yes.

Q.  Who is Jason Potter?

A.  I've seen Jason Potter's name on several occasions when monitoring Mr. Stilley's activities through the IPPC monitoring software that's installed on his devices and through accessing his Corrlinks account.

Mr. Potter is an individual that's currently incarcerated in the Bureau of Prisons.  There is various communications between them from May of 2024 through the last time I looked, sometime in October of 2024.

Q.  Could you briefly describe the nature of those communications?

A.  There's been a lot of communications I've seen over the last year, year to two.  Generally it was about, I believe, certain issues about his case, meaning -- his meaning Potter, and I think they were communicating about maybe some sort of administrative action or appeal that Potter might have been working on.  I would have to look at them to refresh my memory completely.

Q.  Are those communications contained in Government's Exhibit 2 at pages 118 through 163?  They are somewhat voluminous.

A.  Yes.

Q.  In addition to Mr. Potter being a convicted felon, were there other concerns that you had when you reviewed these

communications?

A.   Yes, there were.  Those concerns were that he was, you know, maybe giving legal advice.

Q.   When you say "he," who are you referring to?

A.   Sorry, Mr. Stilley had been giving Mr. Potter legal advice and assisting him in a legal capacity.

Q.   And these communications continued until at least how late?

A.   I think I first discovered them and documented it in May of 2024 and it was through -- through October of 2024 that they had still been communicating.

Q.   Was there another individual who is a felon that you became concerned about communications between Mr. Stilley and the individual?

A.   Yes, that was with Mr. Patrick Miller Webb.

Q.   And are those communications contained in Government's Exhibit 2, pages 164 to 256?

A.   Yes.

Q.   Was Mr. Webb a felon?

A.   He is.

     Included in that page or the page range that you gave is a judgment.  Would you like me to read the judgment?

Q.   No need to read the judgment but it is a felony conviction?

A.   Yes.

Q.   And what page is that on just for the court?

A.   That's from page 250 to 255 -- or, excuse me, 256.

Q.   In addition to Mr. Stilley communicating with a person who was a felon, did you have other concerns raised by the nature of these communications?

A.   Yes.  Again, similar to my concerns with Mr. Potter it was that he was communicating with Mr. Webb and providing him assistance with legal matters, advice.  It looked like he was helping him draft certain -- certain documents that were to be filed in a court proceeding or towards a court case.  That concerned me based on his background and his conditions.

Q.   By his conditions --

THE COURT:  Now you're still speaking in terms of Mr. Webb and interacting with Mr. Stilley; is that correct?

THE WITNESS:  Yes, Your Honor.

Q.   (BY MR. O'REILLY) When you say "his conditions" and "his background," who are you referring to?

A.   Mr. Stilley.

Q.   Mr. Stilley received approximately how much money from an individual by the name of Misty Webb?

A.   $4,000.

Q.   Was that before or after the -- or during the communications with Mr. Webb?

A.   I believe it was during.

Q.   Did the communications with -- between Mr. Stilley and

Ms. Webb reference Patrick?

A.   Yes.

Q.   I'm going to ask you now to -- no, we'll move on.

Did condition 8 require -- is that the condition -- excuse me, condition 7, I believe.  I'm sorry.  Condition 7 -- or violation number 7, not condition 7?

THE COURT:  Let me interrupt with a question.

I certainly note the -- in Government's Exhibit 2 at page 250 I do note the judgment -- the criminal judgment against Patrick Webb.  Now, do I understand the government to be asserting that in addition to a violation of the prohibition against communicating with convicted felons there's also from the government's perspective at least reason to believe that Mr. Stilley was also engaging in the practice of law vis-a-vis Mr. Webb?

MR. O'REILLY:  Yes, Your Honor.

THE COURT:  What pages of Exhibit 2 would you rely on for that?

MR. O'REILLY:  There was quite a bit, Your Honor. Your Honor, between the pages of 164 to 256 -- well, not -- not 256, up to the judgment so up until 249 there's a whole series of communications.  On page 173 there is a specific discussion of remedies with respect to some type of legal matter.

From pages 182 to 209 there's an extended discussion and

examples of a motion under Section 2255 of the United States Code. And on pages 210 through 213 there are discussions of informal remedies.

That is just a sampling of some of the discussions, the communications, from which the government argues that Mr. Stilley was, in fact, engaging in the unauthorized practice of law by giving legal advice to Mr. Webb.

THE COURT: So you're citing page 169, 182 through 209, 210 through 213; is that correct?

MR. O'REILLY: I believe I said 173, not -- let me look at 169, Your Honor.

THE COURT: Okay.

MR. O'REILLY: Yes, Your Honor, 169 would also be.

THE COURT: You're talking about 169 and 173, 182 through 209 and 210 through 213?

MR. O'REILLY: Yes, Your Honor, by way of example.

THE COURT: You may continue.

Q. (BY MR. O'REILLY) Did Mr. Stilley violate the terms and conditions of release requiring that he not commit a violation of law?

A. Yes.

Q. What was that violation of law?

A. He was arrested on July 12th -- or, excuse me, he was arrested on September 24th, 2024, and charged with perjury.

Q. What was the basis of that charge?

116

A.   The basis was that on July 12th, 2024, Mr. Stilley had submitted an Arkansas voter registration application to the Crawford County, Arkansas, circuit -- or circuit clerk, I believe, and on the form it asked if he had ever been convicted of a felony without a sentence having been discharged or pardoned.  He checked "no" for a response to that and then wrote "I have not lawfully -- I have not been lawfully convicted of a felony by a lawful court."

Q.   Did Crawford County issue him a voter registration card?

A.   They did.

Q.   I think you already indicated that Mr. Stilley was arrested on this by Arkansas authorities; is that correct?

A.   Yes.

Q.   Do you know if there is a trial date?

A.   There is.

Q.   Is it sometime in May of next year?

A.   I think so, yes.

Q.   So he has not just been arrested but formally charged by the State of Arkansas?

A.   Yes, he has.

Q.   And some of the contents of that are what is Government's Exhibit 3?

A.   Yes, which I have here.

Q.   And are some of the other contents contained in Government's Exhibit 2 at pages 60 -- 60 through 66?

A.   Yes.

Q.   Did Mr. Stilley's conditions of release require him to notify you or U.S. Probation if he was contacted by or arrested by law enforcement?

A.   Yes.

Q.   Did Mr. Stilley -- step back a second.

     Was there a time frame with respect to how soon he was supposed to notify you?

A.   Yes, 72 hours.

Q.   Did Mr. Stilley notify you of his arrest within 72 hours?

A.   No.

Q.   When was Mr. Stilley arrested again?

A.   He was arrested on September -- excuse me, September 24th of 2024.

Q.   Did Mr. Stilley ever advise you that he was, in fact, arrested?

A.   We discussed it when I went and served him the petition or the summons from the petition in this proceeding.

Q.   On what date was that?

A.   That was October 16th of 2024.

Q.   How many days after he was arrested did Mr. Stilley notify you?

A.   It was more than three.

Q.   Did Mr. Stilley have an explanation of why he didn't

notify you?

A. I believe he had told me that he was in jail for three days. That was one part of it so he felt like he couldn't comply with it regardless. But then more so focused on being, I guess, or disagreeing with the State using the resources they did to come to his house and to arrest him when he had told, like, the prosecutor's office and a few others that he would turn himself in and that if anything came from that, from, you know, the voter registration issue.

Q. I do want to do the math on this. I apologize.

Mr. Stilley was arrested, I think you said September 24th?

A. Yes.

Q. And he got out of jail following that arrest on what date?

A. September 27th.

Q. The date that you served him the subpoena -- not the subpoena, the summons with respect to this hearing was on what date?

A. October 16th.

Q. So this was well over two, approaching three weeks after he got out of prison on the -- after the arrest?

A. Yes.

Q. Had you had any communications with Mr. Stilley in the interim?

A.   In between that time period?

Q.   Yes.

A.   Yes.  I contacted him on -- by telephone a day or two prior to me going to see him just to ensure that he would be available for me to do the home contact.

Q.   Do you have any recollection of what that conversation was about?

A.   Yeah, it was strictly about whether he would be available and my plans on when I believed I'd be coming to see him.

Q.   Did you speak with Mr. Stilley?

A.   Yes.

Q.   Did Mr. Stilley advise you during that phone call that he had been arrested?

A.   No.

          THE COURT:  And roughly when was that?

          THE WITNESS:  That was -- that was October 14th, 15th.

          THE COURT:  But it was about the 16th then that he informed you of the -- this contact with law enforcement?

          THE WITNESS:  Yes.

          THE COURT:  Okay.

Q.   (BY MR. O'REILLY) Mr. Forsyth, in the petition that you provided Mr. Stilley on the 16th, did that contain an allegation that he had violated that term of release?

A.   Yes.

Q.  Was Mr. Stilley required -- excuse me, we already know this, I apologize.

Did Mr. Stilley violate the term of release requiring him to make restitution payments?

A.  Yes.

Q.  Please describe the nature of that violation.

A.  Mr. Stilley last submitted a payment towards his restitution on July 8th, 2024.

Q.  How did you learn that Mr. Stilley had stopped making restitution payments?

A.  Through a program called OPRA that we have access to in our system.  That's how we track payments.  I'm able to go into OPRA and search by district as well since it's -- the payments are going to a different district than where I work at.  And that reflected the last payment was July 8th, 2024.

Q.  Did you discuss Mr. Stilley's nonpayment of restitution with Mr. Stilley?

A.  We did have a brief discussion about that.  I remember talking to him about his lack of payments during a conversation in September.  It was when I called him and asked about the monitoring software interruption.

There was also an email that he had sent to me with monthly reports and an attachment document and in that document he alluded to not paying his restitution that month because he felt that Clinton Johnson -- or he stated in this

attachment that Clinton Johnson needs to stop giving him the silent treatment.

Q.   Who is Clinton Johnson?

A.   The United States Attorney for the Northern District of Oklahoma.

Q.   Did you advise Mr. Stilley that he needed to continue making restitution payments?

A.   Yes.

Q.   How, if at all, did he respond?

A.   I don't recall.

MR. O'REILLY:  Your Honor, that is the government's submission.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. STILLEY:

Q.   Have you seen Oscar Stilley's voter registration?

A.   I have.

Q.   Okay.  So you know that the response to this was not a claim that there was no conviction but that there was no lawful judgment by a lawful court; correct?

MR. O'REILLY:  Objection, Your Honor.  I would ask does Mr. Forsyth know what's in Mr. Stilley's head.

THE COURT:  Well, I'm going to allow him to answer that question.

I think I -- in fairness to all concerned, I can say that

an assertion of the invalidity of the judgment entered in this case in 2010 which has been reviewed by the Court of Appeals will be unavailing but I'm going to -- I will hear the answer to that question and then we'll see where we go from there.

A.   Can you restate the question?

Q.   (BY MR. STILLEY) Sure.  What I'm asking you is, isn't it fair to say that in looking at the voter registration form Oscar Stilley didn't deny that a conviction had occurred?

A.   Is it okay if I look at the --

Q.   Sure, take your time.

     MR. O'REILLY:  It misstates the evidence.  The box is checked "did not commit a felony."

     THE COURT:  I will note the check in the box. That's Government's Exhibit 3?

     MR. O'REILLY:  Yes, Your Honor.

Q.   (BY MR. STILLEY) Have you had a chance to look at that?

A.   Yes.  I mean you checked -- or there's a box checked that says "no" on question -- or let me back up.  Number 10 on the voter registration application, there's A, B, C and D.

     On Section D it says "Have you ever been convicted of a felony without your sentence having been discharged or pardoned?"

     And you x-ed out the box next to "no".

Q.   Right.  But there's qualifying language along with that; correct?

A.   It says "If you check no" -- are you talking about what you wrote on it?

Q.   Yes.

A.   Okay.  What was written it says "I have not been lawfully convicted of a felony by a lawful court."

Q.   That's fair notice that Oscar Stilley had been convicted of a felony in some court; right?

             MR. O'REILLY:  Objection; calls for a legal conclusion.

             THE COURT:  Sustained.

Q.   (BY MR. STILLEY) What judgment would you say that Oscar Stilley is being supervised under today?

A.   The judgment.

Q.   Docket 752?

A.   I don't have the docket number for this judgment next to me.

Q.   Sure.

A.   But it's the judgment that was issued on November 21st of 2022.  It's that revocation judgment.

Q.   Right.  So you were here in court in this town the last time; correct?

A.   Yes.

Q.   So it's that judgment from that revocation that you were supervising me under; correct?

A.   Yes.

124

Q.  The previous judgment had been revoked; correct?

MR. O'REILLY:  Objection; calls for a legal conclusion.

THE COURT:  That is sustained.

MR. STILLEY:  Judge, I hate to do this but I need to have a clarification because if I don't know which one I'm accused of violating under this specific thing, I don't know how to attack it.  Can I get some help on what I'm accused of?

THE COURT:  Let me get you some clarity.  You will be a convicted felon until you draw your last breath unless you are pardoned or that judgment is otherwise vacated.  So this line of questioning is irrelevant to the issues presented by the petition.

MR. STILLEY:  Okay.  I'm trying to decide whether I have to attack the old one and the new one or whether the new one is the operative document.  And it's my understanding the new one is the operative document.

THE COURT:  They are both operative documents and I advise you of that as a matter of law.

MR. STILLEY:  So you're saying that even though the previous supervision was revoked, it is still active?

THE COURT:  The judgment entered in April of 2010 is, as we speak, a valid judgment.

MR. STILLEY:  I'm not asking about validity right now, I'm asking if it is in effect operative for the

125

supervision.

THE COURT:  There's a judgment of revocation, it speaks for itself.

MR. STILLEY:  Yes.

THE COURT:  And there's the original judgment entered in April of 2010 that speaks for itself.  I'm not going to sit here and render legal advice.

MR. STILLEY:  I understand, Judge, I'm just trying to figure out what I'm attacking.  My understanding is --

THE COURT:  You're free to consult with Mr. Reynolds on that score if you want to, but I'm not going to sit here and give you legal advice.  I have ruled that both documents are valid and they stand for what they say within their four corners.

We'll have -- either you can go visit with Mr. Reynolds if you want to or we'll have the next question.

MR. STILLEY:  Sure.

Q.  (BY MR. STILLEY) What you were trying to do and what you understood your job to do was to supervise under the authority of docket number 752, the revocation judgment; correct?

A.  Yes, the revocation judgment was what I looked to when supervising you.

Q.  Thank you.

Have you received the letter that says that Oscar Stilley owes the State of Arkansas nothing?  Have you received that?

A.  You'll have to be more specific.  I've received a lot of documentation in this case.

Q.  You may not have seen it.  It's dated November 12 of 2024.

A.  I'm not sure if I've received it.

Q.  Okay.  Well, if you haven't seen it, then I won't ask further questions about it unless, I mean, you're not aware it.  He's aware of it.

MR. O'REILLY:  Your Honor, I want the record to reflect, and Mr. Stilley may be willing to say, how is it you came by that document?

MR. STILLEY:  You sent it to me.

MR. O'REILLY:  Exactly.

Thank you, Your Honor.

Q.  (BY MR. STILLEY) As you sit there, do you have any reason to believe that Oscar Stilley owes any money to the State of Arkansas?

A.  I'm not sure.

Q.  You realize that the reason that the money all goes to the State of Arkansas is because federal law requires it; correct?

MR. O'REILLY:  Objection, Your Honor, calls for a legal conclusion.

THE COURT:  Sustained.

Q.  (BY MR. STILLEY) Okay.  Can you tell us then what your understanding is of the requirements of your office to make

payments in compliance with law?

A.   Yeah, so there's a judgment that was issued against you November 21st, 2022, and it states that -- in that judgment, that you owe $815,874.93.  And my job, I look at that number, and then I look at the last page, page 8, I look where you're required to submit payments of $50 or 10 percent of your net income, whichever is greater, on a monthly basis moving forward.

Q.   And that has to go to other injured parties.  If there's any other party entitled to restitution, they have to get paid first; correct?

        MR. O'REILLY:  Objection, relevance, Your Honor.

        THE COURT:  Sustained.

Q.   (BY MR. STILLEY) I'm asking about your office procedures, what your understanding is of what is required.

        MR. O'REILLY:  Objection, Your Honor.  You've sustained the objection already.

        THE COURT:  Sustained.

Q.   (BY MR. STILLEY) Okay.  You realize Oscar Stilley said that he was -- there was no liability there and that he would be entitled to a full refund.  You read that; correct?

A.   I'm confused of the question.  Can you restate that?

Q.   Okay.  Oscar Stilley has been making payments of $131 for most of this year; correct?

A.   Up until July 8th, yes.

Q.    Okay.    And you realize that Oscar Stilley said that he had no tax liability with the Arkansas Department of Finance and Administration or the State and that he would be entitled to all of that money back; correct?

MR. O'REILLY:    Objection, point of time of when Mr. Stilley said this.

THE COURT:    That's fair.    Why don't you rephrase it.

Q.    (BY MR. STILLEY) Sure.    In the latter part of this year after Oscar Stilley quit paying the restitution, isn't it correct that he told you that he had no liability to the State of Arkansas anyway so the money would just go in a circle, it would go to your office, it would be to the State and Oscar could claim it on his tax return and get it back?

A.    I vaguely recall you speaking about something to do with what was owed to Arkansas.    I was more focused on your violations so I didn't really retain much of what you had said to me so it's hard for me to verify that.

Q.    If it turned out that Oscar Stilley actually didn't have any liabilities to the State of Arkansas, would you agree that Oscar Stilley didn't commit a violation by not paying that amount?

MR. O'REILLY:    Objection, Your Honor, calls for a legal conclusion.

THE COURT:    Sustained.

**United States District Court**

And just for clarity, as I recall and I'll ask counsel, either Mr. Stilley or counsel to correct me if I'm wrong, the judgment provides for substantial restitution payable both to the State of Arkansas and separately to the IRS; is that correct?

MR. STILLEY: That is correct, Your Honor.

THE COURT: Okay. Very well. So for that reason I'm having trouble with this line of questioning but we'll hear the next question and we'll take it one step at a time from there.

MR. STILLEY: Sure. Can I explain to you my reasoning, legal reasoning for trying to establish this?

THE COURT: This is not the time for that. If you choose to do so, you may do so later.

MR. STILLEY: Okay.

Q. (BY MR. STILLEY) Now, you talked a little bit about the monitoring software; right?

A. Yes.

Q. And you said that it was needed for -- to detect fraudulent activities; right?

A. Yes.

Q. You never detected any fraudulent activities by Oscar Stilley, did you?

A. I feel that your communications with individuals in correctional centers and giving them advice could be perceived

that way.

Q.   So that could be fraudulent?

A.   In my opinion in the sense of you giving somebody advice legally and them taking it when they would have been probably better off going to an actual attorney that's a part of a bar that follows different ethical standards and could hopefully give them more appropriate advice.

Q.   So when you're talking about fraudulent activities, you're talking about that, even though -- correct?

You're talking about helping somebody with administrative matters with their paperwork; right?

MR. O'REILLY:  Objection, Your Honor.  He is not -- it's not alleged that he committed fraudulent activities so this is not relevant to the inquiry.

THE COURT:  Well, before I rule on that objection, where is it that you're picking up this reference to fraudulent activity?  Is it in the petition?

MR. STILLEY:  No, it's not in the petition it came from his testimony on the stand.  I made a note of it.  I just want him to admit that Oscar Stilley didn't commit any fraudulent activities.

THE COURT:  Well, the -- there's -- I stand to be corrected, and I'm sure Mr. O'Reilly will do so if I'm wrong. I don't think there is an asserted violation in the petition that relies on proof of fraud.  So I sustain the objection.

You're not -- you're not on trial this afternoon for fraud.

Q.   Now, you watched the Oscar Stilley screen for how many months approximately?

A.   Let me reference my notes.  17 months, I think approximately.

Q.   Sure.  And an extensive portion of that was while Oscar Stilley was employed by REVAMP; correct?

A.   Correct.

Q.   And you saw various inmates make donations to REVAMP; correct?

A.   No.

Q.   You did not see that?

A.   No, not that I could see, no.  Not to say that that didn't occur or that hadn't happened, but nothing stands out for me about -- in my recollection of my reviews of data every week of your activities online that showed that multiple donations came through.

Q.   Okay.  Oscar Stilley told you that he solicited donations from inmates; isn't that correct?

A.   You mentioned it, I believe, in an email.

Q.   Okay.  And you didn't have any objection to that; right?

A.   It was regarding employment.

Q.   Sure.  So that's fair, that's fair; right?

A.   Yep.

Q.   And you also knew that Oscar Stilley provided a little bit

**United States District Court**

of administrative assistance for those inmates; right?

A.   That's what you had claimed to me.

Q.   Okay.  You might say that it was something else but it was -- at the minimum it was administrative assistance; correct?

MR. O'REILLY:  Objection; asked and answered.

THE COURT:  I'll hear the answer to that.

The documents before me, I think, provide more clarity than this witness' understanding of what you may or may not have been doing but I'll hear the answer to that.

A.   I would say it went further than administrative assistance duties.

Q.   (BY MR. STILLEY) Okay.  We don't need to talk about that right now.  Thank you for your answer but --

THE COURT:  Okay.  Hold on.

Mr. Stilley, it is necessary for Mr. Reynolds to make his court appearance?  Do you waive his services during this period of probably somewhere in the neighborhood of probably 45 minutes to an hour for him to make his court appearance?

MR. STILLEY:  Your Honor, I will most cheerfully waive that.  I am so grateful to you for allowing me have his assistance.  Thank you.  I do waive this for this period of time.

THE COURT:  Mr. Reynolds, you may be excused.

MR. REYNOLDS:  Thank you, Your Honor.

Q.   (BY MR. STILLEY) Is it not also true that you watched Oscar Stilley prepare legal documents, for example, complaints on his computer for REVAMP?

A.   I'm not sure.

Q.   Okay.  You saw him write various things, write various documents for them; correct?

A.   I saw Mr. Stilley write a lot of various documents.

Q.   Isn't it true that some of those had either REVAMP at the top in the caption or one of their officers or supporters in the caption as the plaintiff?

A.   Nothing that I recall specifically.

Q.   Okay.  You do remember Oscar Stilley writing letters about legal matters; right?

        MR. O'REILLY:  Objection.  Just for clarity because part of what is alleged here is Mr. Stilley writing letters on legal matters, so a time frame and whether it was authorized by REVAMP I think is important.

        THE COURT:  That's fair.  I'll certainly allow you to get an answer to that but that clarification is appropriate.

        MR. STILLEY:  Certainly.

Q.   (BY MR. STILLEY) I'm just talking about the time frame when Oscar Stilley was employed by REVAMP and I'm asking you to search your memory and say do you recall Oscar Stilley preparing letters of a legal nature about litigation or

potential litigation or pleadings, things of that nature, for REVAMP?

A.  I recall letters.  Not an abundance of letters but I do recall seeing communication between you and Patti Rush talking about drafting either an email or a letter for her.  I saw discussions about possibly filing certain things but I never saw actual pleadings.

I saw a lot of Mr. Stilley filing lawsuits against, you know, there's a case in Texas that Mr. Stilley has a lawsuit against a doctor there on the abortion ban.  There's a lawsuit filed against former President Trump.  I think it was in Eastern District of Arkansas.

And then the -- the lawsuit with the Arkansas Supreme Court on the abortion ban amendment that was on the ballot but was taken off.  Those kind of dominated what I had seen for legal documents.

Q.  Sure.  I understand that.

If you did see, for example, an FOIA pleading for REVAMP to try to get public records, you wouldn't have any problem with that, would you?  You wouldn't have any objection?

A.  Freedom of Information Act request?

Q.  To prepare a legal pleading.

A.  No, not especially if it's in the lane of employment.

Q.  Sure, absolutely.  Even though it is a legal document?

MR. O'REILLY:  Objection; calls for a legal

conclusion.

THE COURT:  Sustained.

Q.  (BY MR. STILLEY) Okay.  You would have to admit that that would not be the practice of law if Oscar Stilley drafted such a document for REVAMP; right?

MR. O'REILLY:  Objection, Your Honor, that is a legal conclusion.

THE COURT:  Sustained.

Q.  (BY MR. STILLEY) You never told Oscar Stilley that he shouldn't draft documents of a legal nature for REVAMP, did you?

A.  I don't think I told you that.

Q.  You never suggested that Oscar Stilley shouldn't do that; right?

THE COURT:  Should or shouldn't?

MR. STILLEY:  Shouldn't.

MR. O'REILLY:  Objection; asked and answered.

THE COURT:  I'll hear it then we'll get on to the next subject.

A.  Maybe just restate it, sorry.

Q.  (BY MR. STILLEY) You never suggested that Oscar Stilley shouldn't draft documents of a legal nature for REVAMP, did you?

A.  No.

Q.  If you had an objection just to Oscar Stilley drafting

materials of a legal nature, you would have said it, wouldn't you?  Would you not have?

A.  I would have.

Q.  That would be just as much the unauthorized practice of law as doing it for somebody else; right?

MR. O'REILLY:  Objection; calls for a legal conclusion.

THE COURT:  It's sustained on that basis and it's also irrelevant.  We've got other individuals amply reflected in the evidence in this case.  The fact that Mr. Forsyth may not have pursued any one possibility is really irrelevant to the allegations in the petition.

MR. STILLEY:  Your Honor, I want to make clear my point on this is that he didn't believe that was unauthorized practice of law and doesn't believe that any of these others were unauthorized practice of law either because none of those were any worse than what I did for REVAMP.

THE COURT:  Well, you're suggesting that there's something to be gained from your perspective by what he may believe or not believe.  I make my own conclusions from the facts before me.  Mr. Forsyth's belief or disbelief in any given proposition is really not relevant to the conclusions that I ultimately am required to make in this case.

And so whether he believes in a given proposition or for that matter disagreed with a given proposition as to what

constituted the practice of law is immaterial.  That's a conclusion for me to reach.

We'll have the next question.

Q.  (BY MR. STILLEY) Sure.  You have a duty to give guidance to your supervisees; correct?

A.  Yes.

Q.  You never gave Oscar Stilley any guidance that anything that he drafted for REVAMP was inappropriate because it might be unauthorized practice of law; correct?

A.  Correct.

Q.  And for the duration even up to today on all of the other things that have been discussed here, you have never once stated to Oscar Stilley "that is the practice of law and you need to stop," did you?

A.  I did not, no.

Q.  Thank you.

Now, were you told about the case that Patti Rush talked about, Markesha Goff and the decedent Rishard Walker?

A.  No.

Q.  That really doesn't ring a bell?

A.  No, not those names, no.

Q.  Do you remember the case in which an inmate at a jail had confessed to the murder or do you not?

A.  I don't.

Q.  Okay.  Assuming that Oscar Stilley committed unauthorized

practice, can you tell this court what courts in which Oscar Stilley, to your understanding, practiced law without authorization?  What courts?

A.  In specific courts?

Q.  Yes.

A.  I have no information about specific courts.

Q.  Isn't it true that you know that Oscar Stilley has not committed unauthorized practice of law in any court?

        MR. O'REILLY:  Objection, Your Honor, as to relevance.

        THE COURT:  I'll hear the answer.

A.  Can you restate it?

Q.  (BY MR. STILLEY) I'm asking for the names of some courts. I'm asking for names of the courts in which you think Oscar Stilley committed the offense of unauthorized practice of law.

        THE COURT:  In fairness to the witness, are you premising your question on the proposition that it's not unauthorized practice if it's not in connection -- if it's not in court?

        MR. STILLEY:  I'm saying that a law must be practiced -- the practice of law is in some court, it's not just out in the ether somewhere so I'm looking, okay, what courts does he think I committed unauthorized practice in.

        THE COURT:  I'm going to rule otherwise as to what constitutes the unauthorized practice of law.  So that

question is really not relevant to the -- my adjudication of the petition.

Q. Okay. What jurisdictions do you think that Oscar Stilley -- scratch that. Let me start over.

In what jurisdictions do you think that Oscar Stilley actually committed the unauthorized practice of law?

A. The Western District of Arkansas.

Q. And that's another district; right?

A. Correct.

Q. If an offense was committed, it was not in this district?

MR. O'REILLY: Objection; calls for a legal conclusion and relevance.

THE COURT: Sustained.

Q. (BY MR. STILLEY) Okay. I heard one district, let me make sure that that's the only one.

MR. O'REILLY: Objection as to relevance.

THE COURT: Sustained.

MR. STILLEY: Your Honor, if I could have a little proffer here, I think the testimony of this witness is going to be that that is the only jurisdiction that he can think of and I want to make sure this is clear on the record.

Can we see what this -- verify that this is what the witness would testify if he was allowed to say it?

THE COURT: The jurisdiction, whether this witness

is aware of where you physically were when you did this or that is really not material.

MR. STILLEY:  No, that's not what it's about.  What jurisdiction was the unauthorized practice committed in and he said the Western District of Arkansas.  I want to confirm, that's the only place.  That's the only jurisdiction.

THE COURT:  Well, okay.  Go ahead and ask that question then we'll get onto something else.

Q.   (BY MR. STILLEY) Okay.  The Western District of Arkansas, that is the only district in which you think Oscar Stilley has committed the unauthorized practice; right?

A.   Yes.

Q.   What pleadings or papers has Oscar drafted that had anything to do with the Western District of Arkansas or for that matter Arkansas all together?

A.   I don't quite understand your question.

Q.   Oscar Stilley didn't prepare any documents for use in those courts, did he?

A.   Not to my knowledge, no.

Q.   So he couldn't possibly have committed unauthorized practice of law in the Western District of Arkansas?

MR. O'REILLY:  Objection; calls for a legal conclusion.

THE COURT:  Sustained.

Q.   (BY MR. STILLEY) Okay.  Let's make sure we know what

documents that you're talking about.  If you had to rely on your best documents to prove that Oscar Stilley committed unauthorized practice of law in the Western District of Arkansas, what documents would you show this court?

A.  I would --

MR. O'REILLY:  Objection, Your Honor.  We have our exhibits before the court.

THE COURT:  Pardon me?

MR. O'REILLY:  The exhibits are before the court, if Mr. Stilley wants to take issue with specific ones, but asking him to pick out of a miriam is confusing and irrelevant.

THE COURT:  I agree with that.  At a more fundamental level there is a fundamental mismatch between you, your understanding of what constitutes unauthorized practice and what Arkansas law says is unauthorized practice.

And if I need to clear the air on this at this point, I will, but what particular document this witness would associate with you engaging in the practice of law in connection with any particular court especially is a matter that's not relevant to my adjudication of this petition.

MR. STILLEY:  Your Honor, not one of these documents touch the Western District of Arkansas top side or bottom, not even close.  I'm just trying to get the man to admit that, that there's nothing there.

And as far as the law of Arkansas, I saw the not law, not statute, but somebody's opinion of it that was put in.  If this is going to be an issue, I really want a chance, a show-cause order to brief this court, because I know for a fact there is zero chance that Oscar Stilley committed unauthorized practice of law.  I can prove it beyond a shadow of a doubt.

So but here's what I'm trying to do, I'm trying to nail it down.  Because if Oscar Stilley committed unauthorized practice of law in Indiana, I want to brief this court and prove Oscar Stilley didn't commit --

THE COURT:  I don't think there's any suggestion that you committed the unauthorized practice of law within the meaning of the law of any state other than the State of Arkansas.

MR. STILLEY:  Okay.  And here is what I'm trying to do, I'm trying to establish that none of those pleadings, except the ones for REVAMP that he had no problem with, had anything to do with Arkansas or her courts or her rules.

THE COURT:  That's immaterial.

We'll have the next.

MR. STILLEY:  Your Honor, most respectfully, Your Honor, I'm trying to find out how that can be immaterial when I see exactly zero evidence that I can even attack that, okay, this is arguable, maybe this was a violation of a statute on

unauthorized practice of law, it's not there.

I'm trying to hammer this down and just get the witness to say there's no such documents.  Because he's already admitted that the documents Oscar Stilley did for REVAMP which would clearly be unauthorized practice if just drafting a document was the issue.

THE COURT:  Okay.  This is a speaking objection that I'm not going to entertain.

We'll have the next question.

Q.  (BY MR. STILLEY) You don't have an understanding of the definition of legal advice, do you?

MR. O'REILLY:  Objection as to relevance, Your Honor.

THE COURT:  Sustained.

Q.  (BY MR. STILLEY) All the contacts that Oscar talked to in the Bureau of Prisons were approved by the Department of Justice Federal Bureau of Prisons, were they not?

A.  I'm not sure.

Q.  Okay.  Are you aware that in Corrlinks that no inmate is allowed to talk to somebody until the DOJ FBOP approves it?

A.  I was not aware of that or the specific process.

Q.  You said you watched my computer and see what I do; right?

A.  Yes.  And some of -- some of the details I had seen as far as when a new -- a new connection is made in Corrlinks, it says that they've put you on their permitted list.

Q.   Right?

A.   It doesn't say anything about certain officials notifying or, you know, reviewing an application from -- sent in from somewhere to talk to somebody in the Bureau of Prisons.  I do know it happens for certain classification levels.  We've been contacted by the BOP before on other cases saying, hey, these people are communicating but I don't -- I can't say for certain that every single time somebody uses Corrlinks and they're connected with somebody that the Bureau of Prisons has to vet them first.  And that is not my agency that I work for.

Q.   But you have seen Oscar copy and paste the code in so that he could get authorization to communicate with the inmates that you've been talking about; right?

A.   I don't think so, no.

Q.   You don't think so?

A.   I've seen a lot of things but I can't reasonably say that I saw you copy and paste a code.  I'm not --

Q.   But you know that at some point in time they're not authorized and then later they are authorized; correct?

A.   I'm not sure.  Like I just explained, my understanding, it kind of looked to me like if I was in prison and I wanted to talk to Oscar Stilley, I would just put Oscar Stilley's email address on my list of people I want to talk to and I would be allowed to talk to him until I decided I don't want to talk to

Oscar Stilley any more and then you're moved to the -- to a different list where you're not able to reach out to me.

Q.  Well, actually they do have -- they have to be approved and those were approved.

MR. O'REILLY:  Objection, Your Honor.  Testimony from Mr. Stilley, not from the witness.

THE COURT:  Sustained.

Q.  (BY MR. STILLEY) You have watched Oscar Stilley go and prepare messages to inmates; correct?

A.  Yes, I've seen -- I've seen Mr. Stilley draft messages through Corrlinks to inmates, yes.

Q.  And you see that it's, what, 20, 30 names, something like that?

You can see the list as I scroll down; right?

A.  See the --

Q.  The list of names.

A.  The list of names on what?

Q.  When I'm sending a message to somebody on Trulincs.

A.  Is Trulincs the same as Corrlinks?

Q.  Yes, I'm sorry.  Yes, Trulincs and Corrlinks is the same thing.

A.  I see screenshots.

Q.  Right.

A.  Of your screen, so it's not like a video.

Q.  Sure.

A.  So, yes, if it's on your screen, I can see it and I can see that you've communicated with some inmates.

Q.  Sure.  But you also see there is a list and the list gets bigger; right?

A.  My understanding of Corrlinks is that this list is only your inbox or your outbox, it's not necessarily an exhausted list of who you've communicated with.

Q.  Okay.  But you do realize it's not possible to communicate with somebody that's not approved; right?

MR. O'REILLY:  Objection as to relevance in this line of questioning.

THE COURT:  Can you help me -- concisely help me on the relevance of this?

MR. REYNOLDS:  Certainly, Your Honor.  What I'm saying is this man works for the Department of Justice and the prison officials work for the Department of Justice and the Department of Justice approved every single one of those people.  And the next thing I'm going to ask -- that's what I'm trying to say.

THE COURT:  The objection will be sustained.  Nobody in the DOJ has the authority to vitiate a condition of supervised release.

MR. STILLEY:  That's not my point.

THE COURT:  Well, then what is your point?

MR. STILLEY:  My point is that he knew that the BOP,

the Department of Justice, was approving these people and allowing me to talk to them.

And the next thing I'm going to do is to get into the fact -- the fact that he -- he got a call from some of these people objecting.

THE COURT: The fact that somebody at some FCI somewhere put these people on your approved list is irrelevant to the asserted violations in this petition.

Q. (BY MR. STILLEY) Mr. Forsyth, isn't it correct that you got a call from some prison officials complaining that Oscar Stilley was sending legal materials to Patrick Webb?

A. No.

Q. You didn't get that?

A. I did not get a call, no.

Q. Did you get communication?

A. From the BOP?

Q. Right.

A. Directly?

Q. Yes.

A. No.

Q. Indirectly?

A. Yes.

Q. It went to Kory McClintock, did it not?

A. I'm not sure about a call but I was sent a letter from Kory McClintock that was sent to their office advising that

Mr. Stilley --

Q.  So you know that the BOP complained about it on that -- in that instance; right?

A.  I wouldn't categorize it as a complaint.  It was a, hey, letting you know that somebody that was convicted of a felony in your district is communicating and trying to send materials to an inmate at our facility.

Q.  And you did not say, Oscar Stilley, that is forbidden under your terms and conditions, did you?

A.  I did not.

Q.  Now, did you -- I believe you had something to do with the drafting of these terms and -- not the terms and conditions, of the complaint, the petition?

A.  Yes.

Q.  Okay.  I want to ask you questions just one minute.

        MR. STILLEY:  If the court will excuse me.

Q.  (BY MR. STILLEY) Okay.  Can I draw your attention to document 792 at page 4.  Do you see that?

A.  Is that the -- or the petition?

Q.  Petition, that's the petition.

A.  Okay.  Page 4?

Q.  Right.  The -- it's a violation of special condition number 5, it's paragraph 6, the complaint 6, it says, "It is believed that the content of the communications detailed in violations numbers 4 and 5 in regard to Mr. Stilley's

Corrlinks account reflect that Mr. Stilley may be engaging in the unauthorized or unlicensed practice of law."  Correct?

A.  Yes, that's what it says.

Q.  Maybe does not -- it doesn't even rise to the level of preponderance of the evidence, does it?

MR. O'REILLY:  Objection, Your Honor, relevance.

THE COURT:  Sustained.

Q.  (BY MR. STILLEY) Would it be fair to say that that was speculation, the claim?

MR. O'REILLY:  Objection; relevance.

THE COURT:  Sustained.

Q.  (BY MR. STILLEY) Did you inquire of any expert on the law of unauthorized practice of law?

MR. O'REILLY:  Objection; relevance.

THE COURT:  I'll let him answer that.  Go ahead.

A.  No, other than discussing with Kory McClintock about what I -- what the evidence was and if that would be a violation.

Q.  Okay.  Kory McClintock is not an expert either; right?

A.  Not to my knowledge.

Q.  All right.  You talk about Oscar Stilley going to jail, and I appreciate the fact that you also said that he had offered to self surrender, but isn't it true that while Oscar Stilley was in jail you got a phone call from some of the people who had arrested Oscar Stilley?

A.  When?

Q.   While that Oscar Stilley was in jail, you had already gotten a phone call from the people who arrested Oscar Stilley?

MR. O'REILLY:  Objection.  Just a clarification, if Mr. Stilley could identify which time he went to jail.  I believe you're referencing the Arkansas arrest.

Q.   (BY MR. STILLEY) For three days.  The one that I'm in trouble for for not reporting it within three days, 72 hours.

A.   So violation number 7 and 8 we're talking about now; right?

Q.   Yes.

A.   Sorry, what was your question?

Q.   Okay.  Isn't it true that long before Oscar Stilley got out of jail you were already contacted by other law enforcement who told you that Oscar Stilley was in jail?

A.   Yes, I was contacted by a special agent and advised that you had been placed in custody.

Q.   So the problem was not your unawareness?  You were completely aware that Oscar Stilley went to jail long before the 72 hours?

A.   Yes, I was notified and found -- or made aware that you were in jail.

Q.   Okay.  And you know that Oscar Stilley told you that while he was in jail and at a video court hearing, he was told revocation proceedings were under consideration; right?

**United States District Court**

A.   Yes, you mentioned that.

Q.   You have no reason to disbelieve that, do you?

A.   I recall you saying something about hearing that.  I wasn't at the hearing though.

Q.   No, but there's no reason to disbelieve that that was said at the hearing; right?

A.   I wasn't at the hearing.

Q.   Sure, I understand that, but you already had knowledge?

        MR. O'REILLY:  Objection; asked and answered, Your Honor.

        THE COURT:  Sustained.

Q.   (BY MR. STILLEY) Is it not true that failure to report in 72 hours constitutes an offense?

A.   Constitutes a what?

Q.   Violation of supervision.

A.   Yes.

Q.   And that carries up to two years in prison; right?

        MR. O'REILLY:  Objection; calls for a legal conclusion of what the punishment would be.

        MR. STILLEY:  If it's less, I sure would like to know.

        THE COURT:  The premise for your question is correct, so you can consider that point to be made.

    We'll have the next question.

Q.   (BY MR. STILLEY) Okay.  So if Oscar Stilley called you,

for example, after he got out and got his feet under him and told you that he had went to jail, he confessed to a crime, did he not?

MR. O'REILLY:  Objection; calls for a legal conclusion, one, and it actually is incorrect.

THE COURT:  Sustained.

MR. STILLEY:  Just a minute.  If I could be heard on this, here is what I'm saying.  By telling him that I'm reporting after the 72 hours, I'm confessing to a crime and that is the objection and what I have told him.

THE COURT:  Well, the violation is your failure to report and that is not a testimonial act.

We'll have the next question.

Q.  (BY MR. STILLEY) Okay.  Isn't it also true that after Oscar Stilley got fired the third day, the 72 hours, ended on a Sabbath day?

A.  Can you -- Sabbath is on a Friday at sundown; correct?

Q.  Until the next sundown.

A.  We were told today in the hearing that per Patti Rush from REVAMP that you were terminated over the telephone on April 30th.

Q.  Would you deny it if you were shown from your own paperwork a memo that you got from Jeremy Bennett that said it was Wednesday the 1st at 1:23 p.m.?

A.  Yeah, I recall that memo and that's what I received too as

far as having a copy.  I'm just pointing out the testimony the -- the 30th --

Q.  You can't --

A.  So depending on the actual date, if we're looking at what Patti says that you were terminated over the phone on April the 30th, the three days goes until Thursday because that was a Tuesday.  If you're going based off the letter then, yes, the third day ends or is on the first day of the Sabbath.

Q.  Which one are you basing your arguments on, your testimony on?  The written -- the written memo from Mr. Bennett or something else?

MR. O'REILLY:  Objection; argumentative, unclear and irrelevant.

THE COURT:  Could you rephrase it.

Q.  (BY MR. STILLEY) Sure.  I'm asking whether you're basing your testimony about when Oscar Stilley got fired on Jeremy Bennett's written memo with the exact time, or somebody else who maybe didn't have their recollection refreshed and didn't know.

A.  I based it in the petition on the letter drafted by Jeremy Bennett.

Q.  So you credit his testimony; right?

A.  Yes.

Q.  Okay.  So based on that Wednesday at 1:23 p.m. the 72 hours would be Sabbath day at 1:23 p.m.; correct?

A.   It would be Saturday.

Q.   Well, I call it Sabbath, you can call it Saturday, that's fine.

A.   Sorry, I didn't mean any disrespect there.

Q.   That's okay.

A.   Yes, that's correct.

Q.   So the very next day Oscar Stilley reported to you that he lost his job, didn't he?

A.   Yes.

Q.   But that's one of the claimed violations of supervision right here; correct?  In this petition that's one of the claimed violations; right?

        MR. O'REILLY:  Objection; misstates the nature of the violation.  It's a lot more than not reporting within 72 hours.

        THE COURT:  Let me look at that question again.

     Would you rephrase your question.  I'm not sure I quite followed it.

        MR. STILLEY:  Sure.

Q.   (BY MR. STILLEY) Isn't it true that violation number 1, page two of document 792 about the third -- the second paragraph, last sentence, it says "Mr. Stilley did not disclose this change in employment until May 5, 2024, which is outside of the 72 hour time frame."

        MR. O'REILLY:  Your Honor, in fairness the rest of

it should be included.  "Since his termination from REVAMP on May 1st, 2024, Mr. Stilley has been unemployed and has failed to demonstrate adequate effort in obtaining appropriate full-time employment."

Q.  (BY MR. STILLEY) Isn't it true that part of this violation number 1 is the failure to report within 72 hours?

A.  Yes.

Q.  And that is despite the fact that Oscar honored the Sabbath and told you the very next day?

MR. O'REILLY:  Objection; asked and answered.

THE COURT:  I'll hear an answer to that just for the sake of clarity.

A.  Yes.

Q.  (BY MR. STILLEY) So why wouldn't Oscar Stilley also commit a violation of supervision?  If he called you or confessed to a violation of supervision, if he called you 78 hours after he was arrested?

A.  I'm confused by your question.

THE COURT:  I --

Q.  (BY MR. STILLEY) If Oscar Stilley reports late, that is confessing that he didn't report on time; correct?

A.  I'm not sure.  I think it would depend on how the conversation is -- occurs with the officer.

Q.  With what officer?

A.  Me.

Q.   Okay.

A.   You're reporting to me so you call me and tell me at a 78-hour mark that you were terminated from your employment, I think, you know, my -- my thought is, depending on the substantive nature of our conversation, maybe it's admitting to not reporting it within the 72-hour time frame, maybe it's not.

Q.   And the same thing would be true if Oscar Stilley got out of jail after 73 hours and on the 74th hour called you and told you when he got arrested; correct?

A.   Not necessarily.

Q.   You don't think so?

A.   No.

Q.   Let me help you.  Isn't it true that you get -- the supervisee gets 72 hours, no more nor less?

A.   Can you restate?

Q.   Isn't it true that the supervisee gets 72 hours to report an arrest or a loss of a job?

A.   Yes.

Q.   It's not 75 hours?

        MR. O'REILLY:  Objection; asked and answered.

        THE COURT:  Sustained.

Q.   (BY MR. STILLEY) So calling and reporting an arrest at 75 or 78 hours is confessing that you have committed a crime by not doing it within 72 hours; correct?

MR. O'REILLY:  Objection; asked, answered, and relevance.

THE COURT:  And it calls for a legal conclusion and it's sustained on all three bases.

Let me give you some assurance on one thing.  I don't know what my ultimate decision will be as to violation number 1, but if you are found in any respect to have committed a violation of standard condition number 7, which is asserted in violation number 1, it will not be because you failed to call on your Sabbath.  You can take that to the bank.

MR. STILLEY:  Thank you, Judge, I do appreciate that very much.  I'm just trying to establish the principle, the principle.  So I'll proceed.

THE COURT:  Well, I mean, if you want to talk me out of what I just said, that's fine.

MR. STILLEY:  No.  No.

Q.  (BY MR. STILLEY) Okay.  You said something about several pleas of the Fifth Amendment that have been complained of in this petition; correct?

A.  Other than what's in this petition?

Q.  In this petition to revoke.

MR. O'REILLY:  Objection.  Just for clarification, I think Mr. Stilley would need to point Mr. Forsyth to which assertions because there are various.

THE COURT:  That's fair.

Q. (BY MR. STILLEY) Okay, let's focus on number 2 since that's as good as any. You complained that Stilley pled the Fifth Amendment; correct?

A. I didn't complain, I reported.

Q. You reported and you're suggesting to this court that that is a violation of the conditions; correct?

A. Violation number 2 I reported that our office was unable to conduct a complete financial investigation regarding your financial circumstances based on your lack of answers on those documents.

Q. Isn't it true that Oscar Stilley on such forms periodically submitted and always stated that it was a good-faith invocation of the Fifth Amendment requesting that you tell him if you found something not to be a valid invocation of the Fifth Amendment and give him a chance to correct it?

A. I think you've asked for that, yes.

Q. And you have never told Oscar Stilley that you think this particular invocation of the Fifth Amendment is not qualified under the constitution and the case law, have you?

A. No.

Q. Now, you were aware that REVAMP was three paychecks behind when they fired Oscar Stilley; right?

A. I was told that by you.

Q. And you didn't have any reason to dispute that, did you?

A.  No.

Q.  And every time that you've asked Oscar Stilley to send you the pay stubs, you've always gotten all the pay stubs that you asked for from Oscar Stilley; right?

A.  Yep.

Q.  And when you have asked him for tax returns you've always got the tax returns promptly; right?

A.  Yes.

Q.  And when you've asked him for Cash App, PayPal or bank account statements, you've always got those promptly what you asked for; correct?

A.  Yes.  Since this term of supervised release commenced, yes.

Q.  Sure.  So don't you think it would be fair for a person to be told at least once that their invocation of the Fifth Amendment is legally inappropriate before filing a petition?

        MR. O'REILLY:  Objection; relevance.

        THE COURT:  Sustained.

Q.  (BY MR. STILLEY) Oscar Stilley has always been pleasant with you in our communication; correct?

A.  Yes.

Q.  Always been on time with his monthly reports except for the last one; right?

A.  Yes.

Q.  He didn't do that one, did he?

A.   He did not, no.

Q.   He got an extension until Friday, right, the 5th of this month?

A.   I think it was the 5th of -- well, today is the 13th?

Q.   Yes, but you gave Oscar Stilley an extension up to the -- up to Friday after the 5th; correct?

A.   Yes.

Q.   But Oscar Stilley asked you if pleading the Fifth on that form as Oscar Stilley always does would constitute a violation of supervision, did he not?

A.   I think you did ask that, yes.

Q.   And what was your response?

A.   I actually do not recall.  It could have been something of -- I tried to be vague about it because it -- this has been a -- an issue since the first term of supervised release, you putting the Fifth Amendment on documents.

The probation office the Western District of Arkansas feels that you should answer truthfully the questions on every form.  You have not done so.  It has prevented us from being able to perform our work.  So the only recourse that we have is to seek guidance from the court.

Q.   You would have to admit that the claimant exercise the Fifth Amendment privilege on that form, is a constitutional right; correct?

          MR. O'REILLY:  Objection; calls for a legal

conclusion.

THE COURT: Sustained.

Q. (BY MR. STILLEY) Let me rephrase that. You would have to admit that a valid invocation of the Fifth Amendment on that form is a constitutional right? Correct?

MR. O'REILLY: Objection; it still calls for a legal conclusion.

THE COURT: Sustained. That's a matter for me to decide. He can say yes or no and either way it would be of no moment to my conclusion on that score.

MR. STILLEY: I understand, Your Honor. I want you to understand what I'm trying to show here. I'm trying to show that I was given a trick bag that if I sign that and send it to him, which I wanted to do, that is treated as a crime that carries up to two years in prison which I object to. That nobody will explain what is invalid about this and give me a chance to correct my behavior and do things in accordance with the law. That's the trick bag that I'm objecting to and that's why I'm asking these questions.

THE COURT: We'll have the next question on a different subject.

Q. (BY MR. STILLEY) Now, you knew that Oscar Stilley was working on a book during the time that he was unemployed; correct?

A. You had mentioned a book, yes.

Q.   I believe you told me that you had watched it, watched parts of it on the screen as you were monitoring; correct?

A.   Every once in awhile I would see you writing something about fasting but, yeah.

Q.   So you knew that Oscar Stilley was busy doing some productive work?

A.   I mean it's -- sure.  You were keeping yourself busy.

Q.   Sure.  And you know that Oscar Stilley has a passion about helping other people get healthy; correct?

A.   Just from what I've seen about fasting on your PC monitoring data that you're interested in that.

Q.   And you know that that has been published on Amazon; correct?

A.   I think so, yes.

Q.   Now, at the time that Oscar Stilley got fired did you expect Oscar Stilley to just cut everybody off, all the inmates, just cut them off and don't say anything else to them?

A.   To be immediately in compliance, yes.

Q.   Okay.  Even if they had already paid some money and reasonably expected some services, that you wanted them just cut off; right?

MR. O'REILLY:  Objection; asked and answered.

THE COURT:  I'll hear the answer.  Go ahead.

A.   Can you restate?

Q. (BY MR. STILLEY) Even if they had paid money and reasonably expected administrative services, you expected them to be cut off from all communication; right?

A. Well, at the time of making that decision based off of no information from you that you had been paid by anybody to perform any service for them, so I just expected you to cut ties.

I think if somebody were to be more honest and open about what was going on, we -- it's hard for me to sit and Monday morning quarterback that decision with information or a scenario that didn't occur.

Q. But wouldn't that be fraudulent taking somebody's money and then not doing what you said you would do for it?

MR. O'REILLY: Objection; calls for a legal conclusion.

THE COURT: Sustained.

(Mr. Reynolds is back in the courtroom.)

Q. (BY MR. STILLEY) You're aware that Oscar Stilley did not get a ruling on his Fifth Amendment plea last time?

THE COURT: I'm sorry, I didn't mean to interrupt. Go ahead and ask your question again.

Q. (BY MR. STILLEY) The question is that Oscar Stilley did not get a ruling on the merits of his Fifth Amendment claims the last time?

A. At the last revocation?

Q.  Yes.

A.  Yes, my understanding is there was no ruling.

Q.  Yes.  And you were also aware that he had made additional efforts to get a ruling and was unable to do it?

A.  I don't recall the additional efforts.

Q.  Okay.  If you don't, that's okay.

Now, you talked about a photograph that hit Oscar Stilley's computer that had a photo of a check and who it was to and where it was going; correct?

A.  Yes.

Q.  Oscar Stilley obviously knows that you're going to be able to see that check; right?

A.  Yes.

Q.  So it would be exceedingly foolish to do that if he was actually trying to hide anything from you; right?

A.  It would -- yeah, I agree, it would be foolish.

MR. STILLEY:  Your Honor, if I may have just a moment?

THE COURT:  Surely.  And by the way, I do note that Mr. Reynolds has arrived about five minutes ago.

I appreciate your punctuality.

You may confer with Mr. Reynolds.

MR. STILLEY:  Thank you.

Q.  (BY MR. STILLEY) You do not deny that Oscar Stilley is a person within the meaning of the Fifth Amendment, do you?

MR. O'REILLY:  Objection as to relevance, Your Honor.  Plus it calls for a legal conclusion.

THE COURT:  I'm well satisfied that you're a person within the meaning of the Fifth Amendment.

Next question.

MR. STILLEY:  Thank you, Judge.  And I just want you to understand the reason I said that, the Fifth Amendment says no person shall be held to answer for an infamous crime except on indictment or presentment of the grand jury and there's none.

THE COURT:  I understand your point.

Q.   (BY MR. STILLEY) And also this is a criminal prosecution; is that not correct?

MR. O'REILLY:  Objection; calls for a legal conclusion.

THE COURT:  Sustained.

Q.   (BY MR. STILLEY) Okay.  Oscar Stilley faces up to two years in prison; right?

A.   Yes.

Q.   Okay.  So that would be an infamous crime; right?

MR. O'REILLY:  Objection; calls for a legal conclusion, plus relevance.

THE COURT:  Sustained.

Q.   (BY MR. STILLEY) You're not aware of anything in this petition to revoke alleged against Oscar Stilley that actually

occurred in the Northern District of Oklahoma, are you?

MR. O'REILLY:  Objection; relevance.

THE COURT:  Sustained.

MR. STILLEY:  Your Honor, could I -- I would like to get a proffer on that.  I've already talked to him, I know he'll be honest about it and he'll say the answer is, for purposes of the record on appeal, no, nothing that is alleged against Oscar Stilley occurred in the Northern District of Oklahoma.

THE COURT:  Very well.  You've made your proffer. Next question.

MR. STILLEY:  We're not going to be allowed to see what he would say to preserve that and make sure?

THE COURT:  No, we're not.  You've made your proffer.

We'll have the next question.

Q.  (BY MR. STILLEY) You saw when Oscar Stilley filed the case of *Stilley versus Thurston*; right?

A.  Yeah, around that time.  I didn't specifically see you like the day it was filed or anything but I knew that you were working on something.  I wasn't sure specifically exactly what it was.

Q.  And you knew that that was basically an open challenge to the validity of document 752, the revocation judgment; right?

Let me help you out, let me back up.

Let me ask you, isn't it true that you were enforcing revocation judgment 752, the supervision provisions?

MR. O'REILLY:  Objection as to relevance.  Calls for a legal conclusion.

THE COURT:  Sustained on both bases.

Next question.

Q.  (BY MR. STILLEY) Oscar Stilley has told you flat out his position that the judgment 752 is void because he was denied his Sixth Amendment right to counsel; correct?

A.  You have said that, yes.

Q.  That was basically -- that whole proceeding could not be construed as anything less than a challenge to 752, could it?

MR. O'REILLY:  Objection; relevance, Your Honor.

THE COURT:  Sustained.  Mr. Stilley, if you've got questions, further questions of this witness, that go to the facts asserted to substantiate the alleged violations, then you're welcome to ask those questions.  But the lines that you have been pursuing the last few minutes are of no conceivable relevance and for that reason no conceivable help to you.  As a matter of fact, it's kind of moving in the other direction.  And so that's a word to the wise.

So, again, if you have questions of this witness as to the facts underlying the allegations in the petition, you're welcome to proceed on that basis.

Q.   (BY MR. STILLEY) Rosa Parks challenged a facially valid law, did she not?

MR. O'REILLY:  Objection, Your Honor.

THE COURT:  Wait just a minute.  Say -- tell me your question again.

Q.   (BY MR. STILLEY) Rosa Parks challenged a facially valid law, did she not?

THE COURT:  The objection to that will be sustained.

Mr. Stilley, I'm going to give you a very short time to return to cross-examination as to the facts of this case.  If you don't return to cross-examination, if you have any further cross-examination as to the facts of this case, then I'm going to terminate your cross-examination.

And by the way, when I say facts, I'm carefully distinguishing facts from conclusions of law.

Q.   (BY MR. STILLEY) Patrick Webb sent Oscar Stilley materials of his own ideas on -- concerning his 2255; right?

MR. O'REILLY:  Objection, Your Honor.  I'm not clear what the question is.  I apologize.

THE COURT:  It sounded like it might be relevant but I have the same problem.

Could you rephrase it?

Q.   (BY MR. STILLEY) Okay.  Isn't it true that Patrick Webb sent Trulincs documents to Oscar saying what he was complaining about with respect to his judgment?

A.   Yeah, I believe so.

Q.   So Oscar Stilley just smoothed it up and made the language nice and did the work to make a nice pleading; right?

A.   I think Mr. Stilley went further than that.

Q.   Oh, you think so?  Do you have any evidence that he went further than that?

A.   I would look to the exhibits and the communications.

Q.   Okay.  What do you mean by going further than that?

A.   It wasn't just simply taking his idea, in my opinion, taking his idea and then how did you describe it, smoothing it and something.  I think you were working with him and giving him advice and ideas on how to proceed or consider -- things to consider, you know, legally.

Q.   That would be speculation; right?

          MR. O'REILLY:  Objection; calls for a conclusion.

          THE COURT:  Overruled.  You may answer.

A.   Can you restate?

Q.   (BY MR. STILLEY) That would be speculation that Oscar Stilley went beyond the role of administrative assistant?

A.   Me speculating, yes.

Q.   Okay.  Now you realize Oscar Stilley wrote a book called *Busting the Feds, How to Effectively Defend Yourself Against Federal Criminal Charges*; right?

A.   Yes.

Q.   There are sample pleadings at the back of that book;

right?

A.   I don't have a copy of the book.

Q.   Have you read it?

A.   No.

Q.   Have you looked at it?

A.   The cover.

Q.   At the cover.  Okay.  Assuming for the sake of argument that there are pleadings at the back of it, would you think of that as the unauthorized practice of law?

            MR. O'REILLY:  Objection; calls for a legal conclusion.

            THE COURT:  It's also -- that and it's also irrelevant.  Sustained.

Q.   (BY MR. STILLEY) Were you aware that boxes of Patrick's legal materials, his pleadings, were sent back to Oscar Stilley after he had tried to send them in to Patrick Webb?

A.   Yes.

Q.   You're aware that Oscar Stilley has a May trial date, correct, on the felony charge in Arkansas?

A.   The perjury charge?

Q.   Yes.

A.   Yes.

Q.   And if Oscar Stilley goes to prison, going to prison will devastate his ability to defend that action; correct?

A.   I'm not sure if it would.

Q.  Okay.  Do you have any reason to believe that Oscar Stilley's materials would be allowed to come to him when they can't -- they won't go to Patrick?

MR. O'REILLY:  Objection; relevance, Your Honor.

THE COURT:  Sustained.

Q.  (BY MR. STILLEY) Okay.  Can you just tell us that -- just admit that prison devastates the ability to defend against federal or criminal charges of any kind?

MR. O'REILLY:  Objection; relevance.

THE COURT:  Sustained.

MR. STILLEY:  Your Honor, if I may have a moment with counsel.

THE COURT:  Surely.

MR. STILLEY:  Pass the witness.

THE COURT:  Any redirect?

MR. O'REILLY:  None, Your Honor.

THE COURT:  Very well.  You may step down.

Does the government have any further witnesses?

MR. O'REILLY:  No, Your Honor.

THE COURT:  Does the defendant have any witnesses?

MR. STILLEY:  I'm going to have some witnesses. Could I do a motion for judgment as a matter of law at this point in time?

THE COURT:  Your motion is noted and denied.  I don't know that it's even a cognizable motion in this context,

but your motion is noted and denied.

MR. STILLEY:  Can I make sure, Your Honor, that you have considered all of the defenses that I laid out in my response, my claims under the Fifth and Sixth Amendments, venue, everything in my pleadings and you're rejecting that?

THE COURT:  Mr. Stilley, you have your record and response.  I have read every page of your response.

MR. STILLEY:  Okay.  I do not want to make the record burdensome, I just want to make sure that the court understands that I am raising all of those issues and waiving none.

THE COURT:  That is noted.

MR. STILLEY:  Thank you, Judge.

THE COURT:  Now, you say you will be presenting one or more witnesses?

MR. STILLEY:  Yes, Your Honor.

THE COURT:  Can you -- if you would, come to the lectern and give me just a quick, as concise as Mr. O'Reilly did this morning, a quick preview of what we may expect.

MR. STILLEY:  Sure, Judge, thank you.  That's productive and maybe we can make it easier.

I wanted to call my brother just very momentarily to get him to say that the reason that $3,000 went to him is because I had to do a petition for certiorari.  I'm not allowed to have a credit card.  The U.S. Probation won't allow it and he

had it so I sent it there.  He paid $2,100 for it.

THE COURT:  Wait, no, no, no.  You -- I'm sorry, you're disregarding the purpose of and the limitations.  You will be seated.

MR. STILLEY:  I also wanted to call Kory McClintock.

THE COURT:  Very well.  You will be seated.

MR. STILLEY:  Thank you, Judge.

THE COURT:  We'll take a -- let's make it, if possible, again I'll leave this in the hands of Ms. Lynn, if possible let's make it a 10-minute recess.  If we need to go 15 minutes, that's fine.

The court will be in recess.

(RECESS TAKEN.)

THE COURT:  Good afternoon again.  We're resuming in criminal 09-43 with the parties and counsel present as before.

Mr. Stilley, we'll have your first witness.

MR. STILLEY:  Your Honor, I decided not to call any witnesses.

THE COURT:  So I take it you rest without presentation of any evidence?

MR. STILLEY:  Yes.

THE COURT:  Very well.  I will -- I want to hear argument as to the violations that are asserted in the petition.  And, on that score, I will assure everyone that I

have thoroughly reviewed everything that's been submitted.

I want to hear argument on the violations in the petition and then I will -- if I feel like that I am in a position to confidently rule, I will rule this afternoon on the violations, and if I do that, then I will also hear concise argument with respect to disposition.

In other words, at this stage, I'm not prepared to address any matters relating to disposition and, of course, that's relevant only if I find one or more violations.  So I don't want to pinch the parties down too much, but again I realize -- I certainly do realize the importance of the matter.

I think that all things considered and in fairness to both sides, 15 minutes on a side by way of argument would be appropriate.

Does the government object to that?

MR. O'REILLY:  No, Your Honor.

THE COURT:  And does the defendant object to that?

MR. STILLEY:  No, Your Honor.

THE COURT:  Very well.  I'll hear argument from the government.

MR. O'REILLY:  Your Honor, actually the government will be much briefer than 15 minutes because we submitted a brief that basically covers how Mr. Stilley violated each of the conditions alleged in the petition as indicated by

Mr. Forsyth.

The violation number 1 is not based on his not informing Mr. Forsyth within 72 hours, it's the six months thereafter that he has not sought reasonable, lawful employment. Despite Mr. Forsyth reaching out and saying, hey, here is one possibility. And instead of engaging and trying to get full-time employment, Mr. Stilley has not.

He has given vague responses, and, again, after he was terminated from employment May 1st, the only employment he presented was one in which he would have been involved with inmates, again, which had been a problem at REVAMP and which caused concern both for REVAMP, as Ms. Rush testified, and for U.S. Probation.

THE COURT: Let me ask you a question on that. I pressed Mr. Forsyth a bit as to how -- how hard you pressed Mr. Stilley in terms of accepting menial employment and that sort of thing and Mr. Forsyth said that he was aware of a physical problem that was apparent -- would apparently influence how hard he would press Mr. Stilley.

I think I can safely say that Mr. Stilley may not -- may not have made a serious effort to find employment, but here is the problem. I also need to -- on any of these I need to find at least a modicum of wilfulness.

Are we together on that?

MR. O'REILLY: Fair enough, Your Honor. The only

thing we would point to is this is not a week, a month, two months, this is six months going on where despite Mr. Forsyth repeatedly asking "what are you doing," other than that first effort in May to -- which Mr. Stilley quickly located a potential employer with Mr. McGuire in which he would be working with inmates, and that's, I think, the problem U.S. Probation has.  That's the problem the government has is that's not where Mr. Stilley should be right now --

THE COURT:  Very well.  You may continue.

MR. O'REILLY:  With respect to violation number 2, Mr. Stilley does not provide adequate information for U.S. Probation to assess how much he can pay in restitution.  He provides copies of bank account statements but when asked about deposits into that, refuses to provide answers other than with respect to the 25 -- approximately $2,500 deposit, it was from lawful purposes.

He is not providing the, you know, appropriate and adequate information for which he is under supervision.  The government is mindful of if it is a valid Fifth Amendment privilege, we're not -- don't want to trample on that, but the problem is telling the probation officer, hey, I made this money from X, if it was lawful, there's no way it was a Fifth Amendment privilege.

THE COURT:  Say that again.

MR. O'REILLY:  If it was a lawful income, the

government is hard pressed to imagine any scenario where there would be a valid Fifth Amendment privilege asserted for that.

With that being said, that is not the gravamen of the violations here. It is his not providing adequate information about his, you know, his other income which we will now touch on with respect to violation number 3.

And that's the one in which Mr. Forsyth came across both communications from and a copy of a check and a reference to a $1,000 payment from Misty Webb. The $3,000 payment was issued not to Mr. Oscar Stilley but it was in the name of Mr. Stephen Stilley. And while -- Oscar Stilley has provided the government with, just today, an explanation of what had happened there, there's no evidence in the record.

But the problem is all of the communications we have are between Misty Webb and Oscar arranging to pay money and the fact that Patrick Webb, who is referenced in the Misty Webb emails, is somebody who during Mr. Stilley's cross-examination of Mr. Forsyth, he acknowledged in the form of a question that he was helping him draft and edit legal materials.

And Mr. Stilley also asked Mr. Forsyth about if he had accepted money from inmates for services, was he supposed to just cut them off. In the form of the question Mr. Stilley indicated that Mr. Forsyth's interpretation of what he was seeing in these communications was, in fact, a fair and accurate representation that inmates were paying Mr. Stilley

for services.

And as Mr. Forsyth indicated, the $3,000 cashier's check, the $1,000 check that was referenced but no picture of it from Misty Webb, did not get deposited into the Arvest checking account as required by his terms of -- the terms of his release, of supervision. That is a violation of the third -- the third violation alleged in the petition.

During the last revocation hearing one of the allegations that was, in fact, proven and for which Mr. Stilley was revoked was the failure to allow the installation of the monitoring equipment.

When he came out, he did allow the installation of it and for quite some time it was installed and it was providing U.S. Probation with information about his communications including where it gets identified, the communications with Misty Webb, the communications with other individuals.

In July Mr. Stilley decided he didn't want to pay because the price had gone up. And so he notified the IPPC, the monitoring company, that he would no longer authorize them to automatically debit his account. They placed him on an invoice billing system which he has not paid to this day.

When Mr. Forsyth discussed this matter with Mr. Stilley, Mr. Stilley's concern wasn't how do we get this right so I can, you know, make sure the monitoring will work, we work out some -- you know, work out some way of I can pay it maybe at a

reduced rate, it was, when will they come and take it out, when will it be removed.  That was Mr. Forsyth's testimony.

And -- but the company didn't remove it, neither did U.S. Probation.  It was continuing to work even though he wasn't paying for it until early September when IPPC notified U.S. Probation and Ryan Forsyth there was an automatic notification, we're not getting any communications, haven't since September 3rd.

And when Mr. Forsyth made inquiry of Mr. Stilley about what had happened, Mr. Stilley did not give him an answer.  And that's a big -- a recurring problem with supervising Mr. Stilley is he doesn't answer those questions, he feels he doesn't have to.

So because he refused to pay, that was a violation and then when it ceased being monitored, Mr. Forsyth was still able to determine that Mr. Stilley was having communications with individuals, inmates, as demonstrated in Government's Exhibit 1 and 2 after September 8th.  So he was communicating with inmates on an unmonitored cell phone or computer which is a violation of the terms as well.

We've already walked through the violations of the requirement that he not communicate with persons with felony records absent permission from U.S. Probation.  While he was at REVAMP, there was a procedure set out where, hey, if you need to communicate with folks at -- incarcerated persons as

part of your duties at REVAMP, give us, you know, give REVAMP the list and then Mr. Forsyth will be able to have the list. He never provided that. That's what Patti Rush said and it's also what Mr. Forsyth said.

And the record is replete with instances of Mr. Stilley communicating with persons with felony records. And all the ones identified in our pleading, in our memorandum, are well after his termination from REVAMP, so certainly not in any way as part of his employment. That is a violation of standard condition number 8 as alleged in the fifth violation.

There is a whole bunch of communications between Mr. Stilley and Mr. Potter and Mr. Stilley and Mr. Webb that constitute the unauthorized practice of law. They're discussing potential remedies, it's all -- it's laid out in the government's pleading. I don't need to belabor the court with a rereading of those, but it is quite clear to the government that Mr. Stilley continued to give legal advice to practice the unauthorized practice of law despite the condition of supervised release requiring that he not do so.

Finally -- well, not finally, there's two more things. Mr. Stilley walked into a courthouse in Crawford County, Arkansas, and registered to vote. He marked the petition -- the registration answer never been convicted of a felony that has been pardoned or otherwise taken care of. He did hand write "I have not been lawfully convicted -- I have not been

convicted by a lawful court of a lawful felony."  I maybe misstated it slightly.

Mr. Stilley through his questioning seems to argue, that gave notice that I had a felony, it just wasn't lawful.  No, he did not say "I was convicted in this court, it was not lawful," he just hand wrote, "I've never been lawfully convicted by a lawful court."

THE COURT:  I need to see Government's Exhibit 3.

MR. O'REILLY:  Exhibit 3.

THE COURT:  If you can get it off the stand and give it to the clerk or give the clerk a copy.  I thought there was a copy on the stand.

MR. O'REILLY:  There was, Your Honor, I actually took them down.  I got it, Your Honor.

THE COURT:  Thank you.  You may continue.

MR. O'REILLY:  Mr. Stilley is well aware that he was convicted by this court.  He doesn't like it.  He professes to disagree with it, but there's no question this is a disagreement with a fact, not a misunderstanding of it.

When he walked in, he knew that he was a felon and has been charged by the State of Arkansas.  He does not dispute he's the one that walked in, he marked that box, he signed it.  He received the voter registration card.  Mr. Stilley was arrested for this by Arkansas authorities.

This constitutes violation number 8 which was he did not

notify Mr. Forsyth, in fact, the only time he raised it was when Mr. Forsyth came out to provide him with the summons that contained the allegation that -- well, what are the allegations?  That you were arrested and did not notify probation within 72 hours.  The problem is he didn't notify probation for two weeks.  More than two weeks.

And finally violation of the terms of paying restitution. Mr. Stilley has filed materials with the U.S. Attorney's Office and then told Mr. Forsyth, I'm not -- I'm not paying restitution until, you know, the U.S. Attorney's Office and the U.S. Attorney answer my questions.  That's not an excuse to not pay restitution.

Mr. Stilley also alluded to the fact that Arkansas currently has him at a zero balance for the years that he was convicted for and for which this court ordered restitution. Based on his pleadings last week, I actually did make inquiry and that's something I will be bringing to the court's attention at a later date is the need to modify the restitution order because Arkansas is not accepting them which was a surprise to us.

But that does not change the fact that he did not notify Mr. Forsyth of this, he simply said, I'm not paying.  Because if Mr. Stilley doesn't want to do something, he simply doesn't.

The government believes it has proved each of the

allegations as required and would ask that the court find Mr. Stilley in violation.

THE COURT: I'll hear from the defendant.

MR. STILLEY: May it please the court, and I trust that this court, I can rely on the same stipulation after the government's case that the court fully understands all the written pleadings.

THE COURT: That's understood.

MR. STILLEY: Thank you, Judge, very much and I'll do my best to limit the time and if you have questions, of course, I'll do my best.

THE COURT: Well, Mr. O'Reilly used just about all of his 15 minutes and you should feel free to take whatever time up to that time period you see fit.

MR. STILLEY: Thank you, Judge. I do appreciate that, absolutely. That's very meaningful and it's a very important part of our society is the right to be heard at a meaningful time in a meaningful manner and I do appreciate it. And it's very pertinent in this case.

I do want you to understand as to employment I lost the job, found another one that I felt was perfect. I didn't realize these things that they were saying about me. There's no evidence in the record that they showed that say, Oscar, look at all this. So I didn't see that picture so it doesn't make sense.

184

But I do want you to understand that it wasn't very long after that that it came that I -- I registered to vote and got involved in *Stilley versus Thurston*. And, oh, my goodness, that litigation just ate time unbelievable.

THE COURT: Mr. Stilley, please bear in mind this is argument, not testimony.

MR. STILLEY: Sure.

THE COURT: So I need you to confine your argument to evidence that is presently in the record.

MR. STILLEY: Sure, I understand that. Nonetheless, the testimony does show that Oscar Stilley was working on a book, working hard, finished the book and about that time Oscar Stilley got hit with, okay, he gets locked up and then he gets served with the summons for a revocation hearing or prosecution in this case.

And honestly, Your Honor, I would argue that it's -- doesn't really make sense to go to an employer and ask them to hire you when you're facing a very real possibility of losing your liberty, plus when -- once this is settled, if liberty is still there at all, then it would be distinctly possible to get a job. And I want you to know that that's certainly not wilful. I have to have some income, some way to survive, so I just want you to understand my side of that.

Now, as to this unauthorized practice of law, I hope you don't give any credit to that. The reason I tried to get some

information about where that took place is because the law is different in different places.  So if that becomes anything serious whatsoever, I want a chance to brief this court based on what is -- what is before the court.

And as to the Fifth Amendment violations you doubt, let's remember Oscar Stilley tried to get a ruling last time, tried afterwards, was not able to get that, and this time I'm pretty sure that you would have to agree that the record does not show any wilfulness whatsoever on that.

Now, the U.S. -- you've read the pleadings, the U.S. Supreme Court has cases saying that a judgment taken without one of two things, either a valid waiver of counsel, or Sixth Amendment counsel is void.  There's a difference between void judgments and voidable judgments.  Those judgments are not voidable, they are void.

Okay.  I had four cases, presented it to five lawyers at the Arkansas Attorney General.  They defaulted on all of it, and that's in the record, that's not record.  I don't see how anyone can say it's wilful to take the U.S. Supreme Court's decisions at face value especially when high-powered lawyers default on the pleadings that have been filed before the court.

And I also -- it's also in the record that in that case Oscar Stilley had request for admissions that would have exonerated him.  The case was dismissed on the 30th day.  On

the 31st day those admissions would have been admitted.

THE COURT:  Now, run that by again.

MR. STILLEY:  Okay.  In *Stilley versus Thurston*, Oscar Stilley filed requests for admissions that included the admission that Oscar Stilley is not guilty because document 752 is not valid, and document 338, both of the judgments are not valid.

I asked for an order accelerating a response.  No response to that.  The magistrate -- neither the magistrate or special master nor the court ordered a response.  There was a special master ordered and that's in our record here, the special master was ordered.  That is only done when there are facts to be decided.  And when there are facts to be decided, the party is entitled to do discovery.  I got my discovery taken out from under me, boom, it's gone.

Now, I do want you to understand this, once again in the record, it is in the record or it's in the opinions of the Arkansas Supreme Court, in addition to referring Oscar Stilley to the prosecutor, they also referred him to the -- it's the county clerk, not the circuit clerk, that keeps the records of voters.  And the county clerk has not canceled Oscar Stilley's voter registration.  So Oscar Stilley still has opportunity to file a lawsuit for declaratory judgment and serve that same discovery.

All right.  If they couldn't answer that, five hotshot

lawyers at the Arkansas Attorney General's Office, if they can't answer, if they can't respond, if they can't deny, nobody can up in little Crawford County either.

So here is what I'm saying, I have very important opportunities to get the facts that I have been thus far denied in my litigation. Here is the point. That that's not a wilful violation when you do this. When you're standing on a legal right and you have a good basis for it, it's not a wilful violation.

So, let's see. Oh, one other thing that I do want to discuss here and that is the fact that the information, the criminal information charging me with perjury, does not have one single complete sentence. I showed it, linked to it. That's legal, that's strictly legal, and the rules of taking judicial notice are very clear. That pleading shows that, okay, either the Crawford County prosecutor is completely illiterate or Oscar Stilley is not guilty of perjury.

So with that kind of thing out there, I mean, I don't see how the court could find any wilfulness on that. Certainly not to the preponderance of the evidence, something that needs to be punished. And, of course, if I get a chance then I intend to find at least suitable employment to do what is necessary.

So does the court have any questions?

THE COURT: I have no questions.

MR. STILLEY:  Okay.  And I'm not -- I don't want to say anything at the wrong time.

THE COURT:  Say that again, please.

MR. STILLEY:  I don't want to say anything at the wrong time but I still have that form if and when you get ready for it.  The form.

THE COURT:  Have you filled it out?

MR. STILLEY:  I have filled it out.

THE COURT:  If you'll please give it to the clerk.

MR. STILLEY:  Thank you, Judge.

THE COURT:  And I take it that concludes your argument?  Well, I tell you what, confer with Mr. Reynolds and after you confer with Mr. Reynolds you can tell me whether this conclude your argument.

MR. STILLEY:  Thank you, Judge.

Your Honor, that's all my argument.

THE COURT:  Very well.  I am prepared to make my findings on the nine asserted violations.

MR. O'REILLY:  Your Honor, I think the court is still waiting for the documentation.

Did you hand that up, Mr. Stilley?

MR. STILLEY:  I'm sorry.  May I approach?

THE COURT:  You may approach.

I see the affidavit and I will hand it to the clerk. Thank you very much.

I'm going to make my findings based on the presentation that has been made as well as the exhibits that are in evidence.  And my findings are as follows as to the nine asserted violations:  We started out with Patti Rush, the president of the organization called REVAMP, and really the only things from her testimony that I need to note at this point are that she agreed with Probation Officer Ryan Forsyth that the defendant could communicate with incarcerated persons on a list.  The important part is "on a list."  And the list should include the name and what case it was associated with.

Mr. Stilley gave REVAMP a list at the outset but Ms. Rush was very clear in her testimony that although that occurred at the outset, that did not happen again.  And that, of course, is relevant to the question of whether during the period of Mr. Stilley's employment by REVAMP whether there was any interrelationship between individuals on that list and individuals with whom Mr. Stilley would otherwise have had contact or communication.

Ms. Rush also testified that Mr. Stilley was terminated on April 30 of 2024.  The letter was -- and she was very firm about the fact that the verbal termination occurred on April 30th of 2024.  The letter was dated the next day.  And so we can debate all day about whether the effective termination was April the 30th or May 1st.  The verbal termination took place on April 30th and I'm going to come back that.

Although I will note at this point also that Ms. Rush made it very clear and this although not technically relevant it bears noting that the United States Probation had no role in the termination decision.

The second witness, of course, was Probation Officer Ryan Forsyth who is a probation officer in the Western District of Arkansas.  And Mr. Forsyth's testimony was candid and forthcoming.  I will note that at the outset.  And indeed on those matters whether it be on direct or cross as to which the answer might favor Mr. Stilley, Mr. Forsyth was equally candid and forthcoming.

Mr. Forsyth made it very clear, and, of course, this is actually a matter that is safe to assume but it's still worth noting that Mr. Forsyth satisfied himself that Mr. Stilley was made well aware of the conditions governing his supervised release and this took place in an intake meeting in Ft. Smith.

We have three exhibits.  Government's Exhibit 1 is the petition as filed on October 10th of this year.  It is also in the record at docket entry number 792.  We also have Government's Exhibit 2 which is the exhibits which were filed on October 30th and are in the record at docket entry number 802.

And then we have Government's Exhibit 3 which is the transcript and some related documents relating to the voter registration matter pending in -- not only in the Arkansas

Supreme Court but also in Crawford County.  And I'll certainly come back to that.

The first violation as everyone is aware is an asserted violation of standard condition number 7 relating to working full time.  And, on that score, I find from the testimony of Mr. Forsyth both on direct and cross that after Mr. Stilley's employment was terminated by REVAMP he had communication with Mr. McGuire of McGuire Engineering and that related to the possibility of employment with River Valley Torah Assembly.

I gather from that testimony from Mr. Forsyth that the defendant did desire to work for River Valley Torah Assembly and Mr. Forsyth did not approve.  He was concerned that employment by River Valley Torah Assembly might be, as Mr. Forsyth put it, "for his own purposes."  And upon inquiry from the court Mr. Forsyth clarified that his concern about his, "Mr. Stilley's own purposes," would have been specifically with respect to the possibility of Mr. Stilley engaging in the unauthorized practice of law.

Mr. Forsyth did suggest that Mr. Stilley pursue a customer service opportunity but Mr. Stilley did not end up being employed by that organization.  The record is unclear and perhaps necessarily unclear as to exactly why that didn't pan out or what the interaction or communication was between Mr. Stilley and the customer service organization.

That all -- that sequence also included a discussion

between Mr. Forsyth and Mr. Stilley relating to Mr. Stilley's need to get a job and that triggered my -- my questions about how hard Mr. Stilley was pressed to get a job and how menial Mr. Forsyth would have insisted Mr. Stilley go in terms of employment to satisfy standard condition number 7.

And Mr. Forsyth also articulated concerns about Mr. Stilley's physical condition as that might implicate Mr. Still's ability to work at least 30 hours a week as required by standard condition number 7.

If I were to rule on the basis of suspicion that Oscar Stilley was lackadaisical about seeking employment, I would rule against Mr. Stilley on asserted violation number 1. However, I can't rule just on the basis of suspicion. And I cannot find -- when I import a certain element of wilfulness into this requirement, I cannot find by a preponderance of the evidence that Mr. Stilley violated standard condition number 7 as asserted in violation number 1.

I'm uneasy about reaching a conclusion this afternoon based on the record that I have that Mr. Stilley was, if you will, either willfully or otherwise inexcusably lackadaisical in his request for employment. Mr. Stilley is therefore acquitted as to violation number 1.

This brings me to the asserted violation number 2 which relates to the financial affidavit. And, on that score, I'm going to provide the parties with clarity as to where the

court stands on the issue of the applicability and --
applicability and availability of a plea of the Fifth
Amendment by way of compliance with requirements associated
with supervised release.

My beginning point is the Supreme Court's decision in
*Lefkowitz*, L-e-f-k-o-w-i-t-z, *v. Turley*, a 1973 decision
reported at 414 U.S. 70.  And in that case at page 78 the
court stated, and I quote, "The amendment not only protects
the individual against being involuntarily called as a witness
against himself in a criminal prosecution, but also privileges
him not to answer official questions put to him in any other
proceeding, civil or criminal, formal or informal, where the
answers might incriminate him in future criminal proceedings."

That is, if you will, a beginning point in terms of my
analysis of the availability of the Fifth Amendment to Mr.
Stilley by way of response to the requirement that he provide
various kinds of financial reports.

I then go to the case of, also from the Supreme Court,
*Minnesota v. Murphy*, 465 U.S. 420, a decision by the Supreme
Court in 1984.  And in that case on page 429 the court dealt
with the question of whether the individual involved must have
some rational basis for believing that his response or his
answer will incriminate him.

And on page 429 the Supreme Court said, and I quote,
"Thus it is that a witness confronted with questions that the

government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself.  If he asserts the privilege, he may not be required to answer a question if there is some rational basis for believing that it will incriminate him at least without at that time being assured that neither it nor its fruits may be used against him in a subsequent criminal proceeding."

That's at page 429.

And in this quotation and in all the other quotations I'm going to make I am omitting internal quotations and citations.

So that gives us some clarity in terms of what the individual must perceive in order to validly assert the Fifth Amendment protection.

Then we come to a decision from the Tenth Circuit, *United States v. Vonbehren*, that's V-o-n-b-e-h-r-e-n, 822 F.3d 1139, a decision from 2016, and in that case, that case involved a threat by the government to seek revocation of the defendant's supervised release.  And as you'll see that certainly did involve, if you will, a complication relating to the Fifth Amendment.

On page 1144, and, again, I'm eliminating internal quotations and citations, the court, and this would have been by Judge Seymour no less, and I quote, "The Fifth Amendment's privilege against self-incrimination applies not only to

persons who refuse to testify against themselves at a criminal trial in which they are the defendant but also privileges them not to answer official questions put to them in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate them in future proceedings. Significantly a defendant does not lose his protection by reason of his conviction of a crime.  To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating and compelled."

And also on page 1144 the court continued, and I quote, "The Fifth Amendment privilege is only properly invoked when the danger of self-incrimination is real and appreciable as opposed to imaginary and unsubstantial.  The protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer."

The court concluded on page 1148, referring to the Murphy case, and I quote, "The court in *Minnesota v. Murphy* has spoken directly on the issue of Fifth Amendment compulsion in the analogous probation context.  The court's decision in *Murphy* and the prior penalty cases it relies on leads us to conclude that the government's threat to revoke Mr. Vonbehren's supervised release for his failure to answer potentially incriminating questions rises to the level of unconstitutional compulsion."

That is on page 1148 of the F.3d.

And then finally on page 1150 the court observed that, and I quote, "A state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threats of incrimination."

In other words, according to the Tenth Circuit you -- a grant, if you will, of use immunity is a prerequisite to compelling an individual in the revocation context to provide answers that might incriminate him.

Now, with all that understood I go back to the early 1950s, another Supreme Court case, *Hoffman v. United States* which is at 341 U.S. 479, it's a 1951 case.  And that case is not directly in the supervision context but it's still -- it's still relevant.  Bear with me.  It's still relevant for the reasons I think you'll see.

In that case the Supreme Court said at pages 486 and 487, and I quote, "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime.

But this protection must be confined to instances in which the witness has reasonable cause to apprehend danger from a direct answer.  The witness is not exonerated from

answering merely because he declares that in so doing he would incriminate himself.

His say-so does not of itself establish the hazard of incrimination.  It is for the court to say whether his silence is justified and to require him to answer if it clearly appears to the court that he is mistaken."

Now, we come getting more practical and examining how these rules are applied where the privilege is invoked.  I come to *United States v. Pierce*, a Ninth Circuit decision from 1977.  That is at 561 F.2d 735.

And that case is certainly by any standard the most illuminating decision I have found in terms of how the privilege must be invoked.  And this is in the -- an opinion by Judge Wallace with Judge Shirley Hufstedler and District Judge Frey, F-r-e-y, participating.

And the opinion began as follows on pages 737 and 738: "Pierce failed to comply with a condition of probation requiring him to reveal certain financial information. Probation was revoked and Pierce appeals contending that the condition was violative of the Fifth Amendment and thus invalid."

So and as everyone is aware within certain outer bounds we tend to equate probation revocation matters with supervised release matters.

The court continued on page 738, and I quote, "One of the

conditions imposed at the suggestion of the government was that Pierce testify under oath before a representative of the United States Attorney's Office on all questions as to his financial condition relating to amounts and locations of all assets."

Then a little bit later on page 738 the court continued noting that Mr. Pierce, "Refused to testify before the United States Attorney as to his financial condition at the ensuing probation revocation proceeding.  Pierce admitted that he had failed to comply with the challenged condition.  The district judge revoked probation implicitly rejecting Pierce's contention that the condition infringed upon his Fifth Amendment privilege against self-incrimination."

Well, for purposes of my analysis, I equate the requirement that Pierce testify under oath about his finances to questions put by the U.S. Attorney's Office, I equate that with the condition that requires financial affidavits in this case.

The discussion continues on page 741, and I quote, "A proper application of this standard requires that the Fifth Amendment claim be raised in response to specific questions propounded by the investigating body.  This permits the reviewing court to determine whether a responsive answer might lead to injurious disclosures, thus a blanket refusal to answer any question is unacceptable."  I repeat, "Thus a

blanket refusal to answer any question is unacceptable."

The court concluded on page 741 and 742, and I quote, "Because Pierce in his role as a witness made a blanket refusal to answer any questions, we are unable to evaluate his Fifth Amendment claim.  Therefore we need proceed no further in determining the extent of Pierce's Fifth Amendment rights in the circumstances of this case.

Pierce has failed to show that the condition infringed upon his constitutional rights nor has he provided any other justification for his refusal to comply with the condition of probation.  Thus we hold that the district court committed no error in revoking probation."

Now, why did the Ninth Circuit reach that conclusion?  I think the logic of that is easily apparent from the other cases I've quoted from including particularly the Vonbehren case where the Tenth Circuit made it very clear that, and I will come back to this, "That the protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer."

The court also said that the -- that the danger of self-incrimination must be real and appreciable.

Then we come over to the *Hoffman* decision, and this does bear some emphasis, the protection must be confined to instances where the witness has a reasonable cause to apprehend danger.  We've already covered that.  And, "The

witness is not exonerating from answering merely because he declares that in so doing he would incriminate himself.  His say-so does not of itself establish the hazard of incrimination.  It is for the court to say whether his silence is justified."

Mr. Stilley has left me no basis upon which to reach conclusions as to whether his silence is justified.  He has reached -- he has asserted blanket claims of Fifth Amendment immunity.  That in and of itself yields no basis upon which the court, let alone a probation officer, could reach conclusions as to whether the Fifth Amendment is validly asserted.  Blanket assertions are all together unhelpful, they are not supported by the governing case, law and Mr. Stilley's blanket assertions of Fifth Amendment protection will be of no avail to him.

So now let's examine where we are then.  Under violation number 2 the requirement is that the defendant shall, "Upon request of the probation officer complete a personal financial affidavit and authorize the release of any and all financial," and I presume that would be financial information.

Again, that was met with a blanket assertion of Fifth Amendment protection which I have concluded is unavailable.

Mr. Stilley, the testimony quite clearly shows, refused to provide documents to show some of the deposits into the Arvest bank account, and that includes very notably, and this

is important, the source of those deposits.

For the purpose of numerous supervised release conditions it is essential, where a person is a convicted fraudster like Oscar Stilley, it is essential to know the source of that individual's funds.  The fact that they're deposited into a checking account is relevant but it is certainly far from the entire story.  Because it is essential especially in a case in which an individual such as Oscar Stilley has reaped hundreds of thousands of dollars of ill-gotten gains as we saw 15 years ago in the trial that the probation office have reliable information from the offender as to the sources of his funds.

What does the testimony show?  The testimony shows that Mr. Stilley refused to account for the source, for instance, of a $2,540 deposit.  All he would say would be to assert that he got the money legally.

Mr. Forsyth was quite understandably concerned that the $2,540 was derived from the unauthorized practice of law. We'll come to that, but Mr. Stilley has clearly violated condition number 2 by his adamant and I must say blanket refusal under the Fifth Amendment to respond to or to comply with the requirement of filing a financial affidavit.

And, on that score, I can't really -- I really can't help but refer briefly to the case of the co-defendant Lindsay Springer.  Mr. Springer has lived down his supervised release. I didn't hear a peep from Lindsay Springer or about his

compliance.  So Lindsay Springer managed to get through his supervised release complying and without having to defend a revocation matter in -- when he was governed by the exact same conditions of supervised release.

This brings me to asserted violation number 3, and there is some interrelationship between asserted violation number 3 and violation number 2.  There is also some interrelationship between asserted violation number 3 and the unauthorized practice of law violation which is violation number 6 as you will see.

Violation number 3 relies on special condition 2A and specifically that the defendant, "Shall maintain a checking account in the defendant's name and deposit into this account all income, monetary gains, or other pecuniary proceeds and make use of this account for payment of all personal expenses. All other bank accounts and other financial accounts must be disclosed to the probation officer."

That brings us to -- and, again, this also to some degree implicates violation number 6 relating to the unauthorized practice of law.  We have a $3,000 cashier's check with the remitter being Misty Webb.  This was payable to Stephen Stilley.

The probation officer, Mr. Forsyth, asked questions about that payment.  Mr. Stilley refused to answer questions about that payment.  That brings us to pages, broadly speaking,

pages 49 through 70 of Exhibit Number 1.  And I'm not going to go through each of those pages individually, but pages 49 through 70 evidence numerous communications that collectively give rise to a strong implication of unauthorized practice of law and they also show a long course of communication between Mr. Stilley and Misty Webb without any indication of substantive involvement of Stephen Stilley in that dialogue.

I find quite readily that the payment by that cashier's check was funds destined for Oscar Stilley.  And, again, he refused to talk about that payment when inquired of by the probation officer.

To elaborate on that just a bit, I'm looking at the incoming text that's shown on page 51, that is an incoming text from Misty Webb that sheds considerable light on the nature of the relationship and what was expected of Mr. Stilley.

We then come over to another incoming text, SMS which is shorthand for a text, on page 57.  Again, it sheds light on the nature of the relationship and she talks about, "I will be sending money weekly to you to get started," which I think is rather telling.

On the next page another incoming text in which Misty Webb states, "I just got done with my taxes.  They said I get $2,900 so I will be sending it all within two weeks and his grandma is getting the other $2,000."  That was on February

204

7th of this year.  And then a little bit later on the same day she says again "I wanted to let you know about it so we will have you paid off soon, thank you."

Finally we come to the communications later -- yet later on February 7th, again, a very repetitious series of -- not repetitious but a very detailed series of communications entirely by SMS between 1:19 p.m. on that day and 1:26 p.m. on that day obviously showing that Misty Webb considered it very important to get this payment out.  She was assuring -- giving that assurance to Oscar Stilley, not to Stephen Stilley, and on the next page we have the check payable to Stephen Stilley.

And that obviously relates to accounting for cash received and depositing your income into your checking account, not into your brother's checking account, and that also obviously has a direct bearing on asserted violation number 6 relating to the unauthorized practice of law.

Reviewing once again what is required by condition number 2A as set forth in violation number 3, I find that the petition is meritorious as to violation number 3.  Mr. Stilley clearly failed to account for all of his income, monetary gains, or other pecuniary proceeds, and the petition is granted as to violation number 3.  And, again, we'll have a little bit more on violation number 6 a little bit later.

This brings me to violation number 4 relating to the monitoring software.  And it is very clear from the evidence

before me that the problem with maintaining, if you will, that software's subscription arose shortly after midyear of this year.  The probation office was notified by IPPC Technologies that Mr. Stilley had revoked his authorization to automatically charge his bank account.

As a result IPPC removed Mr. Stilley's bank account information from their payment system and they tried to solve the problem by putting him on an invoice basis.  That did not work.  And on August 30th Mr. Stilley informed probation that he had no intentions of paying any bills sent to him from IPPC.

That obviously created a problem between Mr. Stilley and the probation office in terms of Mr. Stilley's compliance. That, if you will, came to a head a little bit later on in early September.  Specifically on September 8th IPPC provided notification indicating that there had been no communications received from Mr. Stilley's smartphone device.

The next day telephone contact was made with Mr. Stilley, and this was described by Mr. Forsyth in his testimony, and Mr. Stilley stated that he would not answer the probation office's questions about the status of his compliance or payment of the billings from IPPC Technologies.

It's noteworthy that the U.S. Probation Office did not uninstall this software and IPPC did not uninstall this software at that juncture.  In fact, the what I call the

subscription was canceled because of Mr. Stilley's refusal to pay the cost of the subscription and Mr. Stilley would not explain the lack of communications from his device, a matter as to which Mr. Forsyth had every good reason to be intensely curious.

I find that the petition is meritorious as to violation number 4 and is granted as to violation number 4.

This brings me to violation number 5 which is the one that we have referred to generically as the prohibition on communicating with a felon. It states as follows, the petition -- or, I'm sorry, the condition: "You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer."

And the evidence very clearly shows by way of material in Exhibits 1 and 2 that Mr. Stilley through the Corrlinks account and otherwise had multiple communications with individuals confirmed to have had prior felony convictions or individuals as the assertion in violation number 5 states were recently involved in criminal activity. And it's very clear from Mr. Forsyth's testimony that he did not in any event give permission for any such communications.

On that score, again, I note that the defendant used the

207

Corrlink system as well as text messages and relevant to that is Exhibit 1 at page 82. Bear with me just a minute. Exhibit 1 at page 82, Mr. Daniel is a felon and an inmate, and that communication obviously shows, first of all, communication between Mr. Stilley and Mr. Daniel, which is relevant to violation number 5, and the unauthorized practice of law.

Specifically the reference by Mr. Daniel in the final sentence of that showing what Mr. Daniel expected, "I would like to know how do we go about getting time back." In this context I have no trouble associating that with the unauthorized practice of law by Mr. Stilley. Those matters like that relating to the rights of inmates are matters as to which Mr. Stilley had had considerable experience.

I also note in this respect Exhibit Number 2 at page 66. Actually that's page 69, communications with Michael Dicks, D-i-c-k-s, and which we start with the communication at page 69 which is not as to Mr. Stilley as an initial matter damming in the sense that it's not a communication by Mr. Stilley. But it does show as we go through the -- the email at page 70, yes, there was communication between Mr. Stilley and Mr. Dicks who was a convicted felon and his status as a convicted felon is amply shown by the judgment in a criminal case from the Western Direct of Missouri.

We also have communication with -- between Mr. Stilley and Thomas Hammett, another convicted felon, that is shown

beginning at page 77 of Exhibit 2 and that consists of an email on September 22nd of this year.  It doesn't really matter that it doesn't relate to the practice of law because that's not what we're talking about.

What we're talking about here is violation number 5 relating to communications with felons.  And Mr. Stilley is plainly communicating with a felon in the person of Thomas Hammett as shown on pages 76 and 77.  That continues on over to page 81, and the communication is obviously ongoing.

Lest there be any doubt, the record clearly shows that Thomas Hammett was, in fact, a convicted felon having been convicted of possession of methamphetamine with intent to distribute and possession of a firearm in furtherance of a drug trafficking crime in violation of 18, United States Code, Section 924(c).

We also have the record at -- in Exhibit Number 1 at page 86 with communication between Mr. Stilley and Rafael -- that's R-a-f-a-e-l -- De La Cruz Jiminez.  This is in June.  We start on page 86 of Exhibit Number 1 and that is a communication to Mr. Stilley.  This is not unauthorized practice of law but, again, now we're focusing on violation number 5, communicating with a felon.

And the felony -- the felon status of Mr. Jiminez is, number one, is easily reflected by the record; and, number two, the communication back from Mr. Stilley to Mr. De La Cruz

**United States District Court**

Jiminez is shown at page 87, and so that is yet another instance of communication not approved or authorized by the probation officer by Mr. Stilley with a convicted felon.

We then come to Mr. Ken Nickell, N-i-c-k-e-l-l. His status as a convicted felon is shown by Exhibit 2 at page 95 and page 95 is an inmate inquiry from Sebastian County, Arkansas, and then we come over to page 98 and we see, in fact, that Mr. Nickell had entered a plea of no contest to the charge of terroristic threatening in the first degree, a Class D felony.

So that is the status of Mr. Hammett and, once again, we have the communications with Mr. Hammett that are shown earlier in Exhibit Number 2, again, specifically the emails by Mr. Stilley at page 77, another one at page 78, and another one at page 79, which is yet another instance of unauthorized communication between Oscar Stilley and a convicted felon.

It was very clear from the testimony of Mr. Forsyth that Mr. Stilley never sought permission from Mr. Forsyth as his probation officer to communicate with these convicted felons.

And, by the way, I shouldn't leave out Jason potter. That is also shown amply by reference Exhibit Number 2 beginning at page 118. And those communications between Mr. Stilley and Mr. Potter occurred in late September beginning at least in terms of what's relevant here with a communication on September 29th shown at page 119 of Exhibit 2, an email from

Mr. Stilley to Mr. Potter.

And we also have other similar correspondence at pages 118 and 120 and 121 and 122 and 123 amply showing communication between Mr. Stilley without authorization and this convicted felon Jason Potter.

We then come to the matter of unauthorized practice of law. And that -- on that score, the communication with Mr. Potter is also quite relevant. I note especially, for instance, from page 116 Mr. Stilley stating, "Let me draft something up for you. I'll send it on Trulincs." That's T-r-u-l-i-n-c-s. "You'll see formatting issues. Everything will be okay when I send you the hard copy. I'll just want you to tell me what needs to be changed."

And let me digress on that just a little bit. There are several items in this record relating to communications between Mr. Stilley and inmates in which he is, in fact, doing things that we would ordinarily expect a paralegal to do, but he is also engaging in communications with various inmates that show that he is also, in fact, applying legal judgment, applying law as he understands it to the facts as he understands the facts, which is clearly beyond anything that a paralegal would do.

So, again, to repeat, because this is, I think, a significant point, yes, Mr. Stilley does do things in these communications and does say things in these communications

that partake of paralegal work, things that we might expect a good experienced paralegal to do, but beyond that and clearly beyond that Mr. Stilley is also with a number of these inmates engaging in the practice of law.

So let's digress another bit and talk about what constitutes the unauthorized practice of law. I will, first of all, note that the prohibition is in special condition number 5 of the original judgment in this case. And what's my beginning point? My beginning point is, first of all, the definition of practice of law in Arkansas and then we come to a statutory provision that heads off in a slightly different direction.

In Arkansas, and I quote from the supreme court of Arkansas website, "The practice of law includes any services of a legal nature rendered outside of courts and unrelated to matters pending in the courts including conveyancing the preparation of legal instruments of all kinds and, in general, all advice to clients and all action taken for them in matters connected with the law."

So that is a definition of the practice of law. Now, I will note that Arkansas has chosen to criminalize one subset of the practice of law and that is in Arkansas Code Title 16, Section 16-22-501. This statute defines only the criminal unauthorized practice of law and it relates to practice of law in the realm of property damages and personal injury.

212

A vast -- and every lawyer in the courtroom including a disbarred lawyer and the person of Mr. Stilley knows that a vast array of legal services in addition to representation in personal injury and property damage matters can, in fact, constitute the practice of law.

So on one hand we have what I would easily call a conventional definition of the practice of law, but then when it comes to criminalizing the unauthorized practice the Arkansas legislature narrowed it down somewhat.  Arkansas law does define the practice of law and I will emphasize separately Arkansas criminalizes the unauthorized practice of law in some instances.

However, in this case the government does not have to rely on the Arkansas criminal statute because the operative prohibition in this case is the unauthorized practice of law prohibition in the special conditions.  In other words, the fact that Arkansas has a provision criminalizing one category of unauthorized practice of law is a matter wholly apart from the question of how the practice of law is defined in the first instance in Arkansas.

So then to come back just briefly to the situation of Mr. Webb and we look at in Exhibit 2 at pages 169 and 173, Mr. Stilley sends an email to Mr. Webb on September 12th, that's actually an incoming email to Mr. Stilley.  On the same date Mr. Stilley responded, "I sent an edited version of your

**United States District Court**

remedies request back to you.  Carefully review for errors and omissions.  I can edit easily from this end.  Make things easy on yourself if you can."  That is the practice of law.  That is not paralegal work.

He then goes into paralegal or even secretarial work in the next paragraph where he talks about double hard returns, but page 169 of Exhibit 2 clearly shows the court the practice of law and specifically practice of law unauthorized in violation of his conditions of supervised release on behalf of Mr. Webb.

Then we come over to page 173 in which it is -- there is communication about the remedies request.  We come to page 174 where on the 5th of September of this year Mr. Stilley advises Mr. Webb, "I don't think you need an affidavit.  You need to allege facts which if true would show a right to relief.  If they challenge your version of events, you can add an affidavit or get testimony.  You have signed your pleading under penalty of perjury.  That's essentially testimony."  And he goes on.  That, once again, is clearly the practice of law.

But there's more.  As to Mr. Webb we over at page 182, again, we have a continuation of that dialogue.  I'm not going to burden the record by going through that chapter and verse, but we do have a continuation of that dialogue which essentially shows the continuation of the practice of law by Mr. Stilley purportedly for the benefit of Mr. Webb.  And that

relevant portion of the record goes over to page 209.

It is also relevant to focus finally on the correspondence on August 22nd, an email from Mr. Stilley to Mr. Webb, "After you've attempted to resolve informally, you will need to document those attempts.  When you talk to the counselor, get the form and review it, he'll probably help you set it up in the proper way.  If you do the BPS, you'll need the proper documentation of attempted informal resolution."

That is on page 210 and that dialogue is also evidenced by the email on August 22nd at page 211 and the email, again, by Mr. Stilley on 8:57 a.m. on August 22nd.

And, again, I'm not going to burden the record by quoting chapter and verse from that email, but that's at page 213 of Government's Exhibit Number 2.  That beyond any doubt reflects the unauthorized practice of law by Mr. Stilley.

He says -- says things in those communications that conceivably could be communicated one way or another by a nonlawyer, but it would still be the practice of law.  It would fall within the Arkansas definition of the practice of law, and the unauthorized practice of law prohibition that's relevant in this case is the one set forth in the special conditions in this case.

That brings me to violation number 7.  Violation number 7 relates to the voter registration.  And the text of the relevant condition is quite simple, "You must not commit

another federal, state or local crime." And in July of this year Mr. Stilley did submit a registration application in Crawford County. Material relevant to that is shown in Government's Exhibit Number 3. And he answered no to the question "Have you ever been convicted of a felony without your sentence having been discharged or pardoned?" He answered "No." He wrote in, if I can read it, "I have not been lawfully convicted of a felony by a lawful court."

Well, not only was that irrelevant to the question, that was false. It was another false statement to a government official, but I don't need to dwell on that. That notation by Mr. Stilley is utterly irrelevant to the application of Arkansas law to get him a voter registration card. How do we know it was irrelevant? Because he got a card. Crawford County issued a voter registration card.

I quite easily sustain the petition, grant the petition, as to violation number 7. And if I omitted to say the same as to violation number 6, yes, I also sustain the petition and grant the petition as to violation number 6.

This brings us to violation number 8 which relates to contact with law enforcement within 72 hours. I frankly am a bit at sea with respect to how all of this unfolded. I do note the allegations on page 4 of Government's Exhibit Number 1. I do have the testimony of Mr. Forsyth that he was not notified by Mr. Stilley until the 16th of October. I credit

216

that as being abundantly believable just as I credit all of the other testimony of Mr. Forsyth as abundantly believable, but I do note also that Mr. Stilley -- Mr. Stilley's arrest became known very promptly to Mr. Forsyth.

I don't think that I can lay my fingers on a statute that in this context says no harm, no foul, but I am going to acquit Mr. Stilley on violation number 8 because the uncontradicted testimony is that Mr. Forsyth became aware of Mr. Stilley's arrest very shortly and within 72 hours after that arrest.

I also note there's some controversy as to how -- exactly how that timing unfolded and what happened on what day and what day may have been the Sabbath and I do note that. And I hasten to emphasize as I've already said, but it bears repeating, I credit the testimony of Mr. Forsyth. Mr. Forsyth's testimony was in every respect credible but I find no harm, no foul and I acquit Mr. Stilley on violation number 8.

That brings us to violation number 9, restitution. Mr. Stilley has made no payments since July 8th of this year. If we were here shortly after July 8th or even within a matter of weeks it might be a little different story but because I do -- I do import onto violations like this as is the case with the requirement to work at least 30 hours a week, I do import an element of wilfulness and I find wilfulness in this instance.

217

Here we are in November.  The petition was filed on October 10th.  The last payment was made on July 8th.  Knowing what I know about Mr. Stilley, knowing about the availability of resources to him, if nothing else by way of some sort of -- of employment or services rendered, I am very hard put to find, and I don't find, that he lacked the ability to make some sort of restitution payment.

He had a very substantial restitution obligation to the State of Arkansas.  He to this day continues to have a very substantial restitution obligation to the Internal Revenue Service, and I -- I really readily find all things considered, given the lapse of time, given what it would take to make some sort of a payment to avoid being accused of a violation of the restitution obligation, I readily find that Mr. Stilley has committed the violation asserted in the violation number 9 and that one is adjudicated against Mr. Stilley.

That concludes my findings as to the violations, and let me ask, Ms. Lynn, have I given you the appropriate announcement on all 9 of them?

DEPUTY COURT CLERK:  Yes, sir.

THE COURT:  Very well.  I will hear concise argument, and I do mean concise argument, from the government as to disposition.

MR. O'REILLY:  Your Honor, we've already made clear, I think, in our pleading, Mr. Stilley has been here before.

**United States District Court**

If the court revokes and then puts him on supervision again we will be back here again.  We seek what Mr. Gallon sought last time, revoke supervision, two years of imprisonment, and we're done.  He can go on.  He will live his life no longer putting U.S. Probation to the task of supervising someone who is this resistant to supervision.

THE COURT:  Thank you.

Mr. Stilley, I'll hear concise argument as to disposition.

MR. STILLEY:  Thank you, Your Honor.  My number one consideration is the ability to defend.

THE COURT:  Is to what?

MR. STILLEY:  The ability to effectively defend, because it's not just this, I've got a felony in Arkansas. I'm going to have a face a jury trial on that in May so what I would request is you decide what you think is a just however many months and -- but let me serve it on home confinement. That was the last form of confinement I had before supervised release and, if I say so myself, I did a good job of it.

Obviously I would ask for a -- I mean, I want less, the lowest I can get, and I do want a stay pending appeal, but... Okay, the other thing is that the harshest thing on Oscar Stilley is to get sent directly today to the jail.  If I got like 30 days to surrender, Your Honor, I would respect this court's judgments and I will surrender.

It would actually be much easier, I have my brother Stephen Stilley here, so if you ordered Oscar Stilley to his last place of physical confinement in the BOP, that would be Yazoo City, Yazoo City Camp.  Once again, I mean, if you tell us to go right now, we'll go right now and go there because that is less disruption to my ability to defend than having to go to the jail.  Last time I went to the jail and then I went to Cimarron -- to the transfer center and then went to Cimarron.  Very disruptive.

THE COURT:  So you're requesting the federal institution at Yazoo City?

MR. STILLEY:  If I can't get home confinement.  Is home confinement off the table?

THE COURT:  Well, I need to hear the rest of what you have to say and then I'll make my decision.

MR. STILLEY:  Sure.  And also honestly, I mean, Your Honor, if the court even just said, I'll give you home confinement during the pendency of your appeal, that's satisfactory.  Once that's done, I don't care, I mean, you can send me on to some other place, I just want to be able to defend effectively.

THE COURT:  Thank you.

MR. STILLEY:  Thank you, Judge.

THE COURT:  To start at the end first, I'm tempted to keep Mr. Stilley under supervision but I'm not going to do

220

so.  If I had violence or dope dealing or things like that, it would be a different story.  But it's a close question because Mr. Stilley is a predator and I see strong indications of continued predatory conduct in the record that we have in this case.

He was shown beyond any doubt to be a predator in the trial of this case back in approximately 2009.  Not only was he a predator, he exercised his predatory instincts in combination with Lindsey Springer on vulnerable people who were desperate to solve their tax problems and they were remorselessly fleeced by Mr. Stilley and Mr. Springer.

So I'm aware Mr. Stilley is a predator.  I have seen signs of those -- continued signs of those tendencies in the record before me.  That would ordinarily be a strong indication that I should keep Mr. Stilley one way or the other under supervision, but other objectives of supervision I am satisfied are unattainable and Mr. Stilley's continued lawlessness, which would not surprise me, Mr. Stilley's continued lawlessness will have to be dealt with other than by revocation of supervised release.

Under 18, United States Code, Section 3583(a) -- I'm sorry, Section 3583(e), I am required to consider certain sentencing factors set forth in Section 3553.  Specifically as authorized by Section 3583(e), I consider the following sentencing factors under Section 3553:  The nature and

circumstances of the offense, the history and characteristics of the defendant, the need to afford adequate deterrence to criminal conduct, the need to protect the public from further crimes of the defendant, the need to provide the defendant with needed educational or vocational training or other treatment.  That is really not in play here.  And the kinds of sentencing and sentencing ranges established with respect to this defendant as well as pertinent policy statements, the need to avoid unwarranted sentencing disparities and the need to provide restitution.

Taking all those matters into account, I do note we have three counts, each one of which could carry two years.  I could -- I could pick a number as to each one of those counts such as 10 months each for a total of 30 months of incarceration.  I could pick a number like two years for each of those counts and impose a term of incarceration of six years, but I -- my duty is to impose a sentence that is sufficient but not greater than necessary to achieve the statutory objectives of sentencing.

I do take into account the nature and circumstances of Mr. Stilley's offenses as proven by the government.  I do take into account his history and characteristics.  I am concerned about the potential for further predation on others by Mr. Stilley.  That predation as I have already mentioned was clearly shown as part of Mr. Stilley's relevant conduct at the

trial that we had coming up on 15 years ago.

Nevertheless, I am also aware of my duty as I've already said once to impose a sentence that is sufficient but not greater than necessary to achieve the statutory objectives of sentencing.

Mr. Stilley this afternoon faces a statutory maximum of six years. I conclude that that would be excessive. The main drivers of my sentencing decision are, in fact, the nature and circumstances of the offense on which I have commented at some length as well as the history and characteristics of the defendant.

Mr. Stilley is fraud personified. He was fraud personified 15 years ago and he is fraud personified to this day. And Mr. Stilley has not, so far as I can tell, changed his ways in any significant respect.

I am unsure as to what I could do to deter Mr. Stilley from further criminal conduct and for that reason I don't really regard deterrence as a significant factor, aggravating factor, with respect to my sentencing decision.

The need to protect the public is in play. Mr. Stilley was a predator back in -- was proven to be a predator back in 2009 or thereabouts when we had our jury trial in this courthouse and the record before me shows significant potential for continued predatory activity involving, once again, people who are vulnerable and desperate. That's the

sort of people that he fleeced as proven at the trial of this case, as found by the jury and that's the sort of people that he still, as shown by this record, inclined to fleece, I dare say without any compunction on his part.

Taking all those matters into account, it is my conclusion that a sentence that is sufficient but not greater than necessary to achieve the statutory objectives of sentencing is a sentence of 24 months of incarceration to be followed by no supervised release.

Mr. Stilley has violated his conditions of supervision as I have found. We have criminal history category of 1 and a Grade B violation as the most serious violation resulting in a guideline range of four to ten months. I find that to be insufficient.

The provisions of the Protect Act do apply. I have considered the Section 3553 factors that are made relevant under Section 3583(e).

It is the order of the court that the defendant is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 24 months. I do impose the restitution balance as set forth in the original judgment. However, I will consider and entertain a motion, an appropriate motion by the government, to redirect restitution to the Internal Revenue Service.

Does the government intend to file such a motion?

MR. O'REILLY:  Yes, Your Honor.

THE COURT:  Very well.  A stay pending appeal is denied.  I do note that the defendant requests designation to the federal institution at Yazoo City.  The judgment will state that the court does recommend that, if eligible, the defendant be designated to the federal institution at Yazoo City.

Mr. Stilley, you're further advised that from this order you do have the right of appeal to the United States Court of Appeals for the Tenth Circuit and if you cannot pay the costs of an appeal you may apply for leave to appeal without payment of costs for the transcript of the record and an attorney at government expense.  Notice of appeal must be filed with the clerk within 14 days or you may request the clerk now to spread same of record.

Mr. Stilley, I do not lightly remand you to the custody of the marshal but I do remand you to the custody of the marshal to begin serving your sentence.  And I'm not going to wax eloquent as to the reasons for that.  I believe that in my findings today I have amply demonstrated the reasons for which I believe remand to the custody of the marshal is called for in this case.

Anything further in this matter this afternoon from the government?

MR. O'REILLY:  No, Your Honor.

**United States District Court**

THE COURT:  From the defendant?

MR. STILLEY:  Your Honor, may I approach to submit a -- I've already got a notice of appeal signed ready to submit.

THE COURT:  You may give it to the court security officer.

MR. STILLEY:  Thank you.

THE COURT:  Anything further from the defendant?

MR. STILLEY:  Yes, Your Honor.  I didn't -- I didn't catch about the potential to self surrender.  Is that denied?

THE COURT:  That is denied.

MR. STILLEY:  Okay.  Thank you, Judge.

THE COURT:  Court will be in recess.

    (Proceedings concluded.)


**REPORTER'S CERTIFICATION**

   I CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

                    CERTIFIED:      S/Laura Griffin
                                  Laura Griffin, RMR, CRR
                                  United States Court Reporter
                                  333 W. 4th Street, RM 411
                                  Tulsa, OK  74103
                                  (918) 699-4879
                                  laura_griffin@oknd.uscourts.gov


**United States District Court**